**IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| GAUGHAN GAMING-NATIVE LIGHTS, LLC, and GAUGHAN GAMING-TONKAWA, LLC, | )<br>)<br>)<br>) |
| Plaintiffs, | )<br>) |
| v. | ) Case No. CIV-11-330-HE |
| | ) |
| THE TONKAWA TRIBE OF INDIANS OF OKLAHOMA and THE TONKAWA TRIBAL GAMING COMMISSION, | )<br>)<br>)<br>)<br>) |
| Defendants. | |

## AMENDED COMPLAINT

Plaintiffs Gaughan Gaming-Native Lights, LLC ("GGNL") and Gaughan Gaming-Tonkawa, LLC ("GGT") (collectively "Plaintiffs" or "Gaughan Gaming") for their claims and causes of action against the Tonkawa Tribe of Indians of Oklahoma (the "Tribe") and the Tonkawa Tribal Gaming Commission ("TTGC") allege and state as follows:

## THE PARTIES, JURISDICTION, & VENUE

1. GGNL is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.

2. GGT is a Nevada limited liability company with its principal place of business in Las Vegas, Nevada.

3. The Tonkawa Tribe of Indians of Oklahoma is a federally recognized Indian Tribe, having its principal place of business in the City of Tonkawa, Kay County, Oklahoma.

4. The Tonkawa Tribal Gaming Commission ("TTGC"), an agency of the Tribe, created by and to serve the purposes of the Tribe pursuant to tribal resolution, is authorized to license and regulate tribal gaming operations conducted on the lands of the Tribe pursuant to Tonkawa Tribal Gaming Ordinance §3.3 as amended by Tonkawa Tribal Council Resolution T-R-02-06 and T-R-16-09 as authorized by 25 U.S.C. §2710 of the Indian Gaming Regulatory Act ("IGRA") and the Tonkawa Tribal Gaming Commission Regulations (the Gaming Regulations") promulgated by the Commission.

5. In 2007, GGNL and GGT entered into separate, but identical in all material respects, Amended and Restated Management Agreements with the Tribe. (the "Management Agreements").

6. The Management Agreements were duly approved by the Chair of the National Indian Gaming Commission, as required by the Indian Gaming Regulatory Act. The approved Management Agreements have not been amended and remain in full force and effect (on May 30, 2007 as to the Native Lights Casino and on September 11, 2007 as to the Tonkawa Casino).

7. The TTGC authorized the Tribe to enter into the approved Management Agreements.

8. Section 21.1 of the Management Agreements provides,

> It is mutually agreed that except as specifically provided in this Agreement, during any kind of controversy, claim, disagreement, or dispute, Manager [Gaughan Gaming] shall remain in possession of the Facility as Manager; and the Tribe and Manager shall continue their performance of the provisions of this Agreement. **Manager shall be entitled to seek injunctive relief from a civil court of competent jurisdiction . . . to maintain possession in the event of a threatened eviction during any dispute, controversy, claim, or disagreement arising out of this Agreement. The Tribe expressly waives its sovereign immunity for disputes covered by this Section 21.1.** (Emphasis supplied).

9. The Tribe and Gaughan Gaming are in the midst of a dispute arising under the approved Management Agreements, and pursuant to §21.1 of the approved Management Agreements, Gaughan Gaming is entitled to remain in possession and in control of the management of the Casinos and to continue to perform as Manager of Casinos.

10. In addition, §16.1(b) of the Management Agreements provides,

> Subject, at all times, to the prohibition against compelling, overturning, negating or in any manner modifying any Tribal Governmental Action as set forth in Section 16.2 below, the Tribe hereby grants to the Manager a limited waiver of sovereign immunity with respect to the following purposes and for not others…
>
> **For the purpose of allowing the Manager to take any and all actions necessary to contest, or seek appeal or review of, the decisions or procedures of the Tribal Gaming Commission** or other regulatory body, subject to the provisions of the Ordinance creating the Tribal Gaming Commission or such other body; nothing in this clause (b), or the Ordinance, shall limit any right of the Manager to take the actions described in clause (a). (Emphasis supplied.)

11. Accordingly, under the approved Management Agreements, the Tribe and the TTGC have waived sovereign immunity as to this lawsuit, and this is a civil court of competent jurisdiction to enforce the Management Agreements, with venue proper in Kay County.

### THE TRIBE REMOVED GAUGHAN GAMING IN VIOLATION OF THE APPROVED MANAGEMENT AGREEMENTS

12. The approved Management Agreements entitle Gaughan Gaming to stay in possession of the Tribe's Native Lights Casino and Tonkawa Casino (the "Casinos") in the event of a dispute under the Management Agreements. Approved <u>Management Agreements</u> at §21.1.

13. A dispute arose under the approved Management Agreements in early 2010. In April, 2010, pursuant to §20.1 of the approved Management Agreements, Gaughan Gaming gave notice to the Tribe of its intent to submit the dispute to arbitration, under the terms of the approved Management Agreements.

14. On August 17, 2010, Gaughan Gaming served notice of its demand for arbitration to the American Arbitration Association and the Tribe.

15. Gaughan Gaming successfully managed the Casinos under the approved Management Agreements until September 28, 2010. Since Native Lights opened in July 2006, the Casinos have generated over 52 Million Dollars in net revenue to the Tribe.

16. On September 28, 2010, without cause and in violation of §21.1 of the approved Management Agreements, the Tribe forcibly removed Gaughan Gaming and its employees from the Casinos. It had never given notice to Gaughan Gaming that it

intended to take such action, denying Gaughan Gaming the knowledge necessary to seek injunctive relief to prevent such action pursuant to §21.1 of the approved Management Agreements.

17. That same date, the Tribe locked Gaughan Gaming out of the Casino's bank accounts, which were controlled by Gaughan Gaming pursuant to the approved Management Agreements.

18. Further, on September 28, 2010, the Tribe filed a Complaint with the TTGC (in conjunction with the TTGC's summary suspension of Gaughan Gaming's license described *infra*).

19. Before the Tribe summarily ousted it, Gaughan Gaming had performed its obligations in accordance with the approved Management Agreements. Gaughan Gaming had done everything in its power to foster the renewed vigor and success of the Tribe's previously shuttered casino operations.

20. In February 2006, before the Tribe engaged Gaughan Gaming, the Tonkawa Tribe's gaming operations were shut down by the National Indian Gaming Association ("NIGC") for violations of the IGRA due to several infractions but mainly because it did not have an NIGC approved management contract to operate the Tonkawa Casino. Gaughan Gaming was not involved with the Tonkawa Tribe when the infractions occurred. The Tribe was put on probation by the NIGC in 2006, and remains on probation.

21. In fact, Gaughan Gaming is the reason the Tribe was able to reopen its gaming operations.

22. The NIGC approved Gaughan Gaming as the manager of the Casinos under the approved Management Agreements.

23. Gaughan Gaming financed the reopening of the Tribe's gaming activities. Specifically, Gaughan Gaming established a $2 Million revolving line of credit for the Tribe to finance pre-opening costs, expenses, and ongoing working capital in connection with the Native Lights Casino and the Tonkawa Casino (collectively the "Casinos"). As part of that financing, Gaughan Gaming financed and constructed the Tribe's second, largest, and most profitable casino – Native Lights Casino.

24. The Tribe executed a Promissory Note in the amount of $2 Million in favor of Gaughan Gaming in connection with the revolving line of credit.

25. The approved Management Agreements provided for payment to Gaughan Gaming of a fee comprised of 30% of the Net Profits of the Casinos. The fee operates as compensation for Gaughan Gaming's management services under the Agreements and also for the substantial risk Gaughan Gaming undertook to loan the money necessary to reopen the Casinos.

26. Prior to the Tribe's forced eviction of Gaughan Gaming, Gaughan Gaming handled every aspect of the Casino's operations, including without limitation advertising, marketing, employee-customer relations, and game play.

27. Each of these elements of the Casinos' operations ties directly to the Casinos' profitability and ultimately the Net Profits as determined under the approved Management Agreements.

28. The Tribe has now eliminated all of Gaughan Gaming's power and authority under the approved Management Agreements--in direct violation of the terms of those Agreements.

29. The approved Management Agreements specifically state that Gaughan Gaming is entitled to remain in possession of the Casinos and to carry out its duties under the approved Management Agreements in the case of a dispute under the Agreements.

30. Gaughan Gaming has been and will continue to be irreparably harmed if it is not restored to its position as manager of the Casinos under the terms of the approved Management Agreements.

31. The Tribe currently controls all aspects of the Casinos, including all fees and expenses incurred and paid by the Casinos, and therefore control the Casinos' profitability, which in turn determines the fee due to Gaughan Gaming.

32. It will be impossible for Gaughan Gaming to determine the lost income under the approved Management Agreements because of the Tribe's actions and omissions and because a calculation of such lost income will necessarily require evaluation of intangible factors such as customer relations and public relations.

33. Notably, the approved Management Agreements entitling Gaughan Gaming to remain in possession of the Casinos have not terminated and remain in full force and effect.

34. Accordingly, Gaughan Gaming requests entry of a judgment directing that the Tribe immediately restore Gaughan Gaming as Manager of the Casinos pursuant to

the terms of the approved Management Agreements, and place Gaughan Gaming in full possession of the Casinos until further order of the Court.

## THE TTGC SUSPENDS GAUGHAN GAMING'S LICENSE WITHOUT CAUSE AND IN VIOLATION OF ITS OWN PROCEDURES

35. Beginning in early 2010, the TTGC notified Gaughan Gaming of purported grounds for suspension or revocation of Gaughan Gaming's License.

36. The grounds that the TTGC alleges are based on stale and outdated disputes relating to events that occurred long in the past and that have long since been cured pursuant to the terms of the approved Management Agreements or based on honest good faith disputes between Gaughan Gaming and the Tribe, which are subject to the pending arbitration.

37. Regardless, the TTGC insists on asserting such events as grounds for suspending and ultimately revoking Gaughan Gaming's License.

38. The TTGC did not make such assertions or begin its attempt to revoke Gaughan Gaming's License until disputes arose between Gaughan Gaming and the Tribe under the approved Management Agreements.

39. The same day that the Tribe evicted Gaughan Gaming from the Casinos, and in concert with the Tribe, the TTGC summarily suspended Gaughan Gaming's License without due process and notice under the guise of "protecting the integrity of gaming activities within the Commission's jurisdiction" and "preserving public health, safety, good order and general welfare of the Tribe."

40. The TTGC acted outside the terms of the Gaming Regulations when it suspended Gaughan Gaming's License.

41. Specifically, the TTGC's Order of Suspension was issued in violation of minimum due process procedures.

42. Moreover, the Gaming regulations require that the TTGC make a finding that there was "an imminent threat to health, safety or the integrity of gaming…" The TTGC made no such finding in its Order of Suspension.

43. In addition, the Gaming Regulations at §16.3.1(a) require that Gaughan (i) had been convicted of a "felony…or misdemeanor…involving gambling, theft, dishonesty or fraud…"; or (ii) "violated the IGRA, the Compact, the Code or these regulations;" or (iii) had performed acts, had reputations or had associations "that would adversely affect public confidence and trust in the integrity of gaming…" or which poses a "threat to the public interest or to the regulation and control of gaming, or create or enhance the danger of unsuitable, inappropriate or illegal practices, methods, or activities in the conduct of gaming…" or "is included on any valid and current exclusion list from another jurisdiction in the United States." One of the above listed criteria must be found before a person can lawfully be excluded from a gaming facility.

44. No such finding was made by the TTGC in the Order of Suspension.

45. Instead, acting in concert with the Tribe on September 28, 2010, the TTGC issued an Order of Suspension consisting of largely conclusory statements, which did not meet the requirements of the Gaming Regulations, and which violated minimum due process procedures.

46. As noted above, the Tribe also filed a Complaint against Gaughan Gaming on September 28, 2010, seeking to permanently revoke Gaughan Gaming's License. The filing of the Complaint initiates a "Disciplinary Hearing" proceeding under §13.2 of the Regulations.

47. By agreement of the TTGC and Gaughan Gaming, the Complaint was stayed pending a hearing on Gaughan Gaming's appeal of the Summary Order of Suspension.

48. On February 28, 2011, the TTGC upheld the Order of Suspension, even though it did not meet the TTGC Regulations requirements (the "Final Suspension Order").

49. Gaughan Gaming appeals the Final Suspension Order under §16.1(b) of the Management Agreements because the Order is based upon erroneous findings of fact, and erroneous conclusions of law, and is in direct violation of applicable Regulations which limit the authority of the TTGC to order any summary suspension.

50. The Final Suspension Order is based upon erroneous application of the facts and the law.

51. Specficially, the Final Suspension Order is is void under the Regulations because

        a. The Order was issued in direct violation of the minimum due process procedures which control orders of immediate suspension and exclusion, as set out in the Regulations approved by the National Indian Gaming Commission, which are binding on the TTGC as well as procedural safeguards for the gaming licensees it regulates;

      b.    The Order is null and void because the TTGC did not make any finding, as required by the Regulations, §5.15.2, that there was "an imminent threat to health, safety or the integrity of gaming . . . ." *Id*. Such a finding is a mandatory prerequesite before a gaming license may be immediately suspended without notice.

      c.    The stated allegations in ¶¶ 1 through 9 of the Order are a recitation of stale and outdated disputes between the parties, and/or constitute honest disputes of fact and contract interpretation made in good faith by Gaughan, and/or are the subject of good faith disputes and proceedingsalready pending between the TTGC and other licensees (Greg Wright and Don Lanners), and/or constitute good faith disputes for which prior request for hearing has been made to the TTGC (alleged nonpayment of fines), and/or constitute intermittent and technical violations which havebeen corrected and do not pose any immediate hazards or threat to the integrity of gaming, and/or are so vague and general that they evidence no immediate hazards or threat to the integrity of gaming, none of which, together or singularly, state facts which would warrant a finding of any immediate threat to health, safety, or the integrity of gaming.

      d.    The Executive Director of the TTGC has made no determination, as required by the Regulations, §16.3.1, that Gaughan (i) had been convicted of a "felony . . . or "misdemeanor . . . involving gambling theft, dishonesty or fraud . . ." (§16.3.1(a)), or (ii) "violated the IGRA, the Compact, the Code or these regulations." (§16.3.1(b)), or (iii) had performed acts, had reputations or had associations "that would adversely affect public confidence and trust in the integrity of gaming . . ." or which poses a "threat to the public interest or to the regulation and control of gaming, or create or enhance the danger of unsuitable, inappropriate or illegal practices, methods or activities in the conduct of gaming . . ." (§16.3.1(c)), or "is included on any valid and current exclusion list from another jurisdiction in the United States." (§16.3.1(d)), (collectively referred to as the "Prohibited Acts"). Such a determination is a mandatory requirement before a person may lawfully be excluded from a licensed gaming facility (§16.3.1).

(e)    The stated allegations in ¶¶ 1 through 9 of the Order are a recitation of stale and outdated disputes between the parties, and/or constitute honest disputes of fact and contract interpretation made in good faith by Gaughan, and/or are the subject of good faith disputes and proceedings already pending between the TTGC and other licensees

>(Greg Wright and Don Lanners), and/or constitute good faith disputes for which prior request for hearing has been made to the TTGC (alleged nonpayment of fines), and/or constitute intermittent and technical violations which have been corrected and do not pose any immediate hazards or threat to the integrity of gaming, and/or are so vague and general that they evidence no immediate hazards or threat to the integrity of gaming, none of which, together or singularly, state facts which would warrant a determination by the Executive Director of the TTGC that Gaughan had committed any one of the Prohibited Acts.

52. On March 1, 2011, the TTGC lawyer requested the stay be lifted, and on March 11, 2011, the TTGC filed a "Motion for Summary Judgment" requesting permanent revocation of Gaughan Gaming's License and set it for hearing on March 31, 2011. Gaughan Gaming has been directed to respond to the Motion for Summary Judgment on or before March 29, 2011.

53. The Gaming Regulations do not provide for resolution of a licensure proceeding by summary judgment.

54. To the contrary, the Regulations require adjudication on such matters at hearing where the TTGC will be required to meet its burden of proving by a preponderance of the evidence that Gaughan Gaming's License should be revoked, where Gaughan Gaming is entitled to be represented by counsel, to subpoena witnesses for live testimony, and call and cross-examine witnesses in person, where the credibility of their testimony may be challenged.

55. Accordingly, by letter dated March 16, 2011, Gaughan Gaming asked the TTGC to withdraw its Motion for Summary Judgment. The TTGC refused to do so.

56. In addition, the TTGC Regulations provide that in any "proceeding" to revoke a license, Gaughan Gaming is "entitled" to request the issuance of subpoenas and call and cross-examine witnesses. Gaughan Gaming, in response to the notice of the summary proceedings and hearing on March 31, 2011, requested that subpoenas be issued for the deposition of witnesses with information relevant to the Complaint on March 28-30, prior to the March 31 hearing. Although delegated the authority to do so, the Executive Director of the TTGC refuses to issue the subpoenas as requested.

57. The TTGC approved the engagement of Gaughan Gaming under the Management Agreements, but the TTGC now seeks to use its administrative capabilities to assist the Tribe in its breach of the approved Management Agreements by revoking Gaughan Gaming's License without cause in a joint attempt between the TTGC and the Tribe to put the Tribe into a permanent management capacity at the Casinos.

58. The facts make clear that the Tribe and the TTGC have conspired against Gaughan Gaming in a conspiracy to evict Gaughan Gaming from the Casinos and to relieve the Tribe from its obligations under the approved Management Agreements it negotiated and signed.

59. Permanent revocation of Gaughan Gaming's license will cause irreparable harm to Gaughan Gaming's reputation and its ability to conduct its management operations in the gaming industry.

60. Accordingly, Gaughan Gaming requests entry of a temporary restraining order, and injunctive relief maintaining the status quo as to Gaughan Gaming's License and directing that Gaughan Gaming's License remain in full force and effect until such

time as the disputes underlying the licensure proceedings are resolved in the arbitration, including without limitation suspension of all further briefing, hearing or other proceedings with respect to the purported Motion for Summary Judgment filed by the TTGC.

WHEREFORE, Plaintiffs Gaughan Gaming--Native Lights, LLC and Gaughan Gaming--Tonkawa, LLC request judgment for injunctive and temporary relief in their favor as follows:

A.   Directing that Gaughan Gaming be immediately restored to its position as Manager of the Casinos, as provided in the approved Management Agreements, with all rights under the approved Management Agreements to remain in effect pending resolution of the arbitration proceedings invoked by Gaughan Gaming;

B.   Directing that the Tribe immediately deliver possession and management control of the Casinos to Gaughan Gaming;

C.   Enjoining the Tribe from any actions designed to remove Gaughan Gaming from its position as manager of the Casinos, until conclusion of the Arbitration, or further order of the Court;

D.   Directing that Gaughan Gaming's License remain in full force and effect until such time as the underlying disputes are resolved in the arbitration;

E.   Enjoining the TTGC from attempting to revoke the License of Gaughan Gaming via summary proceedings such as a motion for summary judgment;,

F.   Restraining the TTGC from conducting a hearing on the Motion for Summary Judgment on March 31, 2011 or requiring Gaughan Gaming to file any written

response or otherwise defend the Motion for Summary Judgment, until further order of the Court;

  G. Overruling the Final Suspension Order and directing that the TTGC proceed according to this Court's order;

  H. Awarding Gaughan Gaming its reasonable costs and attorneys fees; and

  I. Awarding all other such relief as this Court deems necessary and just.

          Respectfully submitted,

          *s/ Jimmy Goodman*
          Jimmy Goodman, OBA #3451
          Regan Strickland Beatty, OBA #20349

          -Of the Firm-

          CROWE & DUNLEVY
          A Professional Corporation
          20 North Broadway
          Suite 1800
          Oklahoma City, OK 73102-8273
          (405) 235-7700
          (405) 239-6651 (Facsimile)

          -And-

          D. Michael McBride III, OBA # 15431

          -Of the Firm-

          CROWE & DUNLEVY
          a Professional corporation
          500 Kennedy Building
          321 South Boston Avenue
          Tulsa, Oklahoma 74103-3313
          (918) 592-9800
          (918) 592-9801 (Facsimile)

ATTORNEYS FOR PLAINTIFFS
GAUGHAN GAMING-NATIVE LIGHTS,
LLC AND GAUGHAN GAMING-
TONKAWA, LLC

**CERTIFICATE OF SERVICE**

      I hereby certify that on this 28th day of March, 2011, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing. Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Gary S. Pitchlynn
O. Joseph Williams
Stephanie Moser Goins
Pitchlynn & Williams, PLLC
124 East Main Street
P.O. Box 427
Norman, Oklahoma 73070
Email: gspitchlynn@pitchlynnlaw.com
jwilliams@pitchlynnlaw.com
smgoins@pitchlynnlaw.com

Roger F. Wiley
Rossette & Associates PC
P.O. Box 1667
McAlester, OK 74502
Email:  rwiley@rosettelaw.com

                                            /s/ Jimmy Goodman
                                            Jimmy Goodman