# DEFENDANT TONKAWA TRIBAL GAMING COMMISSION

# EXHIBIT A

1

2

3

4

5

FILED

2004 JAN 29  A 7 49

CLERK, US DIST. COURT
EASTERN DIST. OF CALIF
AT FRESNO
BY_____
        DEPUTY

6          IN THE UNITED STATES DISTRICT COURT FOR THE

7                 EASTERN DISTRICT OF CALIFORNIA

8

9   CASCADE ENTERTAINMENT GROUP,    )    No. CV-F-04-5135 REC/LJO
    LLC, et al.                     )
10                                  )    ORDER DENYING PLAINTIFFS'
                                    )    APPLICATION FOR TEMPORARY
11                                  )    RESTRAINING ORDER
              Plaintiff,            )
12                                  )
         vs.                        )
13                                  )
                                    )
14  PICAYUNE RANCHERIA OF THE       )
    CHUKCHANSI INDIANS, et al.,     )
15                                  )
                                    )
16            Defendant.            )
                                    )
17  _____)

18       On January 26, 2004, the court heard the Application for

19  Temporary Restraining Order filed by plaintiffs Cascade

20  Entertainment Group, LLC and Karen Sock.

21       Upon due consideration of the record before the court and

22  the written and oral arguments of the parties, the court denies

23  plaintiffs' application.

24       On January 21, 2004, Cascade Entertainment Group, LLC, and

25  Karen Sock filed a Complaint for Breach of Contract; Breach of

26  Implied Covenant of Good Faith and Fair Dealing; Violation of



1

1   Tribal Gaming Ordinance; and Promissory Estoppel.   Named as

2   defendants are the Picayune Rancheria of the Chukchansi Indians,

3   Chukchansi Economic Development Authority, Tribal Gaming

4   Commission of the Picayune Rancheria of the Chukchansi Indians,

5   Silas L. Summers, Jr., Patrick Hammond III, Thomas M. Walker, and

6   Does 1-70.   The Complaint prays for injunctive relief only,

7   seeking an injunction enjoining defendants from:

8               (1) prohibiting Sock from performing her
                duties as Assistant General Manager/Vice
9               President of the Casino; (2) prohibiting Sock
                from entering the Casino; (3) maintaining
10              custody of Sock's temporary gaming license;
                (4) not honoring Sock's temporary gaming
11              license through its period; and (5) denying
                Sock's two-year gaming license until this
12              matter can be arbitrated.

13          Cascade is a development and management company that

14   developed and constructed the Chukchansi Gold Resort and Casino

15   (Casino).   On July 16, 2002, Cascade, the Picayune Rancheria of

16   Chukchansi Indians (Tribe), and the Chukchansi Economic

17   Development Authority (CEDA) entered into a Second Amended and

18   Restated Management Agreement (Management Agreement).   Pursuant

19   to the Management Agreement, Cascade manages and operates the

20   Casino.   Cascade asserts that it hired Karen Sock to be Assistant

21   General Manager/Vice President of the Casino on May 9, 2003.   The

22   Tribe asserts that Ms. Sock was not hired as an employee of

23   Cascade but, rather, as employee of CEDA.   Ms. Sock was granted a

24   temporary gaming license by the Tribal Gaming Commission of the

25   Picayune Rancheria of the Chukchansi Indians (TGC) on May 15,

26   2003.   Pursuant to the terms of the Tribal Gaming Ordinance, Ms.

2

1  Sock's temporary gaming license was effective for 90 days.  Ms.

2  Sock submitted a permanent gaming license application to the TGC

3  and started working as the Assistant General Manager.  According

4  to the Declaration of Silas L. Summers, Jr., Chairman of the

5  Tribal Gaming Commission, on June 19, 2003, Virginia Perkins, the

6  General Manager of the Casino, delivered to the TGC copies of the

7  Casino's operating and procedures manuals.  Included in the

8  Cashier Department Procedure Manual is a "Check Cashing

9  Procedure" which provides in pertinent part that: "There are two

10  types of checks that are available for our guests convenience.

11  They are checks cashed through a check cashing service, and

12  casino check cashing accounts."  The "Check Cashing Procedure"

13  also states: "Company checks will not be accepted".  Mr. Summers

14  avers that "[o]n June 25, 2003, the Tribal Gaming Commission

15  found the policy and procedure manuals provided by Ms. Perkins on

16  June 19, 2003, to be adequate under Section 3.6 of the Management

17  Agreement and Section 8.0 of the Compact by issuing a facility

18  license to the Casino."  On August 14, 2003, the Tribal Gaming

19  Commission issued to Ms. Sock a second temporary gaming license.

20  On August 29, 2003, Ms. Sock gave approval to cash $23,000 worth

21  of checks from the business accounts of Mark Bosio.  A few days

22  later, Mr. Bosio engaged in inappropriate, non-consensual sexual

23  conduct with a Casino host.  After reviewing the tape, Ms. Sock

24  and other employees banned Mr. Bosio from the Casino for 30 days.

25  After he was banned, the checks drawn on Mr. Bosio's business

26  accounts bounced.  Eventually, Mr. Bosio was permanently banned

1  from the Casino.  According to Mr. Summers' declaration, Ms. Sock

2  did not report the incident to the Tribal Gaming Commission until

3  October 21, 2003.  TGC Investigator Rex Sawell was assigned to

4  conduct a preliminary investigation.  Mr. Sawell submitted a

5  report to the TGC wherein he concluded that Ms. Sock had

6  committed several violations of the Casino's policies and

7  procedures.  Mr. Summers avers that "[v]iolations of the Casino's

8  check cashing policies are a serious offense because a common

9  form of fraud and theft in the casino industry occurs due to

10 collaboration and collusion between patrons and casino

11 employees."  On October 25, 2003, Ms. Sock sent an e-mail to the

12 TGC summarizing the incident and her attempts to collect on the

13 checks.  On November 6, 2003, the TGC issued a third temporary

14 gaming license to Ms. Sock.  On November 18, 2003, Russ Pratt,

15 President of Cascade, wrote to the TGC in pertinent part as

16 follows:

17          Your letter notes, correctly, that the checks
           were accepted in a manner that was not
18          consistent with the check cashing policies
           that have been adopted to date by Chukchansi
19          Gold.  Specifically, the checks were accepted
           without Mr. Bosio having been required to
20          open a casino check cashing account, were
           drawn on a company account (albeit a company
21          that Mr. Bosio owns), and were signed by a
           person other than Mr. Bosio.
22
           Section 30.03 of the Casino's Policy Manual
23          provides that the Casino's Credit Committee
           is responsible for approving any changes or
24          exceptions to the check cashing policy, and
           for setting check cashing limits and
25          individual approval levels.  Although Karen
           Sock ... is a member of that Committee, the
26          specific procedures that would have given Ms.

                                    4

Sock guidance in her executive decision had not yet been drafted and implemented, and the Committee was not asked to approve the cashing of Mr. Bosio's checks. Ms. Sock did consult with members of the Committee after the return of the checks and continues to do so as part of the collection process.

. . .

In the gaming industry, it is common practice for regular casino clients who wager large sums to be given check cashing privileges that are not normally accorded to other casino clients, and it was with this in mind that Ms. Sock made the executive decisions that she did. Karen Sock holds the position of authority in the Casino management that would normally give approval of such check cashing. But, the fact remains that the Casino's existing written policies that were designed for the cashier cage were not followed, and I requested the Casino management to provide me with follow up on the collection efforts and a letter of reprimand in regards to Ms. Sock.

I attach a copy of the letter to Ms. Sock that she will be presented with in a counseling session on this matter, together with a letter I have sent to the General Manager of the Casino also on this matter. In addition, I have instructed the Casino's General Manager to convene a meeting of the Credit Committee to discuss in detail, and propose in writing for the consideration of the CEDA Board and Cascade, an express set of policies under which the Credit Committee will exercise its authority under section 30.03 of the Policy Manual.

In addition, on November 19, 2003, Ms. Perkins sent a letter to Ms. Sock:

[T]he tools allowing you to deviate from the established cage cashier check cashing procedures were not in place. Therefore, your actions did not follow proper procedures and are deemed unauthorized. In addition, and upon further review, it was realized that

5

1                an authorized signatory of his business
account signed the check, and Mr. Bosio did
2                not sign them himself.  This also does not
follow proper procedure.
3
                It is a vitally important responsibility that
4                all ... management personnel to be familiar
with policies and procedures and to ensure
5                that they are followed as established.  It is
anticipated that you will continue to make
6                executive decisions that are based on sound
business practices and industry knowledge
7                <u>while staying within the boundaries of our
policies and procedures</u>.  To that end and
8                assist you in managing future policy matters,
you will participate in a training session
9                for all property management on the proper
review and implementation of policy &
10               procedure.

11  Mr. Pratt also wrote to Ms. Perkins, acknowledging that Ms.

12  Sock's approval of Mr. Bosio's checks were "inconsistent with the

13  Casino's present check cashing policy as it relates to the cage"

14  and that Ms. Sock "should have been aware that existing policy

15  was not being observed" and further stating:

16               While the intent of our overall policy is to
have the Credit Committee develop further
17               procedures to provide authority to upper
level management consistent with industry
18               practice, that has not yet occurred.

19  On January 8, 2004, Ms. Shock was called into a meeting with the

20  General Manager and officials from the TGC.  Ms. Shock was handed

21  the following letter:

22               The Gaming Commission has completed your
suitability determination for a gaming
23               license and has hereby denied your
application.
24
In addition, Ms. Sock was handed the following letter from the
25
Tribal Gaming Commission dated January 8, 2004:
26

6

This is to inform you that the Tribal Gaming
Commission has completed its review of your
application for a gaming license and has
determined your application shall be denied.

Pursuant to Section 5.9 (License Denial) of
the Tribal Gaming Ordinance ... Any
application for a License shall be denied if
the Tribal Commission, after an adequate
review, determines the Application is
incomplete or deficient, or that the
employment of the Applicant poses a threat to
the public interest or the effective
regulation of gaming, or creates or enhances
the danger of unsuitable, unfair or illegal
practices and methods and activities in the
conduct of gaming.  If the foregoing
determinations about the Applicant are made,
no management contractor or Tribal gaming
operation shall employ the Applicant.

Your application has been denied for the
following reasons:

Specifically, on August 29, 2003, your
authorized four checks totaling $23,000.00 to
be cashed in violation of the Chukchansi Gold
Resort & Casino Check Cashing Procedures in
that you:

1) Accepted company checks;

2) Made approval of checks without requiring
casino guests to establish a check cashing
account;

3) Failed to process the checks through
TeleChek to verify funds;

4) Accepted third party checks; and

5) Failed to verify the signature and
identity of the check writer with I.D. of
person presenting the checks.

Furthermore, your actions resulted in damages
to the casino in the amount of $23,000.00 as
the four checks were returned for
insufficient funds and have yet to be
recovered.

7

1             Your violations of the Chukchansi Gold Resort
              & Casino Check Cashing Procedures indicate
2             that you are unsuitable for the key gaming
              license position for which you were hired,
3             and such conduct on your part indicates to
              the Tribal Gaming Commission that approving
4             your tribal gaming license would not be in
              the best interests of the Picayune Rancheria
5             of the Chukchansi Indians.

6 Ms. Sock's temporary gaming license was then confiscated

7 (although the Tribe asserts that she "immediately and voluntarily

8 relinquished possession of her temporary tribal gaming license")

9 and she was escorted off the Casino property by security guards.

10 She has filed a petition for arbitration.  On January 20, 2004,

11 counsel for plaintiffs was advised by the Tribal Gaming

12 Commission that he should apply to the Tribal Gaming Commission

13 for reconsideration of Ms. Sock's suitability to the extent that

14 grounds for reconsideration exist.

15      Plaintiffs contend that Ms. Sock was entitled to written

16 notice and an opportunity to be heard pursuant to the terms of

17 the Tribal Gaming Ordinance before revoking Ms. Sock's temporary

18 gaming license and that the basis for the revocation of the

19 temporary gaming license was based on regulations which had not

20 been adopted when she approved the cashing of Mr. Bosio's

21 business checks.  Cascade further argues that these actions

22 constituted a breach of the Agreement and have resulted in

23 detriment to Cascade's operation of the Casino because of an

24 inability to recruit qualified personnel and maintain morale.

25      A.  <u>Subject Matter Jurisdiction</u>.

26      Plaintiffs contend that this court has subject matter

1  jurisdiction.

2      In so asserting, plaintiffs refer the court to <u>Morongo Band</u>

3  <u>of Mission Indians v. Rose</u>, 893 F.2d 1074, 1077 (9th Cir. 1990)

4  for the proposition that a federal question inheres to a

5  complaint regarding enforcement of a tribal ordinance against

6  non-Indians.

7      However, <u>Morongo</u> does not discuss federal question

8  jurisdiction in a case brought by non-Indians against the Tribe

9  based on a tribal ordinance.   Involved in <u>Morongo</u> was an action

10 by the tribe to enforce its ordinance against a non-Indian.

11     However, plaintiffs also refer the court to <u>Tamiami Partners</u>

12 <u>v. Miccosukee Tribe of Indians</u>, 177 F.3d 1212 (11th Cir. 1999).

13 In <u>Tamiami Partners</u>, a bingo facility operator brought an action

14 against an Indian tribe and tribal officers seeking an injunction

15 to prevent the tribe from taking control of the facility.   In

16 addressing the tribe's contention that subject matter

17 jurisdiction was lacking, the Eleventh Circuit held in pertinent

18 part:

19             According to the defendants, these counts
              merely address contract and arbitration
20            disputes arising under the Agreement.   They
              argue that such disputes do not raise a
21            federal question and that the statement in
              Article 23 of the Agreement that the district
22            court 'shall have jurisdiction' over the
              parties cannot change this result.

23
              The defendants are correct in part.   It is
24            well-settled that parties cannot create
              subject matter jurisdiction by agreement ...
25            In addition, the mere fact that a dispute
              concerns a contract or an agreement to
26            arbitrate, without more, does not raise a

9

1    federal question ... In this case, however,
     we find that the first three counts of
2    Tamiami's complaint present more than a mere
     dispute concerning a contract or an agreement
3    to arbitrate.  Each of these counts - at
     least in part - concerns the arbitration of
4    Tamiami's claims that the Tribe had an
     obligation under the Agreement to process the
5    gaming license applications of Tamiami and
     its employees in good faith, and that the
6    Tribe breached its obligation when it
     rejected these license applications for the
7    sole purpose of taking over MIB.  These very
     same claims were before this court in _Tamiami_
8    _II_, albeit in the context of a breach of
     contract suit against the Tribe.  The _Tamiami_
9    _II_ panel concluded that these claims arose
     under federal law because the Agreement
10   incorporated - by operation of law and by
     reference - the provisions of IGRA and its
11   associated regulations ... Because federal
     law is equally implicated when these claims
12   are presented in the arbitration context, we
     must follow the _Tamiami II_ panel's conclusion
13   here.  We hold, therefore, that the first
     three counts of Tamiami's complaint state a
14   federal question insofar as they relate to
     the Tribe's rejection of gaming license
15   applications.

16   177 F.3d at 1222-1223.

17      _Tamiami Partners_ appears to support a finding of federal

18   question jurisdiction here because of plaintiffs' claim that the

19   Tribe failed to comply with procedures set forth in the gaming

20   ordinance before revoking Ms. Sock's temporary gaming license and

21   because of the claim that the revocation of the temporary gaming

22   license was based on grounds not set forth in the ordinance and

23   not enacted by the tribe until after the incident with Mr. Bosio.

24      B.   _Sovereign Immunity_.

25      Plaintiffs assert that neither the Tribal entities or its

26   officers can invoke sovereign immunity.

1       With respect to the Tribe, plaintiffs contend that the Tribe

2   has waived sovereign immunity by Section 16.1 of the Agreement

3   between Cascade and the Tribe, which provides in pertinent part:

4           The parties agree that binding arbitration
            shall be the remedy for all disputes,
5           controversies and claims between the Tribe
            and the Manager or between the [Chukchansi
6           Economic Development] Authority and the
            Manager arising out of this Agreement, any
7           documents referenced by any of this
            Agreement, any agreements collateral thereto,
8           or any notice of termination thereof,
            including without limitation, any dispute,
9           controversy or claim arising out of any of
            these agreements.  The Tribe and the
10          Authority waive any recourse to any court of
            the Tribe, and agree that Tribal court
11          procedures need not be exhausted as a
            precondition to commencing or maintaining
12          dispute resolution procedures under the
            Agreement.  The parties intend that such
13          arbitration shall provide final and binding
            resolution of any dispute, controversy or
14          claim, and that action in any other forum
            shall be brought only if necessary to compel
15          such arbitration, to aid such arbitration, or
            to enforce an award or order resulting from
16          such arbitration ... Notwithstanding the
            foregoing, an arbitrator shall not have the
17          power to compel, negate, assume, usurp or in
            any manner affect any Governmental Action
18          unless any Governmental Action or failure to
            take any Governmental Action constitutes a
19          breach of this Agreement by the Tribe or the
            Authority.

20
            . . .
21
            (iii) Court Authority.  If necessary, orders
22          to compel arbitration, aid arbitration, or
            enforce an award of an arbitrator or provide
23          any necessary remedies in aid of an
            arbitration may sought [sic] before the
24          courts of the State of California and the
            Federal Courts.
25
        Citing C & L Enterprises, Inc. v. Citizen Band Potawatomi
26

                                    11

1  Indian Tribe of Oklahoma, 532 U.S. 411 (2001) for the conclusion

2  that a contract's arbitration provision constitutes clear waiver

3  of tribal sovereign immunity with regard to "disputes ...

4  relating to the contract", plaintiffs argue that the Tribe here

5  expressly agreed to arbitrate disputes relating to the Agreement.

6      To the extent that Cascade has made claims in this action,

7  defendants respond that those claims are barred by sovereign

8  immunity.[1]  In so arguing, defendants refer to the exception to

9  arbitration for "Governmental Action" set forth in Section 16.1.

10 "Governmental Action" is defined in Section 1 of the Agreement as

11 "any resolution, ordinance, statute, regulation, order, or

12 decision regardless of how constituted having the force of law or

13 legal authorization of the Tribe, the Authority or any

14 instrumentality or agency of the Tribe."  Defendants note that

15 Section 5.9 of the Tribal Gaming Ordinance pertains to "License

16 Denial" and provides:

17            Any Application for a License shall be denied
            if the Tribal Commission, after an adequate
18            review, determines the Application is
            incomplete or deficient, or that the
19            employment of the Applicant poses a threat to
            the public interest or the effective
20            regulation of gaming, or creates or enhances
            the danger of unsuitable, unfair or illegal
21            practices and methods and activities in the
            conduct of gaming.  If the foregoing
22            determinations about the Applicant are made,
            no management contractor or Tribal gaming
23            operation shall employ the Applicant.

24 Defendants contend that, if the Tribal Gaming Commission makes

25 _____

26        [1]Defendants do not dispute that individual members of a tribe
    are not entitled to the defense of sovereign immunity.

12

1   any of these determinations, the TGC is required to deny the

2   application.   Therefore, defendants argue, there was no

3   withholding from Ms. Sock of any license that the TGC was

4   authorized to grant.   Defendants further argue:

5           Cascade's suggestion that the exception to
        the governmental affairs carve-out in Section
6       16.1 renders arbitrable its allegation that
        the Tribal Gaming Commission's denial of Ms.
7       Sock's license application constitutes a
        breach of Section 2.5 of the Management
8       Agreement is no more colorable a claim.
        Cascade asserts that the Tribal Gaming
9       Commission's denial constituted an exercise
        of police powers that impaired the Tribe's
10      obligations pursuant to Sections 3.1 and
        3.6.1 of the Management Agreement to allow
11      Cascade 'to conduct and direct all business
        and affairs in connection with day-to-day
12      operation, management and maintenance of the
        Enterprise and the Facility and to exercise
13      exclusive responsibility and authority to
        direct the selection, control and discharge
14      of all employees performing regular services
        for the Enterprise.' ... But Cascade's
15      authority and control is subject to the
        limitation in Section 3.1 that '[t]he
16      Authority shall have the sole proprietary
        interest in and ultimate responsibility for
17      the conduct of all Gaming conducted by the
        Enterprise, subject to the rights and
18      responsibilities of [Cascade] under this
        [Management] Agreement.' ... As licensing is
19      a function committed to the sole province of
        the tribal government under tribal, state and
20      federal law, the caveat in this section
        regarding Cascade's rights and
21      responsibilities cannot possibly be read to
        subordinate tribal licensing decisions to
22      Cascade's managerial prerogatives.

23   Defendants refer the court to evidence that, when a prior version

24   of the Management Agreement was forwarded to the National Indian

25   Gaming Commission (NIGC) for approval, NIGC stated that it could

26   not be approved because

13

1          Certain sections of the Contract provide for
           arbitration to resolve budget, spending, and
2          licensing disputes.  Budget, spending, and
           licensing disputes may not be referred to
3          arbitration, as the Tribe must retain its
           sole-proprietary interest in gaming
4          operation.

5    Through subsequent negotiations and drafts, the Agreement quoted

6    above was approved by the NIGC.

7        D.   Authority to Issue Injunctive Relief.

8        Referring to Section 16.1, plaintiffs assert that this

9    provision in the Agreement allows this court to issue the

10   injunctive relief sought herein.

11       In addition, plaintiffs refer the court to PMS Distributing

12   Co., Inc. v. Huber & Suhner, A.G., 863 F.2d 639, 642 (9th Cir.

13   1988):

14            The fact that a dispute is arbitrable and
              that the court so orders under Section 4 of
15            the Arbitration Act, 9 U.S.C. § 4, does not
              strip it of authority to grant a writ of
16            possession pending the outcome of the
              arbitration so long as the criteria for such
17            a writ are met.  A district court's order to
              arbitrate, with or without a retention of
18            jurisdiction, has an 'ongoing effect,' and
              the parties may return to the district court
19            for interpretation or modification of the
              order ....
20
     Plaintiffs also cite Performance Unlimited v. Questar Publishers,
21
     Inc., 52 F.3d 1373 (6th Cir. 1995):
22
              [W]e ... hold that in a dispute subject to
23            mandatory arbitration under the Federal
              Arbitration Act, a district court has subject
24            matter jurisdiction under § 3 of the Act to
              grant preliminary injunctive relief provided
25            the party seeking the relief satisfies the
              four criteria which are prerequisites to the
26            grant of such relief.  We further conclude

                              14

1
2
3
4
5
6
> that a grant of preliminary injunctive relief
> pending arbitration is particularly
> appropriate and furthers the Congressional
> purpose behind the Federal Arbitration Act,
> where the withholding of injunctive relief
> would render the process of arbitration
> meaningless or a hollow formality because an
> arbitral award, at the time it was rendered,
> '"could not return the parties substantially
> to the status quo ante."' ....

52 F.3d at 1380.

Plaintiffs cannot rely on the provisions of Section 16.1 of the Agreement to provide authority to this court to grant the injunctive relief sought unless this court concludes that it has subject matter jurisdiction independent of those contract provisions.  As noted, subject matter jurisdiction cannot be conferred by agreement.  As discussed above, there is a real issue whether a licensing dispute is arbitrable.  Secondly, the cases cited by plaintiffs do not appear to have application to the matter before the court.  Plaintiffs' complaint is not brought pursuant to the Arbitration Act - plaintiffs are not seeking to compel arbitration.

    C.  Governing Standards.[2]

"The purpose of the preliminary injunction is to preserve the status quo between the parties pending a final determination of the merits of the action."  7-Pt. 2 Moore's Federal Practice, ¶ 65.04[1] at 65-30.  "'The status quo is that last uncontested status which preceded the pending controversy.'"  Tanner Motor

---

    [2]Although the motion before the court is for a temporary restraining order, the same standards apply.

15

1  Livery, Ltd. v. Avis, Inc., 316 F.2d 804, 809 (9th Cir.), cert.

2  denied, 375 U.S. 821 (1963).  The standards governing the

3  issuance of a preliminary injunction in the Ninth Circuit are

4  reiterated in Martin v. International Olympic Committee, 740 F.2d

5  670, 674-675 (9th Cir. 1984):

6              In this circuit, a party seeking preliminary
               injunctive relief must meet one of two tests.
7              Under the first, a court may issue a
               preliminary injunction if it finds that:
8
               (1) the [moving party] will suffer
9              irreparable injury if injunctive relief is
               not granted, (2) the [moving party] will
10             probably prevail on the merits, (3) in
               balancing the equities, the [non-moving
11             party] will not be harmed more than [the
               moving party] is helped by the injunction,
12             and (4) granting the injunction is in the
               public interest.
13
               ... Alternatively, a court may issue a
14             preliminary injunction if the moving party
               demonstrates 'either the possibility of
15             irreparable injury or that serious questions
               are raised and the balance of the hardships
16             tips sharply in his favor.' ... Under this
               last part of the alternative test, even if
17             the balance of the hardships tips decidedly
               in favor of the moving party, it must be
18             shown as an irreducible minimum that there is
               a fair chance of success on the merits.
19
   The Ninth Circuit has concluded, however, that these two tests
20
   are "not really two entirely separate tests, but that they are
21
   merely extremes of a single continuum."  Benda v. Grand Lodge of
22
   IAM, 584 F.2d 308, 315 (9th Cir. 1978), cert. dismissed, 441 U.S.
23
   937 (1979).  Because the difference between the two formulations
24
   is insignificant, the Ninth Circuit accepts either as
25
   satisfactory.  Benda, id.  However, at no point in the continuum
26

                                    16

1   is the court "bound to decide doubtful or difficult questions of

2   law or disputed issues of fact." Dymo Industries, Inc. v.

3   Tapeprinter, Inc., 326 F.2d 141, 143 (9th Cir. 1965).   As

4   explained in Republic of the Philippines v. Marcos, 862 F.2d

5   1355, 1362 (9th Cir. 1988), cert. denied, 490 U.S. 1035 (1989):

6           Serious questions are 'substantial, difficult
            and doubtful, as to make them a fair ground
7           for litigation and thus for more deliberative
            investigation.' ... Serious questions need
8           not promise a certainty of success, nor even
            present a probability of success, but they
9           must involve a 'fair chance of success on the
            merits.'

10  "If the public interest is involved, the district court must also

11  determine whether the public interest favors the [movant]."

12  Westlands Water Dist. v. Natural Resources Defense Council, 43

13  F.3d 457, 459 (9th Cir. 1994).   As explained in Stanley v.

14  University of Southern California, 13 F.3d 1313, 1320 (9th Cir.

15  1994):

16          A prohibatory injunction preserves the status
17          quo ... A mandatory injunction '"goes well
            beyond simply maintaining the status quo
18          pendente lite [and] is particularly
            disfavored.'" ... When a mandatory
19          preliminary injunction is requested, the
            district court should deny such relief
20          '"unless the facts and law clearly favor the
            moving party."' ....

21      D.   Likelihood of Success on the Merits.

22      The court concludes that plaintiffs have not shown a

23  likelihood of success on the merits of their claim that the

24  revocation of Ms. Sock's temporary gaming license and the

25  simultaneous denial of Ms. Sock's application for a permanent

26

                                   17

1  gaming license was in violation of the Second Amended and

2  Restated Management Agreement or the Tribal Gaming Ordinance

3  because Ms. Sock was deprived of the process set forth in the

4  Tribal Gaming Ordinance.  Ms. Sock's application for a permanent

5  gaming license was under review.  She had only been issued a

6  series of temporary gaming licenses which, by the terms of the

7  Ordinance, are only effective for 90 days.  Plaintiffs point to

8  nothing in the Tribal Gaming Ordinance from which it may be

9  inferred that an applicant holding a temporary gaming license is

10  entitled to written notice and a hearing before that temporary

11  license is revoked.  Here, the record establishes that Ms. Sock's

12  temporary gaming license was revoked because her application for

13  a permanent gaming license was denied.  Plaintiffs point to

14  nothing in the Tribal Gaming Ordinance from which it may be

15  inferred that an applicant for a permanent gaming license is

16  entitled to written notice and a hearing before that application

17  is denied or before the denial of the application becomes

18  effective.  The court also concludes that plaintiffs have not

19  shown a likelihood of success on the merits that the denial of

20  Ms. Sock's application for a permanent gaming license was in

21  violation of the terms of the Tribal Gaming Ordinance or the

22  Management Agreement.  The court notes the evidence that Cascade

23  admitted that Ms. Sock's actions in connection with the cashing

24  of Mr. Bosio's company checks was in violation of applicable

25  procedures at the time.  Furthermore, there are serious questions

26  raised whether a licensing dispute is arbitrable at all.

18

1    E. Irreparable Injury.

2        The court further concludes that plaintiffs have not

3    demonstrated irreparable injury if the requested injunction is

4    not issued.  Ms. Sock's allegations that the denial of her

5    application for the permanent gaming license is speculative and

6    contradicted by evidence presented by the defendants.  Cascade's

7    contentions that it will be irreparably injured if the temporary

8    restraining order is not issued is also speculative and inherent

9    in any employment dispute.

10       ACCORDINGLY, IT IS ORDERED that plaintiffs' Application for

11   Temporary Restraining Order is denied.

12       Dated:  Jan 28    , 2003

13

14                              ROBERT E. COYLE
                              UNITED STATES DISTRICT JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

                              19

United States District Court
for the
Eastern District of California
January 29, 2004


* * CERTIFICATE OF SERVICE * *


1:04-cv-05135


Cascade Entertain

    v.

Picayune Rancheria

---

I, the undersigned, hereby certify that I am an employee in the Office of
the Clerk, U.S. District Court, Eastern District of California.

That on  January 29, 2004, I SERVED a true and correct copy(ies) of
the attached, by placing said copy(ies) in a postage paid envelope
addressed to the person(s) hereinafter listed, by depositing said
envelope in the U.S. Mail, by placing said copy(ies) into an inter-office
delivery receptacle located in the Clerk's office, or, pursuant to prior
authorization by counsel, via facsimile.


        Eric George                      REC LJO
        Browne and Woods
        450 North Roxbury Drive
        Seventh Floor
        Beverly Hills, CA  90210




                                    Jack L. Wagner, Clerk

                                BY:
                                    Deputy Clerk