## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

GAUGHAN GAMING – NATIVE ) 
LIGHTS, LLC and GAUGHAN )
GAMING - TONKAWA, LLC )
)
Plaintiffs, )
)
v. )          Case No. 5:11-cv-00330-HE
)
TONKAWA TRIBE OF OKLAHOMA )
and TONKAWA TRIBAL GAMING )
COMMISSION, )
)
Defendants. )
)

### DEFENDANT TONKAWA TRIBE OF OKLAHOMA'S REPLY TO GAUGHAN GAMING'S RESPONSE TO TRIBE'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT AND BRIEF IN SUPPORT

COMES NOW Defendant Tonkawa Tribe of Oklahoma (the "Tribe"), by and through its counsel of record, and hereby respectfully submits its Reply in response to Plaintiff Gaughan Gaming's Response [Docket No. 33] to the Tribe's Motion to Dismiss [Docket No. 30]. In its reply in support of its motion to dismiss, Defendant alleges and states as follows:

### BACKGROUND

I. **The Tribe Has Not Conceded that This Court Has Jurisdiction to Hear the Claims of Gaughan Gaming, and Removal Alone is Insufficient to Waive Tribal Sovereign Immunity.**

In its Response, Gaughan Gaming essentially alleges that by removing the case to this court in order to adjudicate the effect of IGRA upon the threshold procedural jurisdictional issues of Gaughan Gaming's claim, the Defendants have effectively conceded that this court has subject matter jurisdiction to hear the substantive claims of Gaughan Gaming's Complaint as well. Resp. at 3. This theory has already been considered and rejected by this Court, which has previously established that removal of a case in which issues of federal law

are embedded does not constitute a *de facto* concession of subject matter jurisdiction or waiver of tribal sovereign immunity. *See Muhammad v. Comanche Nation Casino*, 2010 WL 4365568, CIV-09-968-D (W.D. Okla. Oct. 27, 2010). (Dismissing a tort action removed from state court to adjudicate jurisdictional issues for lack of subject matter jurisdiction on the basis of tribal sovereign immunity.)

Further, Gaughan Gaming is incorrect in stating that the Tribe has made "contradictory arguments" regarding the issue of subject matter jurisdiction. Resp. at 3. While the Tribe concedes the Management Agreements contain limited waivers of sovereign immunity, the Tribe contends that the limited waiver of sovereign immunity granted in the Management Agreements does not encompass the relief it requests before this Court. In fact, § 16.1(f) of the Management Agreements specifically states that "Nothing in this Agreement shall be deemed to be a general waiver of the Tribe's sovereign immunity from suit, which immunity is expressly asserted."

A review of the language of the Management Agreements in question (attached as Exhibits "1" and "2") contradicts the broad scope of the waivers asserted by Gaughan Gaming in support of its claim that this Court has subject matter jurisdiction to interfere with an administrative proceeding in another sovereign government. For example, Gaughan Gaming represents to the Court that the Court can adjudicate Gaughan Gaming's claims because § 16.1(b) of the Management Agreements "allows Gaughan to 'contest, seek appeal or review of the decisions or procedures of the TTG.'" Resp. at 10. Yet, Gaughan Gaming omits the relevant language of this section, which limits the rights alleged by Gaughan Gaming as to decisions of the TTG to "the provisions of the Ordinance creating the Tribal

Gaming Commission or such other body."

As of the date of this filing, the regulatory proceedings of the TTG – an independent regulatory body which is not a party to the Management Agreements and thus not bound by its contractual provisions - remain pending.  Gaughan Gaming has yet to even complete the administrative process about which it complains.  In its Order of March 30, 2011, this Court recognized that at this stage, Gaughan Gaming has not "submitted evidence sufficient to establish a likelihood of the TGC taking steps that will cause injury to them. There is no reason, on the present showing, to conclude that the TGC will do other than make a good faith effort to apply the applicable law and its own rules to any determination it must make." Order at 10.  Even today, Gaughan Gaming has yet to support its claims of conspiracy or unfairness on the part of the TGC with facts or evidence.

Further, Article 16 of the Agreements specifically limits the Tribe's waiver of sovereign immunity to allowing the Manager "to take any and all actions necessary to enforce the provisions of this Agreement ***pursuant to the alternative dispute resolution procedures set forth below,*** including those which seek injunctive or declaratory relief, damages (limited to recover from the personal property assets and future revenues of the Tribe), specific performance or other legal and equitable remedies in the court or courts authorized by this Agreement and to effect enforcement of any remedy granted therein." §§ 16.1(a), Exhibits 1 and 2.  Article 16.1(c) goes on to state that "the limited waiver contained in this Section applies only to arbitration with Manager conducted in accordance with Article 20 of this Agreement and to no other entity or person" and further states that such waiver applies only to enforcement of an arbitration award against the Tribe.  The sovereign

immunity waiver makes no reference to disputes under Article 21, under which Plaintiff

bases its claim of subject matter jurisdiction.  For reasons discussed below, Gaughan

Gaming's broad interpretation of Article 21 is expressly contradicted by federal law.

II.  **Contrary to the Allegations of Gaughan Gaming, the Parties' Management Agreements Are Preempted by Any Contradictory Provisions of Federal Law.**

Gaughan Gaming alleges that because the Management Contracts were approved by

the NIGC, the Management Contracts "have the force of federal law" and that "the NIGC

would not approve a gaming management agreement that conflicts with federal law."  Resp.

at 10.  As demonstrated by Exhibits 1 and 2, the NIGC issued an opinion letter notifying the

parties of approval of the management contracts.  The Supreme Court has clearly stated that

unlike federal agency interpretations made through formal adjudication or notice-and-

comment rulemaking, federal agency "[i]nterpretations such as those in opinion letters – like

interpretations contained in policy statements, agency manuals, and enforcement guidelines,

all of which lack the force of law-do not warrant *Chevron*-style deference." *Christensen v. Harris*

*County*, 529 U.S. 576, 587 (2000).

As support for its argument that the NIGC's letter approving the parties'

Management Agreements constitutes "force of law," Gaughan Gaming cites to an NIGC

Decision and Order. Resp. at 10, n. 3.   However, this scant legal authority is expressly

contradicted by Gaughan Gaming's own counsel in a scholarly publication on the topic.  As

one of Gaughan Gaming's own attorneys has publicly admitted, the sole focus of NIGC

determinations with regard to management contracts is compliance with IGRA and the

accompanying regulations:

So while approval of a management contract, either by the Secretary of the

Interior or the Chairman of the NIGC, entails a fairly comprehensive and exhaustive examination of the document and surrounding circumstances, ***in the end compliance with IGRA and the regulations is the sole focus***. Has all of the proper documentation been submitted? Does the document contain provisions addressing the required essential topics? Do the backgrounds of "interested parties" check out? We essentially agree with Lien's assessment that "[t]he review is not more than a paper review to test the sufficiency of the documents submitted to the Secretary of the Interior in the first instance and to review whether the management agreement meets the required contents [specified under IGRA]." ***Despite the breadth of the approval and review process, passing on the legal validity of the document (as opposed to approval for a contract seemingly in compliance with IGRA and the regulations) is not within the scope of the administrative bodies***.

Jimmy K. Goodman, Amanda L. Maxfield, *Is That Your Final Answer? The Legal Effect of A National Indian Gaming Commission Decision That A Contract Is A Tribal Gaming Operation Management Contract*, Fed. Law., March/April 2008, at 44, 46. (Attached as Exhibit "3") (Emphasis Added). In the article he co-authored, Mr. Goodman goes on to opine that "[t]he decision made by the NIGC may be helpful to one party or the other but is always subject to a de novo determination in the appropriate court, where the NIGC's decision is only part of the evidence a court should review in making a determination regarding the controversy. The NIGC's decision may be helpful to you or your client, but it will not be the last word if either party demands a judicial decision on the issue." *Id.* at 45-47. The Tribe agrees with Mr. Goodman's opinion that the NIGC's review and subsequent approval of the Management Agreements was merely an "approval for a contract seemingly in compliance with IGRA and the regulations," rather than a decision on the legal effects or validity of the Agreements themselves.

In addition, Gaughan Gaming cites Article 30 of the Management Agreements in support of its request to remand this case back to the state court for consideration of its

claims.  Resp. at 15.  Here, Gaughan Gaming ignores the plain language of Article 30, which specifically states that "[t]he parties agree that the interpretation and enforcement of this Agreement shall be governed by and construed first in accordance with relevant laws of the Tribe; second, federal law; and third, the laws of the State of Oklahoma….or such other court of competent jurisdiction."  Further, in its Order of March 30, 2011 [Docket No. 28], this Court has already incorporated the complete preemption analysis to find that in this case, IGRA has preempted the state law causes of action alleged by Gaughan Gaming, and should therefore reject Plaintiff's request to remand.

III. **Gaughan Gaming Fails to Cite Any Facts or Evidence in Support of its Claim that the Tribe Has Changed the Terms of the Management Agreements.**

In its Response, Gaughan Gaming cites Justice Black's famous quotation in *Tuscarora*, in which he railed against the United States for breaking its contractual treaty obligations to the Tribe.  As a tribal sovereign, the Tonkawa Tribe of Oklahoma agrees with Gaughan Gaming's proposition that Tribes – like big Las Vegas gaming companies who benefit from doing business with them – should honor the express terms of their agreements.  However, unlike privately-owned companies, tribes must rely upon the United States federal government to oversee and approve management contracts pursuant to IGRA to ensure, *inter alia*, that when doing business with outside entities, tribal gaming operations remain protected from organized crime and other "corrupting influences."[1]

In its Response, Gaughan Gaming fails to demonstrate facts supporting its attempt to adjudicate its issues before this Court, rather than before the arbitration panel as required by the Management Agreements. The very act of filing this Complaint demonstrates one of a

[1] 25 U.S.C. § 2702 (2).

6

number of attempts by Gaughan Gaming to subvert its contractual obligations under the Agreements – in this case, by seeking relief expressly barred by the provisions of the Management Agreements, while simultaneously complaining that the Tribe has violated those same provisions. To justify its selective interpretation of the Management Agreements to which it is bound, Gaughan Gaming suggests that this Court should interfere with the ongoing adjudication of the underlying contract dispute (the arbitration claim which was actually initiated by Gaughan Gaming itself) because it alleges that the Tribe is attempting to "change or undo binding terms" of the Management Agreements. Resp. at 6. Both the Tribe and Gaughan Gaming have raised issues of material breaches of the Management Agreements that are currently pending before the arbitration panel; these issues include the "conspiracy" issues Gaughan Gaming raises here against the Tribe. The Court should reject Gaughan Gaming's attempt to make an end run around the pending arbitration proceeding required pursuant to the terms specified in the Dispute Resolution provisions stated in Article 20 of the Management Agreements.

Plaintiff is not the only party who has alleged violations of these Management Agreements. The Tribe has asserted that it is Plaintiff, not Defendants, who is attempting to change the terms of the management agreements. For example, one of the issues the Tribe has alleged in the underlying dispute is that Gaughan Gaming unilaterally amended the terms of the construction loan agreement governing the terms by which Gaughan Gaming provided the Tribe with a loan to build the Native Lights Casino. As one of the construction and development agreements which are expressly incorporated into the Management Agreements via §§1.5, 2.9, 4.2.2, 4.29, 9.9.1.1, and 9.9.1.2, the construction loan

agreement should have been approved by the NIGC as part of the process of approving the Management Agreements. By using the Tribe's money to repay itself early *after* approval of the Management Agreements and the accompanying collateral agreements by the NIGC, Gaughan Gaming essentially unilaterally amended the Agreements by removing the risk which the NIGC factors into the consideration of its approval of Management Agreements. As Gaughan Gaming correctly notes in Part 4 of its Response, management contracts unapproved by the NIGC are void. Resp. at 6-7. Thus, Gaughan Gaming's act of amending the Management Agreements and any incorporated collateral documents *after* NIGC approval would likewise require additional NIGC review and approval, thereby likely rendering Gaughan Gaming's Management Agreements void. While the Tribe stands ready and willing to adjudicate this claim (and other claims) of breaches of the Agreements as provided by Article 20 of those same Agreements – Gaughan Gaming refuses to abide by Article 20 and continues to press its claims of "conspiracy" and repossession against the Tribe before this Court.

IV. **Gaughan Gaming's Interpretation of Article 21 Dispute Resolution Provisions is Expressly Contradicted by Federal Law.**

Gaughan Gaming concedes that this Court's review and power to grant relief must be consistent with the provisions of IGRA and its applicable regulations. Resp. at 2. Yet, the relief sought by Gaughan Gaming in the instant case – repossession of the gaming facilities – is expressly barred by §§ 2710(b)(2)(A) and 2711(g) of IGRA. Inexplicably, Gaughan Gaming asserts that any grant of a proprietary interest and/or in land effected by the Management Agreements would be "in harmony with IGRA." Resp. at 13. As explained below, this assertion demonstrates that Gaughan Gaming's interpretation of the dispute

resolution provisions is incorrect as a matter of law, and contrary to the intent of the NIGC in approving these Management Agreements.

As a prerequisite to approval of tribal gaming ordinances, IGRA and the NIGC regulations enforcing IGRA require that ordinances include provisions to ensure that tribes retain "sole proprietary interest" in Indian gaming operations.  25 U.S.C. § 2710(b)(2)(A). The NIGC has stated that if any entity other than a tribe possesses a proprietary interest in the gaming activity, gaming may not take place.[2]  One of the responsibilities of the NIGC is to review management contracts to ensure that they have no provisions which would grant an impermissible proprietary interest in gaming to a management contractor outside of the tribe.  *See* 25 C.F.R. §§ 522.6, 522.4. Although courts have not yet defined the term "proprietary interest" as it is used in IGRA, the NIGC has borrowed federal courts' interpretations of the term in tax cases as follows: "One would have a proprietary interest if he were sharing in or deriving profit from" the establishment as opposed to being merely a salaried employee performing clerical and ministerial duties.[3]  The NIGC has offered examples of types of agreements that would create violations of the sole proprietary interest requirement, which include agreements which  would give a party other than the tribe the right to control gaming in the event of default by the tribe.[4]

In the context of loan agreements, in analyzing whether a tribe maintains its sole proprietary interest in a gaming operation, the NIGC may factor in value provided by a lender who is taking on a significant financial risk that is commensurate with the rate of

---

[2] *See, e.g.,* NIGC Letter to La Jolla Band of Luiseno Indians, April 2, 2010, attached as Exhibit "4."
[3] *Id. (*citing *Dondlinger v. United States*, 1970 U.S. Dist. LEXIS 12693 (D. Neb. 1970).
[4] 58 Fed. Reg. 5802, 5804 (Jan. 22, 1993).

return provided to the lender.[5]  As described above, the Tribe has raised the issue of early prepayment of Gaughan Gaming's construction loan to the Tribe as an attempt to modify the terms of the Management Agreements, because the NIGC factors in risk undertaking by a management contractor to assess whether the management contractor's share of gaming revenues grants a manager with an inappropriate proprietary interest.

Further, IGRA at 25 U.S.C. § 2711(g) and 25 U.S.C. § 177 explicitly prohibits transfers or conveyances of an interest in land or other real property to a manager or operator of gaming activity absent explicit statutory authority.  Gaughan Gaming's claims assert a possessory interest in the Tribe's gaming facilities a real property interest which is expressly barred by IGRA.  Given IGRA's requirement that ensures tribes retain the "sole proprietary interest" gaming activity, and its prohibition against transfers of interests in tribal land or other tribal real property to a management contractor, it is highly unlikely that the NIGC would have approved the Management Agreements of Article 21.1 with the broad interpretation of "possession" advocated by Plaintiff and to which Gaughan Gaming asserts that it is entitled.

## **CONCLUSION**

For the foregoing reasons, Defendant Tonkawa Tribe of Oklahoma respectfully requests this Court dismiss this case under Fed. R. Civ. P. 12(b)(6).  The Tribe further requests an award of attorney's fees and costs and any other relief consistent with this motion, legal or equitable, available under law.

---

[5] *See City of Duluth v. Fond du Lac Band of Lake Superior Chippewa*, Case No. 09-266 (D. Minn.), Second Aff. of Kevin K. Washburn [Docket No. 46] at ¶ 24 (attached as Exhibit "5").

Respectfully submitted,

/s/ *Stephanie Moser Goins*

_____

Gary S. Pitchlynn, OBA #7180
O. Joseph Williams, OBA #19256
Stephanie Moser Goins, OBA #22242
PITCHLYNN & WILLIAMS, PLLC
124 East Main Street
P.O. Box 427
Norman, Oklahoma 73070
Telephone: (405) 360-9600
Facsimile: (405) 447-4219
Email: gspitchlynn@pitchlynnlaw.com
          jwilliams@pitchlynnlaw.com
          smgoins@pitchlynnlaw.com
ATTORNEYS FOR TONKAWA TRIBE OF
OKLAHOMA

**CERTIFICATE OF SERVICE**

I certify that on the 25th day of April, 2011, I electronically transmitted the attached document to the Clerk of the Court using the ECF System for filing.  Based on the records currently on file, the Clerk of the Court will transmit a Notice of Electronic Filing to the following ECF registrants:

Jimmy Goodman
Regan Strickland Beatty
CROWE & DUNLEVY, PC
20 North Broadway, Ste 1800
Oklahoma City, OK  73102-8273

D. Michael McBride III
CROWE & DUNLEVY, PC
500 Kennedy Building
321 South Boston Avenue
Tulsa, OK  74103-3313

*Attorneys for Gaughan Gaming-Native Lights, LLC and Gaughan Gaming-Tonkawa, LLC*

Ezekiel L.N. Fletcher
ROSETTE & ASSOCIATES, PC
Boji Tower
124 West Allegan St.
Suite 1400
Lansing, MI 48933

Roger Wiley
ROSETTE & ASSOCIATES, PC
14 Crooked Oak Lane
McAlester, OK  74501

*Attorneys for Co-Defendants Tonkawa Tribal Gaming Commission*

*/s/ Stephanie Moser Goins*
_____
STEPHANIE MOSER GOINS