

Anthony E. Street, President
Tonkawa Tribe of Indians of Oklahoma
1 Rush Buffalo Road
Tonkawa, Oklahoma 74653
Fax (580) 628-7033

SEP 1 1 2007

John Gaughan
Gaughan Gaming – Tonkawa, LLC
3555 West Reno Avenue, Suite C
Las Vegas, NV 89118
Fax (702) 739-1503

Dear President Street and Mr. Gaughan:

I am pleased to inform you that I have approved the Amended and Restated Management Agreement (the "Contract") dated August 27, 2007 between the Tonkawa Tribe of Indians of Oklahoma and Gaughan Gaming – Tonkawa, LLC.

The Indian Gaming Regulatory Act and the regulations of the National Indian Gaming Commission (the "NIGC") require that the NIGC Chairman approve management contracts for gaming operations on Indian lands. Accordingly, you submitted the Contract as required by 25 U.S.C. § 2711 and 25 C.F.R. Part 531.

We have reviewed the Contract and other information submitted and have determined that the standards of 25 C.F.R. Parts 531, 533 and 537 have been met. This letter and my signature on the Contract constitute such approval.

Please note that if we learn of any actions or conditions that violate the standards contained in 25 C.F.R. Parts 531, 533, 535, or 537, we may require modifications of, or may void, the approved Contract, after providing the parties with an opportunity for a hearing and a subsequent appeal to the NIGC as set forth in 25 C.F.R. Part 577.

Should you have any questions concerning this approval, please call us at (202) 632-7003.

Sincerely,

Philip N. Hogen
Chairman

NATIONAL HEADQUARTERS   1441 L Street NW, Suite 9100, Washington, DC 20005   Tel: 202.632.7003   Fax: 202.632.7066   WWW.NIGC.GOV

REGIONAL OFFICES   Portland, OR; Sacramento, CA; Phoenix, AZ; St. Paul, MN; Tulsa, OK



**EXHIBIT**

**1**

cc:   Ken Bellmard, Esq.
       Fax Only (405) 235-8786

       Heidi Staudenmaier
       Fax Only (602) 382-6070

AUG 2 8 2007

# AMENDED AND RESTATED MANAGEMENT AGREEMENT

## BETWEEN THE

### TONKAWA TRIBE OF INDIANS OF OKLAHOMA,
a federally recognized Indian Tribe,

### AND

### GAUGHAN GAMING-TONKAWA, LLC
a Nevada limited liability company

DATED AS OF August 27, 2007

449325 5

## TABLE OF CONTENTS

Page

ARTICLE 1 RECITALS.............................................................................................................. 1

ARTICLE 2 DEFINITIONS........................................................................................................ 1

| | | |
|---|---|---|
| 2.1 | Bureau of Indian Affairs ("B.I.A") | 2 |
| 2.2 | Board of Advisors | 2 |
| 2.3 | Capital Reserve Fund | 2 |
| 2.4 | Class II Gaming | 2 |
| 2.5 | Class III Gaming | 2 |
| 2.6 | Commencement Date | 2 |
| 2.7 | Compact | 2 |
| 2.8 | Completion Date | 2 |
| 2.9 | Development and Construction Agreement | 3 |
| 2.10 | Distributable Net Revenue | 3 |
| 2.11 | Effective Date | 3 |
| 2.12 | Enterprise | 4 |
| 2.13 | Enterprise Employees | 4 |
| 2.14 | Enterprise Employee Policy | 4 |
| 2.15 | Facility | 4 |
| 2.16 | Fiscal Year | 4 |
| 2.17 | Furnishings and Equipment | 4 |
| 2.18 | Gaming | 4 |
| 2.19 | Gaming Ordinance | 4 |
| 2.20 | General Manager | 5 |
| 2.21 | Governing Document | 5 |
| 2.22 | Gross Gaming Revenue (Win) | 5 |
| 2.23 | Gross Revenues | 5 |
| 2.24 | I-35 Casino | 5 |
| 2.25 | IGRA | 5 |
| 2.26 | Legal Requirements | 5 |
| 2.27 | [Intentionally Omitted] | 5 |
| 2.28 | [Intentionally Omitted] | 5 |
| 2.29 | Management Committee | 5 |
| 2.30 | Manager | 5 |
| 2.31 | Manager's Marks | 5 |
| 2.32 | Manager's Representative | 6 |
| 2.33 | Minimum Balance Working Capital Fund | 6 |
| 2.34 | Minimum Priority Payment | 6 |
| 2.35 | National Indian Gaming Commission ("NIGC") | 7 |
| 2.36 | Native Lights Casino | 7 |
| 2.36 | Net Revenues | 7 |
| 2.38 | [Intentionally Omitted] | 7 |
| 2.38 | Operating Expenses | 8 |
| 2.39 | Pre-Opening Agreement | 8 |

449325.5     -i-

**TABLE OF CONTENTS**
**(continued)**

| | | |
|---|---|---|
| 2.40 | Promotional Allowances | 8 |
| 2.41 | Property | 8 |
| 2.42 | State | 8 |
| 2.44 | [Intentionally Omitted] | 8 |
| 2.44 | Tonkawa Tribal Constitution | 9 |
| 2.45 | Tribal Committee | 9 |
| 2.46 | Tribal Gaming Commission | 9 |
| 2.47 | Tribal Governmental Action | 9 |
| 2.48 | Tribal Representative | 9 |
| 2.49 | Tribe | 9 |

| | | |
|---|---|---|
| ARTICLE 3 | COVENANTS | 9 |

| | | |
|---|---|---|
| 3.1 | Engagement of Manager | 9 |
| 3.2 | Term | 9 |
| 3.3 | Enterprise | 9 |
| 3.4 | Establishment and Operation of Management Committee | 9 |
| 3.5 | Manager's Compliance With Law; Licenses | 10 |
| 3.6 | Tribal Amendments to Gaming Ordinance | 10 |
| 3.7 | Management Fee | 10 |
| 3.8 | No Pre-existing Contracts | 10 |

| | | |
|---|---|---|
| ARTICLE 4 | BUSINESS AND AFFAIRS IN CONNECTION WITH ENTERPRISE | 10 |

| | | |
|---|---|---|
| 4.1 | Manager's Authority and Responsibility | 10 |
| 4.2 | Duties of the Manager | 11 |
| 4.3 | Security and Public Safety | 13 |
| 4.4 | Damage, Condemnation or Impossibility of the Facility | 13 |
| 4.5 | Conduct of Gaming | 13 |
| 4.6 | Employees | 14 |
| 4.7 | Marketing and Advertising | 15 |
| 4.8 | Enterprise Bank Accounts | 16 |
| 4.9 | Pre-Opening | 16 |
| 4.10 | Operating Budgets | 16 |
| 4.11 | Capital Budgets | 18 |
| 4.12 | Capital Replacements and Maintenance | 18 |
| 4.13 | Creation, Use and Disposition of Capital Reserve Fund | 18 |
| 4.14 | Litigation | 19 |
| 4.15 | No Manager Wages or Salaries | 19 |
| 4.16 | Internal Control Systems | 20 |
| 4.17 | Daily Deposits to Depository Account | 20 |
| 4.18 | Disbursement Account | 20 |
| 4.19 | No Cash Disbursements | 20 |
| 4.20 | Transfers Between Accounts | 20 |
| 4.21 | Insurance | 20 |

**TABLE OF CONTENTS**
**(continued)**

| | | |
|---|---|---|
| 4.22 | Accounting and Books on Account | 21 |
| 4.23 | Retail Shops and Concessions | 22 |
| 4.24 | Enterprise Operating Standards | 22 |
| 4.25 | Manager's Use of the Facility | 22 |
| 4.26 | Allocation of Costs and Expenses | 22 |
| 4.27 | Optional Marketing Services | 22 |
| 4.28 | Limits of Charges to Enterprise for Regulatory Costs | 23 |
| 4.29 | Agreed Ceiling for Repayment of Development and Construction Costs | 23 |

ARTICLE 5 LIENS ......................................................................................................... 23

ARTICLE 6 MANAGEMENT FEE, REIMBURSEMENT AND DISBURSEMENT ............. 24

| | | |
|---|---|---|
| 6.1 | Management Fee | 24 |
| 6.2 | Disbursements | 24 |
| 6.3 | [Intentionally Left Blank] | 24 |
| 6.4 | Payment of Fees and Tribal Disbursement | 24 |
| 6.5 | Adjustment to Final Distribution at End of Fiscal Year | 24 |
| 6.6 | Distribution at End of Term | 24 |

ARTICLE 7 GENERAL PROVISIONS ........................................................................... 25

| | | |
|---|---|---|
| 7.1 | Notice | 25 |
| 7.2 | Authorization | 25 |
| 7.3 | Relationship | 25 |
| 7.4 | Manager's Contractual Authority in the Performance of this Agreement | 26 |
| 7.5 | Further Actions | 26 |
| 7.6 | Defense | 27 |
| 7.7 | Waivers | 27 |
| 7.8 | Captions | 27 |
| 7.9 | Severability | 27 |
| 7.10 | Interest | 27 |
| 7.11 | Reimbursement | 28 |
| 7.12 | Travel and Out-of-Pocket Expenses | 28 |
| 7.13 | Third Party Beneficiary | 28 |
| 7.14 | Brokerage or Other Fees | 28 |
| 7.15 | Survival of Covenants | 28 |
| 7.16 | Estoppel Certificate | 29 |
| 7.17 | Periods of Time | 29 |
| 7.18 | Preparation of Agreement | 29 |
| 7.19 | Exhibits | 29 |
| 7.20 | Successors, Assigns, and Subcontracting | 29 |
| 7.21 | Confidential Information | 29 |
| 7.22 | Employment Solicitation Restriction Upon Termination | 30 |
| 7.23 | Patron Dispute Resolution | 30 |

**TABLE OF CONTENTS**
(continued)

Page

| | | |
|---|---|---|
| 7.24 | Modification | 30 |
| ARTICLE 8 | WARRANTIES | 30 |
| 8.1 | Warranties | 30 |
| 8.2 | Interference in Tribal Affairs | 30 |
| 8.3 | No Political Interference with Operations | 30 |
| 8.4 | Prohibition of Payments to Members of Tribal Government | 30 |
| 8.5 | Prohibition of Hiring Gaming Regulatory Officials and Members of Tribal Government | 31 |
| 8.6 | Prohibition of Financial Interest in Enterprise | 31 |
| 8.7 | Definitions | 31 |
| ARTICLE 9 | GROUNDS FOR TERMINATION | 31 |
| 9.1 | Voluntary Termination and Termination for Cause | 31 |
| 9.2 | Voluntary Termination | 31 |
| 9.3 | Termination for Cause | 31 |
| 9.4 | Involuntary Termination Due to Changes in Legal Requirements | 32 |
| 9.5 | Manager's Right to Terminate Agreement | 32 |
| 9.6 | Tribe's Right to Terminate Agreement | 33 |
| 9.7 | Consequences of Manager's Breach | 33 |
| 9.8 | Consequences of Tribe's Breach | 33 |
| 9.9 | Events Constituting Material Breach | 34 |
| 9.10 | [Intentionally Omitted] | 35 |
| ARTICLE 10 | CONCLUSION OF THE MANAGEMENT TERM | 35 |
| 10.1 | Transition | 35 |
| 10.2 | Undistributed Net Revenues | 35 |
| ARTICLE 11 | CONSENTS AND APPROVALS | 35 |
| 11.1 | Tribe | 35 |
| 11.2 | Manager | 35 |
| ARTICLE 12 | DISCLOSURES | 36 |
| 12.1 | Warranties | 36 |
| 12.2 | Criminal and Credit Investigation | 36 |
| 12.3 | Disclosure Amendments | 36 |
| 12.4 | Breach of Manager Warranties and Agreements | 36 |

**TABLE OF CONTENTS**
(continued)

Page

ARTICLE 13 RECORDATION ............................................................................................. 37

ARTICLE 14 (INTENTIONALLY LEFT BLANK) ............................................................ 37

ARTICLE 15 NO PRESENT LIEN, LEASE OR JOINT VENTURE ................................ 37

ARTICLE 16 TRIBE'S LIMITED WAIVER OF SOVEREIGN IMMUNITY ................ 37

    16.1    Preference for Tribal or Federal Court Jurisdiction ............................................. 37
    16.2    Specific Performance Restriction ........................................................................ 38

ARTICLE 17 TIME IS OF THE ESSENCE ...................................................................... 38

ARTICLE 18 TRIBAL ASSETS ......................................................................................... 38

ARTICLE 19 NOTICE PROVISION .................................................................................. 39

ARTICLE 20 DISPUTE RESOLUTION AND LIMITED WAIVER OF SOVEREIGN
    IMMUNITY ..................................................................................................................... 39

    20.1    Amicably Resolve and Obligation to Meet and Confer ...................................... 39
    20.2    Arbitration ........................................................................................................... 39
    20.3    AAA Commercial Rules of Arbitration .............................................................. 39
    20.4    Equitable Relief as Remedy ................................................................................ 40
    20.5    Standard of Review; Statute of Limitations ........................................................ 40
    20.6    Location of Arbitration ........................................................................................ 40
    20.7    Hearing and Award in Event of Failure of Party to Appear ............................... 40
    20.8    Enforcement ......................................................................................................... 40
    20.9    Limitation Upon Enforcement ............................................................................ 40
    20.10  No Waiver of Remedies; Remedies Cumulative ................................................ 41
    20.11  No Arbitration of Tribal Governmental Action .................................................. 41
    20.12  Commercial Obligations Ordinance .................................................................... 41

ARTICLE 21 AGREEMENT ............................................................................................. 41

    21.1    Performance During Disputes ............................................................................. 41

ARTICLE 22 MANAGER'S MARKS ............................................................................... 42

    22.1    [Intentionally Omitted] ....................................................................................... 42
    22.2    Ownership of Manager's Marks .......................................................................... 42
    22.3    Restriction on Use of Manager's Name .............................................................. 42
    22.4    Litigation Regarding Manager's Marks .............................................................. 42

ARTICLE 23 CONFIDENTIAL AND PROPRIETARY INFORMATION ..................... 43

    23.1    Confidential Information ...................................................................................... 43
    23.2    Proprietary Information of Manager .................................................................... 43

**TABLE OF CONTENTS**
**(continued)**

Page

ARTICLE 24 OTHER DOCUMENTS ....................................................................................... 43

ARTICLE 25 EXECUTION......................................................................................................... 43

ARTICLE 26 ENTERPRISE NAME .......................................................................................... 44

ARTICLE 27 INTENT TO NEGOTIATE NEW AGREEMENT ............................................. 44

    27.1   Intent to Enter into Successive Agreement........................................................ 44
    27.2   Transition Plan.................................................................................................. 44

ARTICLE 28 ENTIRE AGREEMENT....................................................................................... 44

ARTICLE 29 MODIFICATION OF AGREEMENT.................................................................. 44

ARTICLE 30 CHOICE AND ADOPTION OF LAW ............................................................... 44

ARTICLE 31 NEITHER PARTY DEEMED DRAFTER.......................................................... 45

EXHIBIT "A" Legal Description of Property ............................................................................ 47

EXHIBIT "B" BOARD OF REVIEW ........................................................................................ 48

# AMENDED AND RESTATED MANAGEMENT AGREEMENT

THIS AMENDED AND RESTATED MANAGEMENT AGREEMENT (the "Agreement") has been entered into this ____ day of April, 2007, by and between THE TONKAWA TRIBE OF INDIANS OF OKLAHOMA (the "Tribe"), a federally recognized Indian Tribe, its permitted successors and assigns, and GAUGHAN GAMING-TONKAWA, LLC, a Nevada limited liability company, and its permitted successors and assigns (the "Manager").

## ARTICLE 1
## RECITALS

1.1   The Tribe is a federally recognized Indian tribe, enjoying a government-to-government relationship with the United States. The Tribe possesses sovereign governmental powers over the land described in Exhibit "A" hereto (the "Property"), located within the boundaries of the Indian Country in the state of Oklahoma (the "State"), pursuant to the Tribe's recognized powers of self-government, Governing Document, resolutions, and ordinances of the Tribe and federal law. The obligations and rights under this Agreement shall be delegated by the Tribe, as defined below.

1.2   The Property is owned by the United States of America in trust for the Tribe. The Tribe desires to use the Property to improve the economic conditions of its members, to enable it to serve the social, economic, educational and health needs of the Tribe, to increase Tribal revenues, to enhance the Tribe's economic self-sufficiency and self-determination, and to provide positive, long-term social, environmental and economic benefits to tribal members by enhancing its current family-style tourism economy by extending its tourist season without dramatically changing the nature of the local economy.

1.3   The Tribe is seeking technical experience and expertise for the construction of certain improvements to the Enterprise, operation of the Enterprise, and training for members of the Tribe in its operation of the Enterprise. The Manager is willing and able to provide such experience, expertise and instruction.

1.5   The Tribe wants to grant the Manager the exclusive right and obligation to develop, manage, operate and maintain the Enterprise and any expansion thereof on lands currently held by the United States of America in trust for the Tribe, and to train Tribal members and others in the operation and maintenance of the Enterprise during the terms of the Development and Construction Agreement and this Management Agreement. The Manager wishes to perform these functions exclusively for the Tribe as limited in Section 3.3 below.

1.6   This Agreement is entered into pursuant to the Indian Gaming Regulatory Act of 1988, PL 100-497, 25 U.S.C. § 2701 et seq, (herein the "IGRA").

449325.5

## ARTICLE 2
## DEFINITIONS

As they are used in this Agreement, the terms listed below shall have the meaning assigned to them in this Article:

**2.1**  **Bureau of Indian Affairs ("B.I.A.")**.  "B.I.A." is the Bureau of Indian Affairs under the Department of the Interior of the United States of America.

**2.2**  **Board of Advisors**.  "Board of Advisors" shall mean the Board of Advisors as established by the Tribe.

**2.3**  **Capital Reserve Fund**.  "Capital Reserve Fund" shall mean that fund established by the Manager for the purpose of purchasing additions, replacements or improvements to the physical assets, including applicable systems software, of the Tribe.

**2.4**  **Class II Gaming**.  "Class II Gaming" shall mean Class II Gaming as defined in IGRA.

**2.5**  **Class III Gaming**.  "Class III Gaming" shall mean Class III Gaming as defined in IGRA and as provided for in the Compact.

**2.6**  **Commencement Date**.  "Commencement Date" shall mean the first date that (a) the Facility constructed under the Development and Construction Agreement is complete and open to the public; and (b) Class II Gaming and/or Class III Gaming is conducted in the Facility pursuant to the terms of this Agreement.  The Commencement Date shall not occur prior to the Effective Date.

**2.7**  **Compact**.  "Compact" shall mean the Tribal-State Compact executed on the 10th day of June, 1994, between the Tribe and the state of Oklahoma and published in the Federal Register on November 9, 1994, pursuant to IGRA as same may, from time to time, be amended, or such other compact that may be substituted therefor.  The terms of the Compact are incorporated herein and made a part hereof by reference.

**2.8**  **Completion Date**.  "Completion Date" shall mean the date upon which Manager receives:

(i)  an architect's certificate from the Architect identified in the Development and Construction Agreement as having responsibility for the design and supervision of construction, equipping and furnishing of the Facility certifying that the Facility has been fully constructed substantially in accordance with the Plans and Specifications;

(ii)  certification from Manager (or the division, department or designee of Manager having responsibility to assure compliance with any operational standards) stating that the Facility, as completed, is in compliance with any such standards;

(iii)  a permanent or temporary certificate of occupancy from the government authority or authorities pursuant to whose jurisdiction the Facility is constructed,

449325.5                                     2

permitting the use and operation of all portions of the Facility in accordance with this Agreement; and

(iv)    certificates of such professional designers, inspectors or consultants or opinions of counsel, as Manager may determine to be appropriate, verifying construction and furnishing of the Facility in compliance with all Legal Requirements.

**2.9    Development and Construction Agreement**. "Development and Construction Agreement" shall mean that certain Development and Construction Agreement between the Tonkawa Tribe of Indians of Oklahoma and Gaughan Gaming-Tonkawa, LLC, of even date herewith by and between Manager and the Tribe providing the terms under which Manager will develop certain upgrades and improvements to the existing Facility, including without limitation the design, construction and furnishing of certain improvements to the Facility, and equipping the Facility.

**2.10   Distributable Net Revenue**. "Distributable Net Revenue" is the total of Net Revenues (gaming) added to Net Revenues (other), plus amortization and depreciation, less:

(i)     Management Fees earned;

(ii)    The amount of the Gross Gaming Revenue (Win) if such amount has been transferred to the Capital Reserve Fund;

(iii)   The amount necessary to maintain the Minimum Balance and any amount proposed by Manager during the annual budget process and approved by the Board of Advisors of the Tribe as an addition to the Minimum Balance Working Capital Fund of the Enterprise; and

(iv)    Principal payments and interest payments due on debt.

**2.11   Effective Date**. The "Effective Date" shall mean the date five (5) days following the date on which all of the following listed conditions are satisfied:

(a)     written approval of this Agreement is granted by the Chairman of the NIGC;

(b)     written approval of a Tonkawa Tribe of Indians of Oklahoma Gaming Ordinance in form and substance satisfactory to Manager is granted by the B.I.A., U.S. Department of Interior or Chairman of the NIGC;

(c)     written confirmation that the background checks of the Manager by the Tribal Gaming Commission have been satisfactorily completed;

(d)     Manager has received a certified copy of the ratifying Resolution reciting that it is the law of the Tribe that the Management Agreement, Development and Construction Agreement and the documents executed by the Tribe in connection therewith are the legal and binding obligations of the Tribe, valid and enforceable in accordance with their terms;

(e)     Manager has received evidence satisfactory to it that the gaming devices allowed under the Compact and the laws of the State of Oklahoma will be sufficient to create a marketable and competitive casino product and provide a level of play so as to make the scope of the project contemplated by the parties economically feasible;

(f)     Receipt by Manager of the Tribe's approval of the plans and specifications of the Facility. The Tribe agrees to cooperate and to use its best efforts to satisfy all of the above conditions at the earliest possible date.

2.12    **Enterprise**. The "Enterprise" is the improved, upgrades and expanded "Tonkawa Indian Casino" of the Tribe which has been constructed in accordance with the plans and specifications prepared in accordance with Article 2 of the Development and Construction Agreement, together with the existing "Tonkawa Smokeshop". The Enterprise shall at all times be authorized by IGRA and/or the Compact and operated and managed by Manager in accordance with the terms and conditions of this Agreement to engage in:

(a)     gaming, defined as Class II and/or Class III Gaming under IGRA; and

(b)     any other lawful commercial activity allowed in the Facility, including but not limited to, retail outlet(s), food and non-alcoholic beverage outlets, alcoholic beverage/bar, the sale of tobacco, tobacco products, gifts and souvenirs, all whether owned or not owned by the Tribe or any instrumentality of the Tribe. The Tribe shall have the sole proprietary interest in and responsibility for the conduct of all Gaming conducted by the Enterprise, subject to the rights and responsibilities of the Manager under this Agreement.

2.13    **Enterprise Employees**. "Enterprise Employees" shall mean a generic reference to those employees who are assigned to work at the Facility. In the case of full-time employees, such assignment to the Facility must be primary.

2.14    **Enterprise Employee Policy**.    "Enterprise Employee Policy" shall have the meaning given to it in Section 4.6.9.

2.15    **Facility**. "Facility" shall mean the buildings, improvements, and fixtures, now or hereafter located therein or thereon, within which the Enterprise will be housed, all as located on the Property known as Tonkawa Indian Casino at 1000 Allen Drive, Tonkawa, Oklahoma and on the Property known as the Tonkawa Smokeshop at 10750 Allen Drive, P.O. Box 220, Tonkawa, Oklahoma 74653. Title to the Property and the Facility shall merge and continue to be held by the United States of America in trust for the Tribe.

2.16    **Fiscal Year**. "Fiscal Year" shall mean each twelve-month period, or portion thereof, ending on December 31 of each year.

2.17    **Furnishings and Equipment**. "Furnishings and Equipment" shall mean all furniture, furnishings and equipment required in the operation of the Enterprise in accordance with the plans and specifications of the Facility.

**2.18 Gaming.** "Gaming" shall mean any and all activities defined as Class II or Class III Gaming under IGRA.

**2.19 Gaming Ordinance.** The "Gaming Ordinance" is the ordinance and any amendments thereto enacted by the Tribal Committee of the Tonkawa Tribe of Indians of Oklahoma and approved by the NIGC, which authorizes and regulates gaming on the lands of the Tonkawa Tribe of Indians of Oklahoma.

**2.20 General Manager.** "General Manager" shall mean the person employed by Manager to direct the operation of the Facility.

**2.21 Governing Document.** "Governing Document" shall mean the Constitution of the Tonkawa Tribe of Oklahoma enacted and ratified on April 21, 1938 or as amended by the Tribe in the future.

**2.22 Gross Gaming Revenue (Win).** The net win from gaming activities, which is the difference between gaming wins and losses before deducting costs and expenses.

**2.23 Gross Revenues.** Gross Revenues shall mean all receipts of any nature derived directly or indirectly from the Enterprise including, without limitation, Gross Gaming Revenue (Win), food and beverage sales and other retail or other receipts from lessees, sublessees, licensees and concessionaires (but not the gross receipts of such lessees, sublessees, licensees or concessionaires, provided that such lessees, sublessees, and licensees and concessionaires are not subsidiaries or affiliates of the Manager), interest on funds invested pursuant to the Enterprise Investment Policy and revenue recorded for Promotional Allowances.

**2.24 I-35 Casino.** "I-35 Casino" shall mean the proposed gaming facility located on land in trust for gaming owned by the Tribe and located at the Southwest Corner of U.S. Interstate 35 and U.S. Highway 60, Tonkawa, Oklahoma, consisting of ten (10) acres more or less.

**2.25 IGRA.** "IGRA" shall mean the Indian Gaming Regulatory Act of 1988, PL 100-497, 25 U.S.C. § 2701 et seq, as same may, from time to time, be amended.

**2.26 Legal Requirements.** "Legal Requirements" shall mean singularly and collectively all applicable laws including without limitation the Gaming Ordinance, the Code of the Tribe, IGRA, the Compact and applicable federal and Oklahoma statutes.

**2.27 [Intentionally Omitted].**

**2.28 [Intentionally Omitted].**

**2.29 Management Committee.** "Management Committee" shall mean the two-person committee consisting of the Manager's Representative and an individual designated by the Board of Advisors of the Tribe. The Committee shall be responsible for coordinating the policy established by the Board of Advisors and for carrying out such duties as are set forth and defined in this Agreement. The Committee shall remain active during the entire term of this Agreement.

5

**2.30   Manager**. "Manager" shall mean Gaughan Gaming-Tonkawa, LLC, a Nevada limited liability company, and any successors and assigns as permitted in accordance with Section 7.20 of this Agreement.

**2.31   Manager's Marks**.   "Manager's Marks" shall mean any service marks, trademarks, copyrights, trade names, patents or other similar rights or registrations now or hereafter held or applied for and obtained by the Manager in connection with this Agreement.

**2.32   Manager's Representative**. The "Manager's Representative" shall be designated by Manager by notice given to the Tribe in accordance with Article 7 of this Agreement. The Manager's Representative shall serve as a liaison between the Manager and the Tribe and serve on the Management Committee. There shall be a Manager's Representative during the entire term of this Agreement.

**2.33   Minimum Balance Working Capital Fund**.   "Minimum Balance Working Capital Fund" shall mean that amount recommended by the Manager, after a detailed review of the future year's operating budget and cash flow requirements, which shall serve as working capital for operations and be sufficient to retire all of the obligations of the Enterprise expected to mature within the year, and as approved by the Board of Advisors. The Minimum Balance Working Capital Fund shall include amounts in all bank accounts and the cost of marketable securities of the Enterprise (except for the bank accounts and marketable securities of the Capital Reserve Fund) plus the cash on hand in the casino cage and vaults.  The original Minimum Balance Working Capital Fund shall be approximately [          ] Any interim required increase to the Minimum Balance Working Capital Fund shall, if recommended by Manager and approved by the Board of Advisors, be funded from the Enterprise. The Minimum Balance Working Capital Fund may be modified by the Board of Advisors upon the recommendation of the Manager as part of the annual budget process.  Any excess working capital funds accumulated in the Minimum Balance Working Capital Fund may, on the recommendation of the Manager and approval of the Board of Advisors, be transferred to accounts of the Enterprise. Any required increase to the Minimum Balance Working Capital Fund must be approved by the Board of Advisors upon the recommendation of the Manager as part of the annual budget process and such approved increase shall be added to the Minimum Balance Working Capital Fund annually as provided in the calculation of Distributable Net Revenue. At the end of the term of this Agreement, the cash and investment assets of the Minimum Balance Working Capital Fund shall be applied to any remaining obligations under this Agreement with any excess amount distributed at the direction of the Tribe.

*64*

**2.34   Minimum Priority Payment**.   "Minimum Priority Payment" shall mean that payment due the Tribe on a monthly basis. If the Commencement Date is a date other than the first day of a calendar month, the first payment will be prorated from the Commencement Date to the end of the month. The Minimum Priority Payment is payable on the twenty-first (21st) day of each calendar month following the later of

*64*

64

No Minimum Priority Payment shall be owed for any full calendar month(s) during which Class II and/or Class III gaming is suspended or terminated at the Facility pursuant to Section 4.4. The Manager shall pay a percentage of the Minimum Priority Payment for any partial calendar month during which Class II and/or Class III gaming is either suspended or terminated equal to the percentage of such calendar month during which Class II and/or Class III gaming is conducted. The obligation to pay the Minimum Priority Payment shall cease upon termination of this agreement for any reason.

2.35  **National Indian Gaming Commission ("NIGC")**.  The "NIGC" is the commission established pursuant to 25 U.S.C. § 2704.

2.36  **Native Lights Casino.**  "Native Lights Casino" shall mean the gaming facility owned by the Tribe and located at 2375 North Highway 77, Newkirk, Oklahoma.

2.37  **Net Revenues**.  Net Revenues for the purpose of this Agreement shall mean the sum of Net Revenues (gaming) (Section 2.36.1) and Net Revenues (other) (Section 2.36.2).

2.37.1  **Net Revenues (gaming)**.  Net Revenues (gaming) for the purposes of this Agreement shall mean Gross Gaming Revenue (Win), as heretofore defined, of the Enterprise from Class II and/or Class III gaming less all gaming related Operating Expenses, excluding the Management Fee and less the related retail value of any Promotional Allowances, and less the following receipts actually received by the Enterprise and included in Gross Revenues: (i) any gratuities or service charges added to a customer's bill; (ii) any credits or refunds made to customers, guests or patrons; (iii) any sums and credits received by the Enterprise for lost or damaged merchandise; (iv) any sales taxes, excise taxes, gross receipt taxes, admission taxes, entertainment taxes, tourist taxes or charges received from patrons and passed on to a governmental or quasi-governmental entity; (v) any proceeds from the sale or other disposition of Furnishings and Equipment or other capital assets; (vi) any fire and extended coverage insurance proceeds other than for business interruption; (vii) any condemnation awards other than for temporary condemnation; (viii) any proceeds of financing or refinancing; and (ix) any interest on bank account(s). It is intended that this provision be consistent with 25 U.S.C. § 2703 (9).

2.37.2  **Net Revenues (other)**.  Net Revenues (other) for the purposes of this Agreement shall mean Gross Revenues, as heretofore defined, of the Enterprise from all other sources in support of Class II and/or Class III gaming, such as food and beverage, entertainment, and retail, less all related Operating Expenses, excluding the Management Fee and less the related retail value of Promotional Allowances, if any, and less the following receipts actually received by the Enterprise and included in Gross Revenues: (i) any gratuities or service charges added to a customer's bill; (ii) any credits or refunds made to customers, guests or patrons; (iii) any sums and credits received by the Enterprise for lost or damaged merchandise; (iv) any sales taxes, excise taxes, gross receipt taxes, admission taxes, entertainment taxes, tourist taxes or charges received from patrons and passed on to a governmental or quasi-governmental entity; (v) any proceeds from the sale or other disposition of Furnishings and Equipment or other

449325.5

7

capital assets; (vi) any fire and extended coverage insurance proceeds other than for business interruption; (vii) any condemnation awards other than for temporary condemnation; (viii) any proceeds of financing or refinancing; and (ix) any interest on bank account(s). It is intended that this provision be consistent with 25 U.S.C. § 2703 (9).

2.38    [Intentionally Omitted].

2.39    Operating Expenses. "Operating Expenses" shall mean expenses of the operation of the Enterprise, including but not limited to the following: (1) the payment of salaries, wages, and benefit programs for Manager's employees working at the Facility; Off-Site Employees subject to the approval described in Section 4.6.4; and Employees working at the Facility; (2) materials and supplies for the Enterprise; (3) utilities; (4) repairs and maintenance of the Facility (excluding Capital Replacements); (5) interest on installment contract purchases and/or on loans and debt of the Facility; (6) insurance and bonding; (7) advertising and marketing, including busing and transportation of patrons to the Facility; (8) professional fees; (9) security costs and the cost of any increased public safety services directly related to the Facility; (10) reasonable travel expenses for officers and employees of the Enterprise, Manager or its affiliates to inspect and oversee the Enterprise, which expenses must not exceed

$\Delta \forall$

(11) furniture, fixtures, and equipment lease payments, subject to restrictions as specified in Section 4.2.4; (12) trash removal; (13) costs of goods sold; (14) any other amounts advanced by Manager and relating to the Facility, together with expenses specifically designated as Operating Expenses in this Agreement; (15) depreciation and amortization; (16) recruiting and training expenses; (17) fees due to the NIGC under IGRA or the State of Oklahoma pursuant to the Compact (except fees charged by the NIGC for background investigations of Manager and Manager's employees); and (18) any costs and expenses incurred in connection with enabling the Tribe to comply with NEPA.

2.39.1  If at any time during the term of this Agreement the Tribe is able to obtain the right to operate slot machines or to obtain the right to conduct Class II and/or Class III table games, any expenses incurred with respect to the obtaining or establishment of such rights, including any expenses, payments, or fees made to the State of Oklahoma, shall be charged as an Operating Expense.

2.40    Pre-Opening Agreement. Pre-Opening Agreement shall mean the agreement between the National Indian Gaming Commission and the Tonkawa Tribe of Indians of Oklahoma entered into In the Matter of the Notice of Violation of Tonkawa Tribe of Oklahoma NOV 06-06 and Temporary Closure Order for the Tonkawa Tribe of Oklahoma CO-06-01.

2.41    Promotional Allowances. Promotional Allowances shall mean the retail value of complimentary food and beverage and merchandise provided to patrons as promotional items.

2.42    Property. "Property" shall mean the parcel of land described in Exhibit "A" hereto held by the United States of America in trust for the Tribe.

**2.43    State.** "State" shall mean the State of Oklahoma.

**2.44    [Intentionally Omitted].**

**2.45    Tonkawa Tribal Constitution.** "Tonkawa Tribal Constitution" shall mean that certain Constitution and By-Laws of the Tonkawa Tribe of Indians of Oklahoma, ratified on April 21, 1928.

**2.46    Tribal Committee.** "Tribal Committee" shall mean The Tonkawa Tribe of Indians of Oklahoma elected Tribal Committee established pursuant Section 1. of Article V of the Tonkawa Tribal Constitution.

**2.47    Tribal Gaming Commission.** "Tribal Gaming Commission" shall mean the body created pursuant to the Gaming Ordinance to regulate Gaming in accordance with the Compact, IGRA and the Gaming Ordinance.

**2.48    Tribal Governmental Action.** "Tribal Governmental Action" means any resolution, ordinance, statute, regulation, order or decision of the Tribe or any instrumentality or agency of the Tribe, regardless of how constituted, that has the force of law.

**2.49    Tribal Representative.** "Tribal Representative" shall mean the person designated by the Board of Advisors to sit on the Management Committee.

**2.50    Tribe.** "Tribe" shall mean The Tonkawa Tribe of Indians of Oklahoma, a federally recognized Indian Tribe.

## ARTICLE 3
## COVENANTS

In consideration of the mutual covenants contained in this Agreement, the parties agree and covenant as follows:

**3.1    Engagement of Manager.** The Tribe hereby retains and engages the Manager as its exclusive independent contractor for the purposes of managing the Enterprise and training Tribal members and others in the management of the Enterprise. Nothing contained herein grants or is intended to grant Manager a titled interest to the Facility or to the Enterprise. The Manager hereby accepts such retention and engagement.

**3.2    Term.** The term of this Agreement shall begin on the Effective Date and continue for a period of _____ years after the Commencement Date.



**3.3    Enterprise.** Neither the Tribe nor any enterprise or instrumentality owned in whole or in part by the Tribe shall, during the term of this Agreement, develop, manage, own or operate any Class II or Class III facility other than the Enterprise located at the Facility, the Native Lights Casino, and the I-35 Casino. Without limitation, management of the Native Lights Casino and the I-35 Casino referenced in the immediately preceding sentence is wholly outside of and not covered by the scope of this Agreement.

**3.4** **Establishment and Operation of Management Committee**. Within thirty (30) days after the Effective Date, (a) the Manager shall designate the Manager's Representatives and notify the Tribe of their identity pursuant to Article 7 and (b) the Board of Advisors shall designate the Tribal Representatives and notify the Manager of their identity pursuant to Article 7. The Management Committee shall have the obligations, rights and powers described in Section 2.29.

**3.5** **Manager's Compliance With Law; Licenses**. The Manager covenants that it will at all times comply with all Legal Requirements, including the Tribe's Gaming Ordinance, IGRA, the Compact, and any licenses issued under any of the foregoing. The Manager, Manager's executive officers and all other persons required by applicable law shall be licensed to operate the Enterprise pursuant to the Gaming Ordinance, the Compact and IGRA. The Tribe shall not unreasonably withhold, withdraw, qualify or condition such licenses. If, as, and when any fine is levied against the Tribe under the Compact based on the acts of or failure to act on the part of the Manager, then, provided the fine relates to the operation of the Casino and is not levied for an act or failure to act or matter that the Board of Advisors has in writing instructed the Manager to perform, then the cost and expense of said fine shall be borne by the Manager from the Manager's own finances. Likewise, if, as, and when any fine is levied against the Manager under the Compact based on the acts of or failure to act on the part of the Tribe, then, provided the fine relates to the operation of the Casino and is not levied for an act or failure to act or matter that the Board of Advisors has in writing instructed the Manager to perform, then the cost and expense of said fine shall be borne by the Tribe from the Tribe's own finances. This Section shall not be interpreted as precluding Manager from challenging, in a forum of competent jurisdiction, any law or regulation, which Manager believes in good faith, is inconsistent with the IGRA, the Indian Civil Rights Act, 25 U.S.C. §1302, the Compact, and/or the terms of this Agreement or the Development and Construction Agreement.

**3.6** **Tribal Amendments to Gaming Ordinance**. The Tribe covenants that any amendments made to the Gaming Ordinance will be a legitimate effort to ensure that Gaming is conducted in a manner that adequately protects the environment, the public health and safety, and the integrity of the Enterprise. The Tribe further covenants that any amendments to the Gaming Ordinance will comply with the foregoing standard. The Tribe will not adopt any amendments to the Gaming Ordinance that would adversely impede the Enterprise's ability to succeed in the market or which would affect the Manager's rights under this Agreement or the Development and Construction Agreement.

**3.7** **Management Fee**. The Tribe agrees to pay the Manager a fee (the "Management Fee") that is calculated as

$\int$

**3.8** **No Pre-existing Contracts**. The Tribe covenants that there are no valid pre-existing contractual impediments to the entry by the Tribe into this Agreement and the Development and Construction Agreement.

## ARTICLE 4
## BUSINESS AND AFFAIRS IN CONNECTION WITH ENTERPRISE

**4.1    Manager's Authority and Responsibility.**    All business and affairs in connection with the day-to-day operation, management and maintenance of the Enterprise and the Facility, including the establishment of operating days and hours, shall be the responsibility of the Manager. The Manager is hereby granted the necessary power and authority to act, through the General Manager, in order to fulfill its responsibilities under this Agreement.

**4.2    Duties of the Manager.**    In managing, operating, maintaining and repairing the Enterprise and the Facility, the Manager's duties shall include, without limitation, the following:

(a)    Assist in the Tribe's improvement and renovation of the Facility in accordance with the Development and Construction Agreement;

(b)    Maintain and improve the Facility to insure that it will provide a safe and clean environment for all Gaming conducted on the premises;

(c)    Operate the Facility during all hours of operation;

(d)    Set advertising budgets and place advertisements;

(e)    Promptly pay bills and expenses as they become due;

(f)    Provide fire protection services;

(g)    Comply with all applicable provisions of the Internal Revenue Code;

(h)    Provide, supervise and pay the cost of any increased public safety services;

(i)    If applicable, provide assistance to the Tribe in order to enable the Tribe to supply the National Indian Gaming Commission with information necessary for compliance with the Commission's National Environmental Policy Act ("NEPA") regulations; and

(j)    Submit background information required under 25 C.F.R. Section 537 to the National Indian Gaming Commission and information required by the Tribe's Gaming Ordinance, and pay all fees required by the National Indian Gaming Commission or the Tribal Commission in connection with review of the background information.

**4.2.1    Management.**    Consistent with the Operating and Capital Budgets of the Enterprise, the Manager shall use reasonable measures for the orderly administration, management, and operation of the Enterprise and the Facility, including without limitation cleaning, painting, decorating, plumbing, carpeting, grounds care and such other maintenance and repair work as is reasonably necessary.

**4.2.2    Compliance.**    The Manager shall comply with all duly enacted statutes, regulations and ordinances of the Tribe. The Tribe shall: (a) enact no law substantially impairing the obligations of the Tribe related to Manager pursuant to this Agreement and the Development

449325.5                                11

and Construction Agreement; and (b) shall not act in any way whatsoever, directly or indirectly, to cause this Agreement to be amended, modified, canceled, or terminated, except pursuant to its express terms or with the consent of the Manager. The Tribe shall take no action and adopt no statute or ordinance that violates the Indian Civil Rights Act (25 U.S.C. §§ 1301-1303). Notwithstanding the foregoing, a breach of this Section 4.2.2 shall not be a basis to overturn, negate or in any manner modify any Tribal Governmental Action through arbitration or other proceedings, and any remedy for such breach shall be subject to the Specific Performance Restriction as set forth in Section 16.2 of this Agreement.

4.2.3 **Required Filings**. The Manager shall comply with all applicable provisions of the Internal Revenue Code including, but not limited to, the prompt filing of any cash transaction reports and W-2G reports that may be required by the Internal Revenue Service of the United States or under the Compact.

4.2.4 **Contracts in Tribe's Name and at Arm's Length**. Manager is authorized to make, enter into and perform in the name of the Tribe, such contracts deemed necessary by Manager to perform its obligations under this Agreement, provided such contracts comply with the terms and conditions of this Agreement, and provided such contracts do not obligate the Tribe to pay sums not approved in the Operating and Capital Budgets of the Enterprise. Contracts for the operations of the Enterprise shall be entered into in the name of the Enterprise, and signed by the Manager. Any contract, excluding contracts for capital expenditures identified in the Operating and Capital Budgets of the Enterprise requiring an expenditure in any year in excess of _____ shall be approved by the Board of Advisors; such approval shall not be required for employment or other contracts which may include aggregate payments in excess of _____

Neither the Tribe nor the Enterprise shall enter into any transaction of any kind with any affiliate or insider of the Manager other than transactions on terms at least as favorable to the Enterprise as would be the case in an arm's length transaction between unrelated parties of equal bargaining power, the terms of which are disclosed to the Board of Advisors in writing and approved thereby, such approval not to be unreasonably withheld, delayed or conditioned. Notwithstanding anything to the contrary contained herein, contracts for the supply of any goods or services paid for entirely by the Manager may be provided by parties affiliated with the Manager or its officers or directors. Payments on such contracts shall constitute Operating Expenses only if such contracts are at actual cost and neither Manager nor its affiliates obtain any profit in excess of the actual cost. If any such contracts are in excess of actual cost to Manager or its affiliates, such contracts shall not be an Operating Expense and shall be the sole responsibility of Manager. Further, in the event of the leasing of any gaming equipment to the Tribe for use at the Enterprise, neither Manager nor any of its affiliates shall obtain any direct or indirect financial benefit from such leasing activity. Notwithstanding anything to the contrary, Manager shall deliver copies of all contracts executed by it on behalf of the Enterprise to the Management Committee on a monthly basis. Nothing contained in this Section 4.2.4 shall be deemed to be or constitute a waiver of the Tribe's sovereign immunity.

4.3 **Security and Public Safety**. The Manager shall provide for appropriate security for the operation of the Enterprise. All aspects of the Facility security shall be the responsibility

of the Manager. Any security officer shall be bonded and insured in an amount commensurate with his or her enforcement duties and obligations.

      **4.3.1**  **Security/Police Services**. Security/police services shall be divided into the operation of the Tribal Police, security personnel and surveillance personnel.

> (a)    The Tribal Police, a branch of the Tribal Government, shall be responsible for all arrest situations in conjunction with other law enforcement officers where appropriate;

> (b)    The Manager shall be solely responsible for the hiring, training, and supervision of the security personnel. Security personnel shall be responsible for the security of the money and tokens and perform such other duties as the Manager shall require, including, but not limited to, responsibility for carrying out the emergency plan. The parties acknowledge, however, that, should the Tribe so choose, at any time, the Tribe may add a Tribal security person to the security teams in the Casino. The cost of such a security person shall be solely borne by the Tribe;

> (c)    The Tribal Gaming Commission shall have unfettered access to all aspects of the Enterprise, including access to the surveillance room at any time; and

> (d)    Any increased direct cost of public safety or fire protection shall be an Operating cost of the Enterprise.

      **4.4**  **Damage, Condemnation or Impossibility of the Facility**. If the Facility is damaged, destroyed or condemned so that continued development, construction or operation of Gaming cannot be or can no longer be continued at the Facility, the Facility shall at the Tribe's option be reconstructed if the insurance or condemnation proceeds, together with any other funds available to the Tribe, are sufficient to restore or replace the Facility to a condition at least comparable to that before the casualty occurred or such other condition as Manager and the Tribe may agree. If the insurance proceeds, together with other funds available to the Tribe, are not sufficient to so restore or replace the Facility or are not used to repair the Facility, the Tribe shall, with the assistance of Manager, adjust and settle any and all claims for such insurance proceeds or condemnation awards, and such proceeds or awards and any undistributed Distributable Net Revenue pursuant to this Agreement shall be applied first to the amounts due under any indebtedness pertinent to the Facility payable by the Tribe (whether to Manager or third parties); second to pay any third party liabilities of the Enterprise; third to any amounts owed to Manager (other than any loans); and fourth to the Tribe; but subject, in each case, to any applicable subordination agreements.

      **4.5**  **Conduct of Gaming**. All Gaming covered by the Agreement shall be conducted in accordance with all Legal Requirements as required by 25 CFR §531.1(a).

      **4.6**  **Employees**.

      **4.6.1**  **Manager's Responsibility**. Subject to the terms of this Agreement, and subject to the Tribal Gaming Commission's ability to determine and verify that each employee has all necessary qualifications to obtain and maintain the required gaming license, Manager

      13

shall have the exclusive responsibility and authority to direct the selection, hiring, training, control and discharge of all employees performing regular services for the Enterprise in connection with the maintenance, operation, and management of the Enterprise and the Facility and any activity upon the Property.

4.6.2 **Manager's Employees**. Subject to the Budget, it is anticipated that Manager will initially employ persons including, but not limited to those holding the following job titles at the Facility: General Manager, Director of Finance, Director of Marketing, Director of Services, Director of Human Resources, Director of Facilities, and Games Supervisor. Nothing contained herein is intended to limit Manager's right to expand, consolidate, or eliminate any of these positions. Manager may also employ persons in other job categories it determines are necessary to properly staff the Enterprise. Pursuant to Section 4.6.5, the Manager shall give preference in recruiting, training and employment to qualified members of the Tribe.

4.6.3 **Enterprise Employees**. Subject to the Budget, Manager shall hire sufficient employees to effectively staff the Enterprise. All such employees shall be employees of the Tribe, but under Manager's supervision. Pursuant to Section 4.6.5, the Manager shall give preference in recruiting, training and employment to qualified members of the Tribe. The Manager shall not hire any employees that are excluded by the Pre-Opening Agreement with the NIGC or by an exclusion order of the Tribal Gaming Commission.

4.6.4 **Off-Site Employees**. Manager shall also have the right to use employees of Manager or Manager's affiliates not located at the Facility to provide services to the Facility ("**Off-Site Employees**"). All matters related to the use of such employees shall be subject to the budget approved by the Board of Advisors, and be based on a cost recovery basis only as start-up expenses or operating expenses as appropriate. In addition, all Off-Site Employees shall at all times comply with all licensing requirements of the Tribal Gaming Commission and shall result in no additional (direct or indirect) compensation or profit to Manager. Payments to Off-Site Employees shall constitute Operating Expenses only if such payments are at Manager's actual cost and neither Manager nor its affiliates obtain any profit in excess of the actual cost. If any such payments are in excess of actual cost to Manager or its affiliates, then such payments shall not constitute an Operating Expense and shall be the sole responsibility of Manager.

4.6.5 **Indian and Other Preference, Wages, Training and Employment**. In order to maximize benefits of the Enterprise to the Tribe, the Manager shall, during the term of this Agreement, give preference in recruiting, training and employment to qualified members of the Tribe and their spouses and adult children in all job categories of the Enterprise, including management positions, in the following order of preference to the extent consistent with law: (a) enrolled Tribal members; (b) spouse, parent or children of Tribal members; (c) other Native Americans; (d) others from the Tonkawa community; (e) others from the region; and (f) others from the state of Oklahoma. The Manager shall, in consultation with the Tribe, develop a plan for training qualified members of the Tribe in upper management roles during the term of this Agreement. The plan shall be presented for approval by the Board of Advisors no later than the end of the first year of operation and shall commence within the first thirteen (13) months of operation. The training program shall include training for all management positions, including those initially filled with Manager's Employees, to enable tribal members to fill all management positions by the end of the ____ year term of this Agreement. The cost of the training plan

14

shall be an Operating Expense. In order to recruit Tribal members, spouses and adult children, the Manager shall take the following actions: provide job fairs for members of the Tribe and clearly specify in all job advertisements the preference for Tribal members.

        **4.6.6 Removal of Employees**. The General Manager will act in accordance with the Enterprise Employee Policies with respect to the discharge, demotion or discipline of any Enterprise employee.

        **4.6.7 Determination of Qualifications and Compensation**. Subject to the Tribal Gaming Commission's ability to determine and verify that each employee has all necessary qualifications to obtain and maintain the required gaming license, Manager shall have the sole responsibility for determining whether a prospective employee is qualified and the appropriate level of compensation to be paid thereto.

        **4.6.8 Employee Background Check**. A background investigation shall be conducted by the Tribal Gaming Commission in compliance with all Legal Requirements, to the extent applicable, on each applicant for employment as soon as reasonably practicable. No individual whose prior activities, criminal record, if any, or reputation, habits and associations pose a threat to the public interest, the effective regulation of Gaming, or to the gaming licenses of the Manager or any of its subsidiaries or affiliates, or create or enhance the dangers of unsuitable, unfair or illegal practices and methods and activities in the conduct of Gaming, shall be employed by the Manager or the Tribe. The background investigation procedures employed by the Tribe shall satisfy all regulatory requirements independently applicable to the Tribe and to the Manager.

        **4.6.9 Enterprise Employee Policy**. The Manager shall prepare a draft of personnel policies and procedures (the "Enterprise Employee Policy"), including a job classification system with salary levels and scales, which policies and procedures shall be approved by the Board of Advisors. The Enterprise Employee Policy shall include a grievance procedure in order to establish fair and uniform standards for the employees of the Tribe engaged in the Enterprise, which will include procedures for the resolution of disputes between Manager and Enterprise Employees as set forth in Exhibit "B" attached hereto. Employment policies shall ensure the utilization of the Tribe as a primary point of dissemination of information related to employment and career opportunities. The Tribal Education and Training Office shall serve as an initial contact and referral source for tribal members and other Indians, and review training and career paths. Any revisions to the Enterprise Employee Policy shall not be effective unless they are approved in the same manner as was the original Enterprise Employee Policy. All such actions shall comply with applicable Tribal law.

    **4.7    Marketing and Advertising**. The Manager shall have responsibility to advertise and promote the Enterprise, the budget for which marketing and advertising activities shall be included in the annual operating budget approved by the Management Committee as described in Section 4.10. Manager, in marketing and advertising the Facility, shall, pursuant to Section 4.6.4, have the right to use marketing and advertising services of Off-Site Employees. The cost of such marketing and advertising activities shall result in no additional (direct or indirect) compensation or profit to Manager, and shall constitute an Operating Expense.

**4.8    Enterprise Bank Accounts.** The Management Committee shall, with approval of the Board of Advisors, select a bank or banks located in the State of Oklahoma for the deposit and maintenance of the funds of the Enterprise and shall establish such bank accounts as the Manager deems appropriate and necessary in the course of business and as consistent with this Agreement, including, but not limited to accounts to service the Minimum Balance Working Capital and the Capital Reserve Fund. No bank account of the Enterprise shall be opened without prior written notice to the Management Committee and a resolution signed by the Board of Advisors of the Tribe.

**4.9    Pre-Opening.** Three (3) months prior to the scheduled Commencement Date, Manager shall commence implementation of a pre-opening program, which shall include all activities necessary to financially and operationally prepare the Facilities for opening. To implement the pre-opening program, Manager shall prepare a comprehensive pre-opening budget, which shall be submitted to the Management Committee for its approval.

**4.10    Operating Budgets.** Manager shall, prior to the scheduled Commencement Date, submit to the Board of Advisors for its approval, a proposed operating budget and business plan for the remainder of the current year ("Operating Budget and Business Plan"). Thereafter, Manager shall, not less than sixty (60) days prior to the commencement of each full or partial year, submit to the Board of Advisors, for its approval, a proposed Operating Budget and Business Plan for the ensuing full or partial year, as the case may be. The Board of Advisors' approval of the Operating Budget and Business Plan shall not be unreasonably withheld or delayed. Manager shall meet with the Board of Advisors to discuss the proposed Operating Budget and Business Plan, and the Board of Advisors' approval shall be deemed given unless a specific written objection thereto is delivered by it to Manager within thirty (30) days after Manager and the Board of Advisors have met to discuss the proposed Operating Budget and Business Plan. If the Board of Advisors for any reason declines to meet with Manager to discuss a proposed Operating Budget and Business Plan, it shall be deemed to have given its consent unless a specific written objection is delivered by it to Manager within fifteen (15) days after the date the proposed Operating Budget and Business Plan are submitted to the Board of Advisors. The Board of Advisors shall review the Operating Budget on a line-by-line basis. To be effective, any notice that disapproves a proposed Operating Budget and Business Plan must contain specific objections to individual Budget line items. If the initial proposed Operating Budget contains disputed budget item(s), the Board of Advisors and Manager agree to cooperate with each other in good faith to resolve the disputed or objectionable proposed item(s). If the Board of Advisors and Manager are unable to resolve the disputed or objectionable item(s) prior to the commencement of the applicable year, the undisputed portions of the proposed Operating Budget shall be deemed to be adopted and approved and the corresponding line item(s) contained in the Operating Budget for the preceding year shall be adjusted as set forth herein and shall be substituted in lieu of the disputed item(s) in the proposed Operating Budget. Those line items which are in dispute shall be determined as follows:

(a)    For disputed items other than those involving payments to Manager or any of its affiliates, such items shall be determined by increasing the preceding year's actual expense for the corresponding line items by an amount determined by Manager which does not exceed the Consumer Price Index for All Urban Consumers published by the Bureau of Labor Statistics of the United States Department of Labor, U.S. City

Average, all items (1982-1984 = 100) for the year prior to the year with respect to which the adjustment to the line item(s) is being calculated or any successor or replacement index thereto. The resulting Operating Budget obtained in accordance with the preceding sentence shall be deemed to be the Operating Budget in effect until such time as the Board of Advisors and Manager have resolved the disputed items.

(b)     For those disputed items involving payments to Manager or any of its affiliates, the prior year's budget for the disputed item shall remain in effect until such time as the Board of Advisors and the Manager have resolved the disputed items. Manager may, after approval by the Board of Advisors, revise the Operating Budget from time to time, as necessary, to reflect any unpredicted significant changes, variables or events or to include significant, additional, unanticipated items of expense. Manager may, after notice to the Board of Advisors, reallocate part or all of the amount budgeted with respect to any line item to another line item and to make such other modifications to the Operating Budget as Manager deems necessary. In addition, in the event actual Gross Revenues for any interim accounting period are greater than those provided for in the Operating Budget, the amounts approved in the Operating Budget for guest services, food and beverage, telephone, utilities, marketing and the repair and maintenance of the Facility for any month shall be automatically deemed to be increased to an amount that bears the same relationship (ratio) to the amounts budgeted for such items as actual Gross Revenue for such month bears to the projected Gross Revenue for such month. The Tribe acknowledges that the Operating Budget is intended only to be a reasonable estimate of the Enterprise revenue and expenses for the ensuing year. Manager shall not be deemed to have made any guarantee, warranty or representation whatsoever in connection with the Operating Budget. Without limitation, any payments made to Manager pursuant to any affiliate or other related contracts shall at all times be subject to the cap on payment to the Manager as set forth in Section 4.27.1 of this Agreement.

4.10.2 **Adjustment to Operating Budget and Business Plan**. If Manager encounters circumstances which require unbudgeted and unexpected expenditures not foreseen at the time of preparation of the Operating Budget and Business Plan and which Manager deems reasonably necessary, in addition to and without limiting the instances described in Sections 4.10, 4.11, and 4.12 and the remedies in Section 4.10, Manager may, without the Board of Advisors' approval, make such expenditures for so long as the same will not, in any quarter, exceed ___ of the amount budgeted for any department. Such limitation shall not apply to the reallocation of budgeted dollars within any department. Manager shall have the right, from time to time during such year, to submit a revision to the Operating Budget and Business Plan to the Board of Advisors for approval, which approval shall not be unreasonably withheld or delayed. The Board of Advisors will review all proposed revisions to an Operating Budget and Business Plan on a line by line basis in the same manner as the Operating Budget and Business Plan. If the Board of Advisors shall disapprove or raise any objections to any items contained in revisions to an Operating Budget and Business Plan, Manager shall continue to use all reasonable efforts to comply with the Operating Budget and Business Plan until a proposed revision has been approved or this Agreement is terminated.

4.11     **Capital Budgets**. Manager shall, not less than sixty (60) days prior to the commencement of each year, submit to the Board of Advisors a recommended "Capital Budget"

for the ensuing full or partial year, as the case may be, for furnishings, equipment, and ordinary capital replacement items ("Capital Replacements") as shall be required to operate the Enterprise in accordance with sound business practices. The Board of Advisors and Manager shall meet to discuss the proposed Capital Budget and the Board of Advisors shall be required to make specific written objections to a proposed Capital Budget in the same manner and within the same time periods specified in Section 4.10 with respect to an Operating Budget. Proposed revisions of the Capital Budget shall be considered in the same manner and within the same time frames specified in Section 4.10. The Board of Advisors shall not unreasonably withhold or delay its consent. Unless the Board of Advisors and Manager otherwise agree, Manager shall be responsible for the design and installation of Capital Replacements, subject to the Board of Advisors approval and right to inspect.

4.12 **Capital Replacements and Maintenance**. The Tribe, through the Board of Advisors, shall effect and expend such amounts for any Capital Replacements as shall be required, in the course of the operation of the Enterprise, to maintain, at a minimum, the Enterprise in compliance with any Legal Requirements and to comply with Manager's recommended programs for renovation, modernization and improvement intended to keep the Enterprise competitive in its market or to correct any condition of an emergency nature, including without limitation, maintenance, replacements or repairs which are required to be effected by the Tribe through the Board of Advisors, which in Manager's sole discretion requires immediate action to preserve and protect the Facility, assure its continued operation, and/or protect the comfort, health, safety and/or welfare of the Facility's guests or employees. Manager is authorized to take all steps and to make all expenditures from the Enterprise's bank account, or Capital Reserve Fund, described at Section 4.13, (in the case of expenditures for Capital Replacements) as it deems necessary to repair and correct any such condition, regardless whether such provisions have been made in the Operating Budget for any such expenditures, and the cost thereof may be advanced by Manager and reimbursed from future revenues. Design and installation of Capital Replacements shall be affected in a time period and subject to such conditions as the Management Committee may establish to minimize interference with or disruption of ongoing operations.

4.13 **Creation, Use and Disposition of Capital Reserve Fund**. Manager shall establish a reserve fund for the purpose of purchasing additions, replacements or improvements to the physical assets (including applicable systems software) of the Facility by transferring a percentage, as set forth below, of the monthly Net Revenues to an Enterprise Bank Account established for this purpose. All amounts in the Capital Reserve Fund shall be invested in interest bearing investments to the extent that availability of funds, when required, is not thereby impaired. Interest earned on amounts deposited in the Capital Reserve Fund shall be added to the balance available for the purpose of the Capital Reserve Fund. Manager shall invest these funds in accordance with an investment policy adopted by the Board of Advisors. Manager shall draw on the Capital Reserve Fund to purchase those items included in the "Capital Budget" approved by the Board of Advisors or such emergency additions or replacements as shall be required to keep the Enterprise in compliance with legal requirements or such additions or replacements necessary to protect the comfort, health, safety or welfare of the Facility's guests or employees or the operating standards of the Enterprise. Deposits into the Capital Reserve Fund shall be _____ each month. Such transfers shall be made from Distributable Net Revenues, shall not be deemed an Operating Expense and shall be made each month by the

18

twenty-first day to disburse the previous month's addition to the Capital Reserve Fund. At the end of any fiscal year, if the actual amount remaining in the Capital Reserve Fund exceeds any such excess shall be distributed at the direction of the Tribe. At the end of the term of this Agreement, the cash and investment assets of the Capital Reserve Account and the Capital Reserve Fund shall be applied to any remaining obligations under this Agreement, with any excess amount distributed at the direction of the Tribe.

64

**4.13.1 Supply Items**. Anything with GAAP useful life of one (1) year or less is deemed a supply item and not a capital item.

**4.13.2 Expenditures**. Any expenditures for capital replacements, which have been approved in the budget process, may be paid from the Reserve Fund without further approval from the Tribe.

**4.14 Litigation**. If any claim or legal action is brought against the Tribe, the Manager, the Management Committee, the Board of Advisors or any employee of the Manager or of the Enterprise at the Facility or Board of Directors of the Tribe by any person arising out of the operation of the Enterprise or against the Manager, its parent, subsidiary or affiliates arising out of Manager's participation in the Tribe's manager selection process or the execution of this Agreement or any other related agreement between Tribe and Manager, the Tribe, the Board of Advisors, or the Manager, as appropriate, shall defend such action. All liabilities, costs and expenses, including reasonable attorneys' fees and disbursements incurred in defending and/or settling any claim or action which are not covered by insurance and which, as to Manager, relate to acts or omissions of Manager within the scope of its authority under this Agreement, shall be an Operating Expense, or, if incurred prior to the Commencement Date, shall be a Start-up Expense. The only exception to the foregoing shall be that each party will be responsible for its own acts if same are proven to be willful or wanton. Further, notwithstanding anything to the contrary contained herein, to the extent that the attorneys' fees incurred by Manager are in connection with acts or omissions of Manager where Manager is adjudicated to be at fault, then such attorneys' fees shall not constitute an Operating Expense.

**4.15 No Manager Wages or Salaries**. Except as otherwise provided, with respect to Manager's employees described in Section 4.6.2 and Off-Site Employees described in Section 4.6.4, neither the Manager nor any of its officers, directors or shareholders shall be compensated by wages from or contract payments by the Enterprise for their efforts or for any work which they perform under this Agreement, other than loan repayments, and the Management Fee paid to Manager under Section 6.4. Nothing in this subsection shall restrict the ability of an employee of the Enterprise to purchase or hold stock in the Manager, its parents, subsidiaries or affiliates where (a) such stock is publicly held, and (b) such employee acquires, on a cumulative basis, less than five percent (5%) of the outstanding stock in the corporation.

**4.16 Internal Control Systems**. The Manager shall install systems for monitoring of all funds, which systems shall be submitted to the Board of Advisors for approval in advance of implementation, which approval shall not be unreasonably withheld. The Board of Advisors shall retain the right to review all internal control systems (the "Internal Control Systems") and any changes instituted to the Internal Control Systems of the Enterprise. The Board of Advisors shall have the right to retain an auditor to review the adequacy of the Internal Control Systems

449325.5                                         19

prior to the Commencement Date. The cost of such review shall constitute a start-up expense. Any significant changes in such systems after commencement of operation of the Facility also shall be subject to review and approval by the Board of Advisors. The Board of Advisors and the Manager shall have the right and duty to maintain and police the Internal Control Systems in order to prevent any loss of proceeds from the Enterprise. The Board of Advisors shall have the right to inspect and oversee the systems at all times. The Manager shall install a closed circuit television system to be used for monitoring the cash handling activities of the Enterprise.

4.17  **Daily Deposits to Depository Account**. The Manager shall establish for the benefit of the Tribe in the Tribe's name a Depository Account. The Manager shall collect all gross revenues and other proceeds connected with or arising from the operation of the Enterprise, the sale of all products, food and beverage, and all other activities of the Enterprise and deposit the related cash into the Depository Account at least once during each 24-hour period. All money received by the Enterprise on each day that it is open must be counted at the close of operations for that day or at least once during each 24-hour period. The parties hereto agree to obtain a bonded transportation service to effect the safe transportation of the daily receipts to the bank, if such service is available at a reasonable cost and if not provided by the bank, which expense shall constitute an Operating Expense.

4.18  **Disbursement Account**. The Manager shall establish for the benefit of the Tribe in the Tribe's name a "Disbursement Account". The Manager shall, consistent with and pursuant to the approved annual budget, have responsibility and authority for making all payments for Operating Expenses, debt service, management fees, and disbursements to the Tribe from the Disbursement Account.

4.19  **No Cash Disbursements**. The Manager shall not make any cash disbursements from the bank accounts or cash on hand except for the payment of cash prizes or disbursements from any petty cash fund of[        ] Any and all other payments or disbursements by the Manager shall be made by check or wire transfer drawn against a bank account.

4.20  **Transfers Between Accounts**. The Manager has the authority to transfer funds among the Operating Accounts, excluding the Capital Reserve account, in order to pay Operating Expenses, to pay amounts due under the Development and Construction Agreement, the Minimum Priority Payment, the investment of Minimum Balance Working Capital Funds pursuant the Enterprise Investment Policy and the fees payable to Manager pursuant to this Agreement and any other payments provided for in Section 6.4.

4.21  **Insurance**. The Manager, on behalf of the Tribe, shall obtain and maintain, or cause its agents to maintain, with responsible insurance carriers licensed to do business in the State of Oklahoma, insurance in compliance with the Compact and satisfactory to Manager and the Management Committee covering the Facility and the operations of the Enterprise, naming the Tribe, the Manager, its parent and other affiliates as insured parties.

4.22  **Accounting and Books on Account**.

4.22.1  **Statements**.  The Manager shall prepare and provide to the Tribal Committee, monthly financial statements of the Enterprise, which shall include, without

limitation, a current balance sheet, income statement, statement of cash flows, operating reports, and the balance held in the Minimum Balance Working Capital Fund and in the Capital Reserve Fund. In addition, upon the request of the Tribal Committee, Manager shall additionally provide copies of the foregoing statements prepared on a quarterly and/or on an annual basis, and after the full year of operations of the Enterprise, will include comparative statements of all revenues, and all other amounts collected and received, and all deductions and disbursements made therefrom in connection with the Enterprise. The monthly and quarterly statements and reports provided by Manager pursuant to this Section 4.22.1 shall be delivered by the twenty-first $(21^{st})$ day of the month following the completion of the applicable month or quarter, with the annual operating report delivered within sixty (60) days of the year end. The annual certified audit of the Enterprise shall be conducted by the Tribe's audit firm. The Tribe, the B.I.A. and the NIGC shall also have the right to perform special audits of the Enterprise on any aspect of the Enterprise at any time without restriction. The costs incurred for such audits shall constitute an Operating Expense. Such audits shall be provided by the Tribal Committee to all applicable federal and state agencies, as required by law, and may be used by the Manager for reporting purposes under federal and state securities laws, if required. The auditors shall have access to all books and records, all cash management procedure manuals, all internal control manuals, and all other records, documents, papers and persons of the Enterprise or employed by the Enterprise as the auditors shall deem necessary. For each audit performed by the auditors, the auditors shall provide Manager with a draft management letter, and shall permit Manager a reasonable time within which to respond to the management letter with changes to the operations of the Enterprise, which address the concerns expressed in the draft management letter. The Manager warrants that it shall retain in the strictest confidence the information provided by the Tribal Committee, and shall include in any reports concerning Manager's financial affairs only such portions of information supplied by the Tribal Committee as is required by statute to be provided. The Tribal Committee shall provide copies of the auditor's annual audit to the NIGC and to such other governmental agencies as may be required by law.

**4.22.2 Books of Account.** The Manager shall maintain full and accurate books of account at an office in the Facility or at such other location as may be approved by the Tribe. The Tribe shall have immediate access to the daily operations of the Enterprise and shall have the unlimited right to inspect, examine, and copy all such books and supporting business records. Such rights may be exercised through an agent, employee, attorney, or independent accountant acting on behalf of the Tribe.

**4.22.3 Accounting Standards.** Manager shall maintain the books and records reflecting the operations of the Enterprise in accordance with the accounting practices selected by the Tribe in conformity with Generally Accepted Accounting Principles consistently applied and shall adopt and follow a fiscal year as identified and selected by the Tribe. The Facility level generated accounting records reflecting detailed day-to-day transactions of the Facility's operations shall be kept by Manager and shall be immediately accessible and available for inspection by the Tribe. The accounting systems and procedures shall, at a minimum (i) comply with the Compact between the State of Oklahoma and the Tribe; (ii) include an adequate system of internal accounting controls; (iii) permit the preparation of financial statements in accordance with generally accepted accounting principles; (iv) be susceptible to audit; (v) permit the calculation and payment of the Management Fee as described in this Agreement and the calculation by the Tribe and the NIGC of annual fees payable under 25 C.F.R. Section 514.1; and

449325.5                                      21

(vi) provide for the allocation of operating expenses or overhead expenses among the Tribe, the Tribal gaming operation, the contractor, and any other user of shared facilities and services.

**4.22.4 Accounting Services.** Subject to the Tribe's ability to approve the location of books and records as set forth in Section 4.22.2 above, all accounting services for the Facility shall be performed by Enterprise Employees, Off-Site Employees or third party contractors to be determined by the Manager. The cost of such services shall constitute an Operating Expense.

**4.23 Retail Shops and Concessions.** With respect to the management of the shops and concessions located within the Facility, the Board of Advisors shall approve in advance in writing the specific type or types of shops or concessions proposed by the Manager to be authorized for inclusion in the Enterprise.

**4.24 Enterprise Operating Standards.** Manager shall operate the Enterprise in a proper, efficient and competitive manner in accordance with operating standards established by the Management Committee and ratified by the Board of Advisors, which standards shall be consistent with the operating standards of the industry generally.

**4.25 Manager's Use of the Facility.** Manager may use the Facility as a model gaming enterprise for the purpose of tours by, or display to, Indian tribes or other parties which may be interested in developing gaming operations to be managed by Manager, provided that such tours will not unreasonably interfere with the operation of the Enterprise, and that the cost thereof will not constitute an Operating Expense of the Enterprise.

**4.26 [Intentionally Omitted].**

**4.26.1 [Intentionally Omitted].**

**4.27 Optional Marketing Services.** The Tribe acknowledges that Manager or Manager's affiliates may provide services in addition to those which are encompassed by this Agreement. The Tribe agrees to consider in good faith any bids/proposals presented to it by Manager or any of its affiliates for such additional services relative to the Casino; it being understood, however, that this Section shall in no event be construed to require the Tribe to accept any such bid/proposal.

**4.27.1 Cap on Payments to Manager.** Except as otherwise set forth in this Agreement, charges to and amounts payable by the Tribe under this Agreement, when combined with the Management Fee, shall not exceed⎿ �englishIn addition, except for payment of the Management Fee and interest payable by the Tribe to Manager with respect to any loans from Manager to the Tribe, all payments to Manager shall reflect Manager's actual cost of such payment items, and in no event shall Manager charge or receive, either directly or indirectly, any profit in excess of Manager's actual cost.

64

**4.28 Limits of Charges to Enterprise for Regulatory Costs.** Without intending to limit the Tribe's ability to budget any amount it determines necessary for the regulation of gaming at the Enterprise, the Tribe and Manager agree that the maximum payable by the

22

Enterprise for tribal regulatory cost shall be an amount not to exceed an amount to be agreed to by the parties.

**4.29    Agreed Ceiling for Repayment of Development and Construction Costs.** The Facility is already in existence and there are no plans for expansion that would significantly change the current footprint of the Facility. Any changes to the Facility will be limited to internal renovations, upgrades and similar improvements to the Facility.

The Tribe's total financial obligations for renovations, upgrades and improvements to the Facility shall not exceed

## ARTICLE 5
## LIENS

The Tribe specifically warrants and represents to the Manager that during the term of this Agreement the Tribe shall not act in any way whatsoever, either directly or indirectly, to cause any party to become an encumbrancer or lien holder of the Property or the Facility, or to allow any party to obtain any interest in this Agreement without the prior written consent of the Manager, and, where applicable, consent from the United States, except as provided in the last sentence of this paragraph. The Manager specifically warrants and represents to the Tribe that during the term of this Agreement the Manager shall not act in any way, directly or indirectly, to cause any party to become an encumbrancer or lien holder of the Property or the Facility. The Tribe and the Manager shall keep the Facility and Property free and clear of all mechanics' and other liens resulting from the construction of the Facility and all other liens which may attach to the Facility or the Property, which shall at all times remain the property of the United States in trust for the Tribe. If any such lien is claimed or filed, it shall be the duty of the Tribe and the Manager to discharge the lien within 30 days after having been given written notice of such claim, either by payment to the claimant, by the posting of a bond and the payment into the court of the amount necessary to relieve and discharge the Property from such claim, or in any other manner which will result in the discharge of such claim. Nothing herein shall prevent the Tribe from utilizing the proceeds of the Enterprise to secure borrowing for governmental and economic development purposes as long as same is subordinated to the Capital Replacement Reserve, Operating Expenses, and the Management Fee. Notwithstanding the foregoing, purchase money security interests in personal property may be granted with the prior written consent of the Board of Advisors and, when necessary, the B.I.A., United States Department of Interior and/or the NIGC as appropriate.

## ARTICLE 6
## MANAGEMENT FEE, REIMBURSEMENT AND DISBURSEMENT

**6.1    Management Fee.** Subject to the provisions of Section 6.4, on or before the twenty-first (21st) day of each month after the first calendar month of operation. Manager is authorized by the Tribe to pay itself from the Minimum Balance Working Capital Account its Management Fee.

**6.2** **Disbursements**. As and when received by Manager, all revenues shall be deposited in the Bank Account(s) created pursuant to Section 4.8 of this Agreement. There shall, in turn, be disbursed by Manager, for and on behalf of the Tribe, funds from the Bank Account(s) to pay, to the extent available, Operating Expenses and required deposits into the Capital Reserve Fund for Capital Replacements.

**6.3** **[Intentionally Left Blank]**

**6.4** **Payment of Fees and Tribal Disbursement**. Within 21 days after the end of each calendar month of operations, the Manager shall calculate and report to the Tribe the Gross Revenues, Operating Expenses, Net Revenues and Distributable Net Revenue of the Enterprise for the previous month's operations and the year's operations to date. Such Distributable Net Revenues shall be disbursed monthly from the Minimum Balance Working Capital Account to the extent available to pay the scheduled items to the extent due and payable and earned in the following order of priority:

(i)     the Minimum Priority Payment as described in Section 2.34;

(ii)     any and all principal and interest due according to the loan amortization schedule for loans relating to the development and operation of Enterprise, if any (except as set forth in Section 4.29 of this Agreement, as of the date hereof,

*64*

(iii)     Capital Reserve Fund contribution as described in Section 4.13;

(iv)     the Recoupment Payment and reimbursement of other amounts advanced by the Manager;

(v)     Management Fee as described in Section 3.7.

All remaining Distributable Net Revenues shall be distributed at the direction of the Tribe. The Tribe shall be responsible for payment and provision of all operating capital for the Enterprise.

**6.5** **Adjustment to Final Distribution at End of Fiscal Year**. The independent certified public accounting firm selected pursuant to this Agreement shall recommend, as part of the annual audit, any adjustments, if necessary, to the annual Management Fee and the Tribe's distribution (other than the Minimum Priority Payment), which adjustments shall be made by Manager and the Tribe.

**6.6** **Distribution at End of Term**. At the end of the Term of this Agreement, and following the completion, by the auditor, of the annual audit for the final year of the Management Agreement, but in no event later than one hundred and twenty (120) days following the end of the Term of this Agreement, any balance due to Manager, together with any adjustment determined to be necessary as a result of the final annual audit of the Enterprise, shall be paid to Manager.

## ARTICLE 7
## GENERAL PROVISIONS

7.1    **Notice**. Any notice required to be given pursuant to this Agreement shall be delivered to the appropriate party by Certified Mail Return Receipt Requested, addressed as follows:

| | |
|---|---|
| If to the Tribe: | TONKAWA      TRIBE      OF      INDIANS      OF OKLAHOMA<br>c/o President<br>P.O. Box 70<br>Tonkawa, Oklahoma 74653<br>FAX: 580-628-7033 |
| Copy to: | ANDREWS DAVIS<br>c/o Ken Bellmard, Esq.<br>100 North Broadway, Suite 3300<br>Oklahoma City, Oklahoma 73102-8812<br>FAX: 405-235-8781 |
| If to Manager: | GAUGHAN GAMING-TONKAWA, LLC<br>c/o John Gaughan<br>3555 West Reno Avenue, Suite C<br>Las Vegas, Nevada 89118<br>FAX: 702-891-5228 |
| Copy to: | GAUGHAN GAMING, LLC<br>c/o Sam Basile, Vice President and General Counsel<br>3555 West Reno Avenue, Suite C<br>Las Vegas, Nevada 89118<br>FAX: 702-891-5228 |

or to such other different address(es) as the Manager or the Tribe may specify in writing using the notice procedure called for in this Article 7. Any such notice shall be deemed given two days following deposit in the United States mail or upon actual delivery, whichever first occurs.

7.2    **Authorization**. The Tribe and Manager represent and warrant to each other that they each have full power and authority to execute this Agreement and to be bound by and perform the terms hereof. On request, each party shall furnish the other evidence of such authority.

7.3    **Relationship**. Manager and the Tribe shall not be construed as joint venturers or partners of each other by reason of this Agreement and neither shall have the power to bind or obligate the other except as set forth in this Agreement.

7.4    **Manager's Contractual Authority in the Performance of this Agreement**. Subject to the provisions of the IGRA and the Compact, Manager is authorized to make, enter

449325.5                                    25

into and perform, in the name of and for the account of the Tribe, any contracts deemed necessary by Manager to perform its obligations under this Agreement.

7.5    **Further Actions.**    The Tribe and Manager agree to execute all contracts, agreements and documents and to take all actions necessary to comply with the provisions of this Agreement and the intent hereof.

7.5.1  **Fire and Safety.**    The Facility has been constructed, and will be maintained in compliance with the State of Oklahoma Building Code. Nothing in this Section shall grant any jurisdiction to the State of Oklahoma or any political subdivision thereof over the Property or the Facility. The Manager shall make all arrangements for emergency and fire protection to be supplied to the Facility. All costs relative to the provision of such emergency and fire protection shall constitute an Operating Expense.

7.5.2  **Taxes.**    If the State of Oklahoma or any local government attempts to impose any possessory interest tax upon any party to this Agreement or upon the Enterprise, the Facility or the Property, the Board of Advisors, in the name of the appropriate party or parties in interest, will, upon the request of either party, resist such attempt through legal action. The costs of such action and the compensation of legal counsel shall be an Operating Expense of the Enterprise. Any such tax shall constitute an Operating Expense of the Enterprise. This Section shall in no manner be construed to imply that any party to this Agreement or the Enterprise is liable for any such tax, or that any state or federal tax on the Manager's income is to be considered an expense of the Enterprise.

7.5.3  **Tribal Taxes.**    The Tribe agrees that neither it nor any agent, agency, affiliate or representative of the Tribe will impose any taxes, fees, assessments, or other charges of any nature whatsoever on payments of any debt service to Manager or to any lender furnishing financing for the Facility or for the Enterprise, or on the Enterprise, the Facility, the revenues there from or on the Management Fee as described in Section 6.4 of this Agreement; provided, however, the Tribe may assess a tax upon Manager in the nature of a business and occupation tax or other tax assessed against Manager by the State of Oklahoma, but only to the extent that same is a dollar for dollar set off against the State tax. The Tribe further agrees that neither it nor any agent, agency, affiliate or representative will impose any taxes, fees, assessments or other charges of any nature whatsoever on the salaries or benefits, or dividends paid to, any of the Manager's stockholders, officers, directors, or employees or any of the employees of the Enterprise. Manager retains the right, in its sole discretion, to terminate this Agreement and all accompanying agreements if it reasonably determines that any statute or regulation of the Tribe renders operation of the Enterprise uncompetitive.    Should the Manager terminate this Agreement pursuant to this Section, the Manager shall retain the right to repayment of: (a) money lent to the Tribe; and (b) reimbursement of any monies, which may become due and payable. Except as otherwise provided herein, if any taxes, fees or assessments are levied by the Tribe on the Enterprise, such taxes and assessments shall be abated for the term of this Agreement. Nothing herein shall limit the Tribe's ability to tax its members.

7.5.4  **Situs of the Contracts.**    This Agreement, as well as all contracts entered into between the Tribe and any person or any entity providing services to the Enterprise, shall be deemed entered into at the Executive Office of the Tribe on Indian County in Oklahoma, and

shall be subject to all Legal Requirements of the Tribe and federal law as well as approval by the Secretary of the Interior or the Chairman of the NIGC where required by 25 U.S.C. § 81 or IGRA.

7.5.5 **Compliance With The National Environmental Policy Act**. The Tribe shall supply the NIGC with all information necessary for the NIGC to comply with any regulations of the Commission issued pursuant to NEPA.

7.6 **Defense**. Except for disputes between the Tribe and Manager, Manager shall bring and/or defend and/or settle any claim or legal action brought against Manager or the Tribe, individually, jointly or severally in connection with the operation of the Enterprise. Manager shall retain and supervise legal counsel, accountants and such other professionals, consultants and specialists as Manager deems appropriate to defend and/or settle any such claim or cause of action. In all claims or legal actions bringing claims against the Tribe involving questions of jurisdiction, tribal sovereignty or sovereign immunity issues, the Manager shall consult with the Tribe concerning the presentation and defense of such actions. All liabilities, reasonable costs, and expenses, including attorneys' fees and disbursements, incurred in defending and/or settling any such claim or legal action, which are not covered by insurance, shall be an Operating Expense. Nothing contained herein is a grant to the Manager of the right to waive tribal sovereign immunity.

7.7 **Waivers**. No failure or delay by Manager or the Tribe to insist upon the strict performance of any covenant, agreement, term or condition of this Agreement, or to exercise any right or remedy consequent upon the breach thereof, shall constitute a waiver of any such breach or any subsequent breach of such covenant, agreement, term or condition. No covenant, agreement, term, or condition of this Agreement and no breach thereof shall be waived, altered or modified except by written instrument. No waiver of any breach shall affect or alter this Agreement, but each and every covenant, agreement, term and condition of this Agreement shall continue in full force and effect with respect to any other then existing or subsequent breach thereof.

7.8 **Captions**. The captions for each Section and Article are intended for convenience only.

7.9 **Severability**. If any of the terms and provisions hereof shall be held invalid or unenforceable, such invalidity or unenforceability shall not affect any of the other terms or provisions hereof. If, however, any material part of a party's rights under this Agreement shall be declared invalid or unenforceable (specifically including Manager's right to receive its Management Fees), the party whose rights have been declared invalid or unenforceable shall have the option to terminate this Agreement upon thirty (30) days written notice to the other party, without liability on the part of the terminating party.

7.10 **Interest**. Except for any advances by Manager to the Tribe of all or any part of the Minimum Priority Payment, any amount payable to Manager or the Tribe by the other, which has not been paid as provided herein, or in the Development and Construction Agreement shall accrue interest at a rate equal to                                    Without limitation, all interest paid to Manager shall constitute an Operating Expense.

**7.11**   **Reimbursement**. The performance by Manager of its responsibilities under this Agreement are conditioned upon the Enterprise generating sufficient funds from borrowings and operations to enable Manager on a timely basis to perform its obligations hereunder.

**7.12**   **Travel and Out-of-Pocket Expenses**. Subject to the annual budget, Manager shall be reimbursed for all reasonable travel and out-of-pocket expenses of Manager's employees reasonably incurred in the performance of this Agreement. Reasonable travel and out-of-pocket expenses shall not include ongoing living expenses of the Manager or employees of the Enterprise. All such expenses shall be reimbursed at actual cost to the Manager. Subject to the annual budget, all such expenses shall be an Operating Expense so long as Manager establishes that these expenses constitute the actual cost to Manager.

**7.13**   **Third Party Beneficiary**. This Agreement is exclusively for the benefit of the parties hereto and it may not be enforced by any party other than the parties to this Agreement and shall not give rise to liability to any third party other than the authorized successors and assigns of the parties hereto.

**7.14**   **Brokerage or Other Fees**. Manager and the Tribe represent and warrant to each other that neither has sought the services of a broker, finder or agent in this transaction, and neither has employed, nor authorized, any other person to act in such capacity other than as disclosed herein. Manager and the Tribe each hereby agrees to indemnify and hold the other harmless from and against any and all claims, loss, liability, damage or expenses (including reasonable attorneys' fees) suffered or incurred by the other party as a result of a claim brought by a person or entity engaged or claiming to be engaged as a finder, broker or agent by the indemnifying party.

**7.15**   **Survival of Covenants**. With the exception of the obligation to make the Minimum Priority Payment described at Section 6.4, any covenant, term or provision of this Agreement which, in order to be effective, must survive the termination of this Agreement, shall survive any such termination.

**7.16**   **Estoppel Certificate**. Manager and the Tribe agree to furnish to the other party, from time to time upon request, an estoppel certificate in such reasonable form as the requesting party may request stating whether there have been any defaults under this Agreement known to

the party furnishing the estoppel certificate and such other information relating to the Enterprise as may be reasonably requested.

7.17  **Periods of Time.**  Whenever any determination is to be made or action is to be taken on a date specified in this Agreement, if such date shall fall on a Saturday, Sunday or legal holiday under the laws of the Tribe or the State of Oklahoma, then in such event, said date shall be extended to the next day which is not a Saturday, Sunday or legal holiday.

7.18  **Preparation of Agreement.**  This Agreement shall not be construed more strongly against either party regardless of who is responsible for its preparation.

7.19  **Exhibits.**  All exhibits attached hereto are incorporated herein by reference and made a part hereof as if fully rewritten or reproduced herein.

7.20  **Successors, Assigns, and Subcontracting.**  The benefits and obligations of this Agreement shall inure to and be binding upon the parties hereto and their respective successors and assigns. So long as same is in compliance with IGRA and the Compact, the Tribe's consent shall not be required for Manager to assign or subcontract any of its rights, interests or obligations as Manager hereunder to any parent, subsidiary or affiliate of Manager or its successor corporation, provided that any such assignee or subcontractor agrees to be bound by the terms and conditions of this Agreement, specifically the right of the Enterprise to the use of Manager's Marks during the term of this Agreement. The acquisition of Manager or, if applicable, its parent company by a party other than the parent, subsidiary, or affiliate of Manager, or its successor corporation, shall not constitute an assignment of this Agreement by Manager and this Agreement shall remain in full force and effect between the Tribe and Manager, subject only to NIGC completion of its background investigation and approval of the purchaser provided that such acquiring company shall seek the Board of Advisors' approval of any General Manager, Director of Finance, Director of Human Resources and the Director of Casino Operations if such are replaced subsequent to the Acquisition and this Agreement shall be amended to so provide automatically upon such acquisition. Other than as stated above, this Agreement may be assigned or its non-gaming obligations subcontracted by the Manager, subject to approval by the Tribe, which approval shall not be unreasonably withheld, and the Chairman of the NIGC or his authorized representative after a complete background investigation of the proposed assignee. The Tribe shall, without the consent of the Manager but, to the extent required, subject to approval by the Secretary of the Interior or the Chairman of the NIGC or his authorized representative, have the right to assign this Agreement and the assets of the Enterprise to an instrumentality of the Tribe or to a corporation wholly owned by the Tribe organized to conduct the business of the Enterprise for the Tribe that assumes all obligations herein. Any assignment by the Tribe shall not prejudice the rights of the Manager under this Agreement.  No assignment authorized hereunder shall be effective until all necessary government approvals have been obtained.

7.21  **Confidential Information.**  Both parties agree that any information received concerning the other party during the performance of this Agreement, regarding the parties' organization, financial matters, marketing plans, or other information of a proprietary nature, will be treated by both parties in full confidence, and, except in response to legal process or appropriate and necessary governmental inquiry, will not be revealed to any other persons, firms

or organizations. This provision shall survive the termination of this Agreement for a period of two (2) years.

**7.22 Employment Solicitation Restriction Upon Termination**. It is anticipated that the initial management staff of the Enterprise will be recruited by Manager from the ongoing operations of Manager or other gaming operations ("Covered Employees"). In addition, during the Term of this Agreement, such positions might likewise be filled with Covered Employees. If this Agreement is terminated at any time other than at the end of the Term, then the Tribe agrees not to employ any Covered Employee for a period of twelve (12) months after the termination or expiration of this Agreement, without Manager's prior written approval. Furthermore, the Tribe hereby agrees not to solicit the employment of any Covered Employee at any time during the Term of this Agreement without Manager's prior written approval.

**7.23 Patron Dispute Resolution**. Manager shall submit all patron disputes concerning play to the Tribal Gaming Commission pursuant to the Gaming Ordinance, the regulations promulgated thereunder, and the Compact.

**7.24 Modification**. Any change to or modification of this Agreement must be in writing signed by all parties hereto and shall be effective only upon approval by the Chairman of the NIGC, the date of signature of the parties notwithstanding.

## ARTICLE 8
## WARRANTIES

**8.1 Warranties**. The Manager and the Tribe each warrant and represent that they shall not act in any way whatsoever, directly or indirectly, to cause this Agreement to be amended, modified, canceled, or terminated, except pursuant to Section 7.24. The Manager and the Tribe warrant and represent that they shall take all actions necessary to ensure that this Agreement shall remain in full force and effect at all times.

**8.2 Interference in Tribal Affairs**. The Manager agrees not to interfere in or attempt to influence the internal affairs or government decisions of Tribal government by offering cash incentives, by making written or oral threats to the personal or financial status of any person, or by any other action, specifically including actions in the normal course of business of the Manager that only affect the activities of the Enterprise, except for contact with the Board of Advisors or authorized Tribal employees.

**8.3 No Political Interference with Operations**. The Tribe agrees that it shall not, through its elected government officials, interfere with the day-to-day operations of Manager.

**8.4 Prohibition of Payments to Members of Tribal Government**. The Manager represents and warrants that no payments have been or will be made to any member of the Tribal government, any Tribal official, or any Tribal government employee for the purpose of obtaining any special privilege, gain, advantage or consideration.

**8.5 Prohibition of Hiring Gaming Regulatory Officials and Members of Tribal Government** . No member(s) of the Board of Advisors, the Tribal Gaming Commission, the Tribal Representative or their respective immediate family member(s) may be employed at the

449325.5                                    30

Enterprise. Any elected Tribal official who is not involved in gaming matters at the Enterprise as set forth in the immediately preceding sentence may be employed at the Enterprise upon obtaining a written waiver from the Board of Advisors and other required regulatory approval. For these purposes, the term "immediate family member" means an individual who is related to a member of the Board of Advisors, Tribal Gaming Commission or the Tribal Representative as a father, mother, son, daughter, brother, sister, husband, wife, father-in-law, mother-in-law, son-in-law, daughter-in-law, bother-in-law, sister-in-law, stepfather, stepmother, stepsister, stepbrother, half brother or half sister.

**8.6   Prohibition of Financial Interest in Enterprise.** No member of the Tribal government shall have a direct or indirect financial interest in the Enterprise greater than the interest of any other member of the Tribe.

**8.7   Definitions.** As used in this Article 8, the term "member of the Tribal government" means any member of the Tribal Committee, or other tribal elected official, Board of Advisors, the Tribal Gaming Commission or any independent board or body created to oversee any aspect of Gaming and any Tribal court official.

## ARTICLE 9
## GROUNDS FOR TERMINATION

**9.1   Voluntary Termination and Termination for Cause.** This Agreement maybe terminated pursuant to the provisions of Sections 8.2, 9.2, 9.3, 9.4, and 9.5.

**9.2   Voluntary Termination.** This Agreement may be terminated upon the mutual written consent and approval of the parties.

**9.3   Termination for Cause.** Either party may terminate this Agreement if the other party commits or allows to be committed any material breach of this Agreement. A material breach of this Agreement shall include, but not be limited to, a failure of either party to perform any material duty or obligation on its part for any twenty (20) consecutive days after notice. Neither party may terminate this Agreement on grounds of material breach unless it has provided written notice to the other party of its intention to declare a default and to terminate this Agreement and the defaulting party thereafter fails to cure or take steps to substantially cure the default within sixty (60) days following receipt of such notice. The discontinuance or correction of a material breach shall constitute a cure thereof. The Tribe may also terminate this Agreement where the Manager has had its license withdrawn because the Manager, or a director or officer of the Manager, has been convicted of or pleads nolo contendere to a criminal felony or misdemeanor offense such as fraud, embezzlement or a crime of moral turpitude; provided, however, the Tribe may not terminate this Agreement based on a director or officer's conviction where the Manager terminates such individual within ten (10) days after receiving notice of the conviction or plea of nolo contendere. In the event that a director or officer of Manager is convicted of or pleads nolo contendere to a criminal felony or misdemeanor offense such as fraud, embezzlement or a crime of moral turpitude, said individual shall not be allowed to continue management responsibility or be present at the Enterprise and shall immediately be prohibited by Manager from said activities or presence. In the event of any termination for cause, regardless of fault, the parties shall retain all money previously paid to them pursuant to

Article 6 of this Agreement; and the Tribe shall retain title to all Facility fixtures, improvements, supplies, equipment, funds and accounts, subject to the rights of the Manager to any accrued and unpaid Net Revenues due under Article 6 of this Agreement. The Manager shall continue to have the right to repayment of unpaid principal and interest and other amounts due under any agreements entered pursuant hereto. An election to pursue damages or to pursue specific performance of this Agreement or other equitable remedies while this Agreement remains in effect shall not preclude the injured party from providing notice of termination pursuant to this Section 9.3. Neither shall termination preclude a suit for damages.

9.4     **Involuntary Termination Due to Changes in Legal Requirements**. It is the understanding and intention of the parties that the establishment and operation of the Enterprise conforms to and complies with all Legal Requirements. If during the term of this Agreement, the Enterprise, any material aspect of Gaming or any material aspect of the Compact is determined by the Congress of the United States, the Department of the Interior of the United States of America, the NIGC, or the final judgment of a court of competent jurisdiction to be unlawful under federal law, the obligations of the parties hereto shall cease, and this Agreement shall be of no further force and effect; provided that (i) the Manager shall have the rights in Section 4.4 of this Agreement; (ii) the Manager and the Tribe shall retain all money previously paid to them pursuant to Article 6 of this Agreement; (iii) funds of the Enterprise in any account shall be paid and distributed as provided in Article 6 of this Agreement; (iv) any money lent by or guaranteed by the Manager or its affiliates to the Tribe shall be repaid to the Manager to the extent provided in this Agreement; and (v) the Tribe shall retain its interest in the lease and title to all Enterprise fixtures, supplies and equipment, subject to any requirements of financing arrangements. Nothing contained in this Section 9.4 shall be read to preclude either or both parties' contest of any actions, which could lead to the involuntary cessation of gaming, by the Enterprise.

9.5     **Manager's Right to Terminate Agreement**.     Manager may terminate this Agreement by written notice effective upon receipt if:

(a)     Any Tribal, State or Federal authority where approval is required fails to approve this Agreement or otherwise objects to the performance by Manager of any obligation imposed on it under this Agreement.

(b)     Manager has been notified by any regulatory agency that the performance by it of any obligation imposed by this Agreement will jeopardize the retention of any license, or approvals granted thereunder, held by Manager or any of its affiliates in any other jurisdiction, and the Tribe refuses to allow the Manager to immediately rectify any such complaint.

(c)     Manager has reason to believe that the performance by it or the Tribe of any obligation imposed under this Agreement may reasonably be expected to result in the breach of any applicable Tribe, State or Federal law.

(d)     The Tribe fails to make any payment to Manager when due although funds are available.

**9.6    Tribe's Right to Terminate Agreement**.    The Tribe may terminate this Agreement by written notice effective upon receipt of:

(a)    Any Federal or State authority, where approval is required, fails to approve this Agreement or otherwise objects to the performance by Manager of any obligation imposed on it under this Agreement.

(b)    Tribe has reason to believe that the performance by it or Manager of any obligation imposed under this Agreement may reasonably be expected to result in the breach of any applicable Tribal, State or Federal law or the Compact.

(c)    Manager fails to make any Monthly Minimum Priority Payment to the Tribe or annual year end distribution within the time specified in this Agreement, unless otherwise provided in this Agreement.

**9.7    Consequences of Manager's Breach**.    In the event of the termination of this Agreement by the Tribe for cause under Section 9.3, the Manager shall not prospectively from the date of termination, except as provided in Section 9.3, have the right to its Management Fee from the Enterprise, but such termination shall not affect the Manager's rights relating to reimbursement under this Agreement, or any other agreements entered pursuant hereto. The Manager and Tribe acknowledge and agree that termination of this Agreement may not be a sufficient or appropriate remedy for breach by the Manager, and further agree that pursuant to the other provisions of this Agreement, the Tribe shall, upon breach of this Agreement by the Manager, have the right to pursue such remedies (in addition to termination) at law or equity as it determines are best able to compensate it for such breach. Any Net Revenues accruing through the date of termination shall be distributed in accordance with Article 6 of this Agreement.

**9.8    Consequences of Tribe's Breach**.    In the event of termination of this Agreement by the Manager for cause under Section 9.3, the Manager shall not be required to perform any further services under this Agreement and the Tribe shall indemnify and hold the Manager harmless against all liabilities of any nature whatsoever relating to the Enterprise, but only insofar as these liabilities result from acts within the control of the Tribe or its agents or created by the termination of this Agreement. The Manager and the Tribe acknowledge and agree that termination of this Agreement may not be a sufficient or appropriate remedy for breach by the Tribe, and further agree that pursuant to the other provisions of this Agreement, including but not necessarily limited to, Articles 16 and 21, the Manager shall, upon breach of this Agreement by the Tribe, have the right to pursue such remedies (in addition to termination) at law or equity as it determines are best able to compensate it for such breach, including, without limitation, specifically the Management Fee pursuant to Article 6 for a term equal to the then remaining term of this Agreement at the percentage of Net Revenues specified in Article 6. The Tribe specifically acknowledges and agrees that there will be irreparable harm to the Manager and that damages will be difficult to determine if the Tribe commits any breach, and the Tribe therefore further acknowledges that an injunction and/or other equitable relief is an appropriate remedy for any such breach. In such event, the Manager shall have the right to its Management Fee accruing through the date of termination as provided in Article 6 of this Agreement, the repayment of unpaid principal and interest and other amounts due under any note guaranteed or provided by Manager or its affiliates or any loans to the Tribe.

449325.5

33

**9.9    Events Constituting Material Breach**.  The following described events and conditions shall, following notice and failure to cure as provided in Section 9.3 hereof, constitute a Material Breach.

> **9.9.1    On the part of Manager**.
>
>> 9.9.1.1 **Failure to Comply with Covenants**.  Manager shall fail to comply with any applicable covenant contained in this Agreement or the Development and Construction Agreement;
>>
>> 9.9.1.2 **False Representations**.  Any representation, warranty, statement or certificate, made or furnished to the Tribe by Manager pursuant to this Agreement or the Development and Construction Agreement proves to be knowingly false or erroneous in any material respect at the time of making thereof;
>>
>> 9.9.1.3 **Bankruptcy**.  A petition in bankruptcy is filed by or against Manager pursuant to the U.S. Bankruptcy Code or receivership laws, or any similar law, state or federal, or makes any assignment for the benefit of creditors or is adjudged insolvent by any state or federal court; or
>>
>> 9.9.1.4 **Intentional Interference in Internal Political Activity**.  Manager shall have been found to have violated Section 8.2.
>
> **9.9.2    On the Part of the Tribe**.
>
>> 9.9.2.1 **Failure to Comply with Covenants**.  The Tribe fails to comply with any covenant contained in this Agreement or the Development and Construction Agreement;
>>
>> 9.9.2.2 **False Representations**.  Any representation, warranty, statement or certificate, made or furnished to Manager by or on behalf of the Tribe proves to be knowingly false or knowingly erroneous in any material respect at the time of the making thereof;
>>
>> 9.9.2.3 **Actions with Respect to Collateral**.  Except in the ordinary course of the business of the Enterprise, or as otherwise contemplated in this Agreement, the Tribe directly or indirectly sells, leases, transfers, hypothecates, encumbers or otherwise disposes of, or suffers or permits the sale, lease, transfer, hypothecation, encumbrance or other disposition of any portion of the collateral under any credit facilities owed by the Tribe, or removes any such collateral from the Facility, or fails to keep such collateral, or fails to cause such collateral to be kept, in good order and repair, or uses or permits the use of such collateral in violation of any applicable law, statute or ordinance;
>>
>> 9.9.2.4 **Interference with Manager's Rights**.  The Tribe adopts any amendments to its laws, or any rule or regulation promulgated thereunder, or imposes any tax or fee or assessment of any kind, which would prejudice any of

Manager's rights hereunder, including, without limitation, the right to payments due to Manager hereunder, or to the repayment of monetary obligation due under this Agreement or the Development and Construction Agreement, or which violates the Indian Civil Rights Act, 25 U.S.C. §§1301, et seq.

9.9.2.5 **Taxes or Fees**. The Tribe levies any tax, fee, or other assessment of any kind in contravention of Section 7.5.3.

**9.10    [Intentionally Omitted]**.

## ARTICLE 10
## CONCLUSION OF THE MANAGEMENT TERM

Upon the conclusion of the term of the Management Agreement, or the termination of this Agreement under other of its provisions, in addition to other rights under this Agreement, the Manager shall have the following rights:

**10.1    Transition**. If termination occurs at any time other than upon the conclusion of its Term, Manager shall be entitled to a reasonable period of not less than thirty (30) days to transition management of the Enterprise to the Tribe or its designee. Notwithstanding the foregoing, in the event of a termination of this Agreement following revocation or withdrawal of Manager's gaming license by final administrative action (and after completion of judicial review or expiration of the time for seeking such review and any appeals therefrom), Manager shall have no ability or obligation to participate in the transition of management of the Enterprise and shall not be present at the Enterprise.

**10.2    Undistributed Net Revenues**. If the Enterprise has accrued Net Revenues, which have not been distributed under Article 6 of this Agreement, the Manager shall receive that Management Fee equal to that Fee it would have received had the distribution occurred during the term of the Management Agreement.

## ARTICLE 11
## CONSENTS AND APPROVALS

**11.1    Tribe**. Where approval or consent or other action of the Tribe is required, such approval shall mean the written approval of the Tribal Committee evidenced by a duly enacted resolution thereof. Any such approval, consent or action shall not be unreasonably withheld or delayed; provided that the foregoing does not apply where a specific provision of this Agreement allows the Management Committee an absolute right to deny approval or consent or withhold action.

**11.2    Manager**. Where approval or consent or other action of the Manager is required, such approval shall mean the written approval of the Managing Officer. Any such approval, consent or other action shall not be unreasonably withheld or delayed.

## ARTICLE 12
## DISCLOSURES

**12.1   Warranties**. The Manager warrants and represents as follows: (i) no person or entity has any beneficial ownership interest in the Manager other than as set forth herein; and (ii) no member, manager, officer, director or owner of 5% or more of the stock of the Manager has been arrested, indicted for, convicted of, or pleaded nolo contendere to any felony or any gaming offense, or had any association with individuals or entities known to be connected with organized crime.

**12.2   Criminal and Credit Investigation**. The Manager agrees that all of its shareholders, directors and officers (whether or not involved in the Enterprise), shall:

(a)   Consent to background investigations to be conducted by the Tribe, NIGC, the State of Oklahoma, the Federal Bureau of Investigation (the "FBI") or any other law enforcement authority if requested by the Tribe and to the extent required by the IGRA and the Compact.

(b)   Be subject to licensing requirements in accordance with Tribal law.

(c)   Consent to a background, criminal and credit investigation to be conducted by the NIGC.

(d)   Consent to a financial and credit investigation to be conducted by a credit reporting or investigation agency at the request of the Tribe.

(e)   Cooperate fully with such investigations.

(f)   Disclose any information requested by the Tribe, which would facilitate in the background and financial investigation. Any materially false or deceptive disclosures or failure to cooperate fully with such investigations by an employee of the Manager or an employee of the Tribe shall result in the immediate dismissal of such employee. The results of any such investigation may be disclosed by the Tribe to federal officials as required by law.

**12.3   Disclosure Amendments**. The Manager agrees that within ten (10) days following Manager's becoming aware of a material change in the information disclosed pursuant to this Article 12, Manager shall provide written notice detailing such change to the Tribe, to the NIGC, and the Department of the Interior (to the extent required). All of the warranties and agreements contained in this Article 12 shall apply to any person or entity that would be listed in this Article 12 as a result of such changes. In the event that the material change disclosed by Manager results in or causes additional background investigations to be conducted, such notice shall be provided to the NIGC within sufficient time so as to enable the NIGC to conduct such investigations.

**12.4   Breach of Manager Warranties and Agreements**. The material breach of any warranty or agreement of the Manager contained in this Article 12 shall be grounds for immediate termination of this Agreement; provided that (a) if a breach of the warranty contained in clause (ii) of Section 12.1 is discovered, and such breach was not disclosed by any background check conducted by the FBI as part of the NIGC or other federal approval of this Agreement, or was discovered by the FBI investigation but all officers and directors of the Manager sign sworn

affidavits that they had no knowledge of such breach, then the Manager shall have 30 days after notice from the Tribe to terminate the interest of the offending person or entity and, if such termination takes place, this Agreement shall remain in full force and effect; and (b) if a breach relates to a failure to update changes in financial position or additional gaming related activities, then the Manager shall have 30 days after notice from the Tribe to cure such default prior to termination.

## ARTICLE 13
### (INTENTIONALLY LEFT BLANK)

## ARTICLE 14
### (INTENTIONALLY LEFT BLANK)

## ARTICLE 15
### NO PRESENT LIEN, LEASE OR JOINT VENTURE

The parties agree and expressly warrant that neither the Management Agreement nor any exhibit thereto is a mortgage or lease and, consequently, does not convey any present interest whatsoever in the Facility or the Property, nor any proprietary interest in the Enterprise itself. The parties further agree and acknowledge that it is not their intent, and that this Agreement shall not be construed, to create a joint venture between the Tribe and the Manager; rather, the Manager shall be deemed to be an independent contractor for all purposes hereunder.

## ARTICLE 16
### TRIBE'S LIMITED WAIVER OF SOVEREIGN IMMUNITY

16.1 **Preference for Tribal or Federal Court Jurisdiction**. Subject, at all times, to the prohibition against compelling, overturning, negating or in any manner modifying any Tribal Governmental Action as set forth in Section 16.2 below, the Tribe hereby grants to the Manager a limited waiver of sovereign immunity with respect to the following purposes and for no others:

(a)    For the purpose of allowing the Manager to take any and all actions necessary to enforce the provisions of this Agreement pursuant to the alternative dispute resolution procedures set forth below, including those which seek injunctive or declaratory relief, damages (limited to recover from the personal property assets and future revenues of the Tribe), specific performance or other legal and equitable remedies in the court or courts authorized by this Agreement and to effect enforcement of any remedy granted therein.

(b)    For the purpose of allowing the Manager to take any and all actions necessary to contest, or seek appeal or review of, the decisions or procedures of the Tribal Gaming Commission or other regulatory body, subject to the provisions of the Ordinance creating the Tribal Gaming Commission or such other body; nothing in this clause (b), or the Ordinance, shall limit any right of the Manager to take the actions described in clause (a).

(c)    Subject to this Article 16, pursuant to its limited waiver, the Tribe expressly waives its immunity from suit for the limited purpose of Manager's

449325.5                                                 37

enforcement of this Agreement and/or the Development and Construction Agreement in the event of a material breach of such agreements by the Tribe, only in the manner and to the extent described in this Article 16, provided that the limited waiver contained in this Section applies only to arbitration with Manager conducted in accordance with Article 20 of this Agreement and to no other entity or person; and provided further that such waiver applies only to enforcement of an arbitration award against the Tribe in the courts of the Tribe; in the United States District Court for the Western District of Oklahoma; the United States Court of Appeals; the United States Supreme Court; or in any other court of competent jurisdiction. If the United States District Court for the Western District of Oklahoma lacks jurisdiction, the Tribe consents to be sued in any other court of competent jurisdiction; provided that each party agrees to vigorously raise any and all arguments for United States District Court jurisdiction.

(d)     The Tribe agrees that it shall not plead or raise as a defense the requirement of exhaustion of tribal court remedies, abstention, or comity, as the parties have expressly agreed that Federal Court jurisdiction may be sought for judicial enforcement of any arbitration award. The Tribe agrees that in the event jurisdiction is denied by the United States District Court, Manager may in such suit seek similar relief from a court of competent jurisdiction.

(e)     The limited waiver of sovereign immunity granted here does not include any waiver, either express or implied, to any third party.

(f)     Nothing in this Agreement shall be deemed to be a general waiver of the Tribe's sovereign immunity from suit, which immunity is expressly asserted.

16.2     **Restriction on Actions Impacting Tribal Governmental Action**. No arbitrator or court shall have the power to compel, overturn, negate or in any manner modify any Tribal Governmental Action; but such restriction shall not prevent an arbitrator from determining that the taking of any Tribal Governmental Action or the failure to take any Tribal Governmental Action, which is not caused by a breach of the Manager's obligations under this Agreement, constitutes a breach of this Agreement by the Tribe or the impairment of rights of the Manager under this Agreement; and which therefore results in liability on the part of the Tribe for damages in favor of the Manager as provided in this Agreement.

## ARTICLE 17
## TIME IS OF THE ESSENCE

Time is of the essence in the performance of this Agreement.

## ARTICLE 18
## TRIBAL ASSETS

Not withstanding anything in this Agreement, nothing shall obligate or authorize the payment or encumbrance of any funds or assets of the Tribe other than the revenues and personal property assets of the Enterprise, excluding the Facility and the Property.

## ARTICLE 19
## NOTICE PROVISION

The Tribe will give the Manager notice of any alleged violation of the Gaming Ordinance and before the gaming agency may take any action based on such alleged violation, the Tribe shall provide Manager with a cure period equal to the lesser of thirty (30) days, or such shorter cure period as is required pursuant to applicable law.

## ARTICLE 20
## DISPUTE RESOLUTION

**20.1    Amicably Resolve and Obligation to Meet and Confer**.  The Manager and Tribe shall attempt to resolve and settle all disputes arising out of this Agreement amicably through good faith discussions.  Neither party may commence arbitration proceedings without providing written notice of the pending commencement of such proceedings to the other party, together with a general statement of the grounds for such proceedings, no less than fifteen (15) days prior to such commencement, during which time the parties must in good faith seek to meet and confer to resolve the dispute without the need for commencement of arbitration proceedings. Any Dispute arising out of this Agreement not resolved during the meet-and-confer process referred to in this section shall be settled by binding arbitration in accordance with the requirements of Section 20.2.

**20.2    Arbitration**.  Any dispute arising out of this Agreement not resolved during the meet-and-confer period referred to in Section 20.1 of this Agreement shall be settled by binding arbitration in accordance with the requirements of this section.  During the meet-and-confer period, the parties shall consult and may agree upon a single arbitrator to hear the dispute.  If no such agreement is reached during the meet-and-confer period, then each party shall name one (1) arbitrator, and the two (2) arbitrators thus selected shall together select a third arbitrator within ten (10) calendar days thereafter.  If the two (2) arbitrators are unable to agree upon a third arbitrator within such time, they or either party shall notify the office of the American Arbitration Association (the "AAA") having jurisdiction, and the AAA shall select the third arbitrator.  The single arbitrator or the three (3) member panel (as applicable, and whichever of which is hereinafter referred to as the "Arbitrator", individually and collectively) thus selected shall proceed to hear and decide the matters at issue in such manner as the Arbitrator determines. No Arbitrator shall have or previously have had any significant relationship with any of the parties.  Notwithstanding the foregoing, if the only relief sought is for a monetary award of $100,000.00 or less, then the dispute shall be resolved by one (1) Arbitrator.  The parties agree that it is in the best interests of all parties to have any matter submitted to arbitration under the provisions of this paragraph decided as expeditiously as possible.  The costs of arbitration shall be borne equally by the parties, unless the Arbitrator rules otherwise.  The substantially prevailing party in any arbitration or judicial proceeding shall be awarded its legal fees and costs, including any expert witness expenses.  The substantially prevailing party shall submit a detailed statement of its fees and costs within twenty (20) calendar days after receipt of the arbitration award.

**20.3    AAA Commercial Rules of Arbitration**.  The arbitrator shall apply the commercial rules of arbitration of the American Arbitration Association and the Federal

Arbitration Act, provided that reliance on said rules shall not be construed as consent to suit by the Tribe in courts of the State of Oklahoma or in the courts of any other State or as expanding in any manner the Tribe's limited waiver of sovereign immunity set forth in Article 16 of this Agreement. The parties agree that the waiver of tribal sovereign immunity in this Agreement is of a specifically limited nature and is related only to the express terms of this Agreement and that the Tribe is specifically limiting any recovery only to the terms stated in this Agreement, and further, that the agreement by the parties for arbitration herein is not to be construed as a blanket waiver of the immunity of the Tribe.

**20.4    Equitable Relief as Remedy.**    To the extent permitted or authorized by applicable law and regulations, and subject at all times to the limitations set forth in Section 20.11 herein, and the limitations set forth in this Section 20.4 below (which eliminate the Arbitrator's ability to authorize the Manager's continued operation of or presence at the Enterprise following revocation of Manager's gaming license), the Arbitrator shall have the authority to award equitable relief. Notwithstanding the foregoing, the parties acknowledge and agree that in the event that Manager's gaming license has been revoked or withdrawn, Manager shall have no ability to participate in management of the Enterprise and shall not be present at the Enterprise. Accordingly, following the revocation or withdrawal of Manager's gaming license, the Arbitrator shall have absolutely no ability or authority to issue injunctive or other relief allowing the Manager's continued operation of, presence at, or involvement in the Enterprise.

**20.5    Standard of Review; Statute of Limitations.**    In determining the parties' claims and/or counterclaims presented in arbitration, the arbitrator shall apply the terms of this Agreement and any amendments thereto, without adding to, modifying or changing the terms in any respect. Although the parties acknowledge and agree that the laws of the State of Oklahoma are not applicable to this Agreement, the parties agree that the Arbitrator shall resolve the dispute in accordance with the law of the State of Oklahoma concerning construction of contracts for the limited purpose of interpretation of this Agreement in order to define the rights and obligations of the parties. The parties further agree that the Arbitrator shall apply the Oklahoma statutes of limitation that would otherwise be applicable to a dispute for purposes of enforcement of this Agreement.

**20.6    Location of Arbitration.**    Any arbitration under this Agreement shall be held in Kay County, Oklahoma or any other location agreed to by the parties.

**20.7    Hearing and Award in Event of Failure of Party to Appear.**    Should either Party not appear for the arbitration after proper notice, then the arbitration hearing shall nevertheless proceed, and the arbitrator or arbitrators may take such evidence as, in their sole discretion, they deem appropriate, to render an award.

**20.8    Enforcement.**    An arbitration award shall be final and binding upon the parties, and judgment upon the award rendered by the arbitrators may be enforced only in the forums specified in the Tribe's limited waiver of sovereign immunity as set forth in Article 16 of this Agreement.

**20.9    Limitation Upon Enforcement**. The Arbitrator shall have the authority to award actual damages, but shall not have the authority to award consequential damages, exemplary damages, incidental damages, and/or punitive damages.    The Tribe's waiver of sovereign immunity as set forth in Article 16 of this Agreement is further limited by and conditioned on the requirement that the satisfaction of any money judgment or award resulting from arbitration shall be paid only from the following: (i) all assets of the Facility which is operated by or for the Tribe, not including any property held in trust for the Tribe by the United States of America; (ii) all income received by the Tribe from the Facility which is operated by or for the Tribe; and (iii) Net Revenues of the Enterprise. Damages awarded against the Tribe shall not constitute a lien upon or be collectable from any other income or assets of the Tribe, except with the Tribe's consent.

**20.10   No Waiver of Remedies; Remedies Cumulative**.  No omission by any party to exercise any right, power, or remedy accruing under this Agreement shall impair such right, power, or remedy, nor shall it be construed to be a waiver of or acquiescence in a breach of or default under the Agreement.  Any waiver, permit, or approval of any breach of or default under this Agreement must be in writing.  All remedies under this Agreement to any party shall be cumulative, not alternative.

**20.11   No Arbitration of Tribal Governmental Action**.  Notwithstanding anything to the contrary contained in this Section 20, an Arbitrator shall not have the power to compel, negate, assume, usurp, or in any manner affect any Tribal Governmental Action.  The preceding sentence does not prevent an Arbitrator from determining that the taking of any Tribal Governmental Action, or the failure to take any Tribal Governmental Action, constitutes a breach of this Agreement by the Tribe, thereby resulting in liability on the part of the Tribe for damages or other remedies in favor of the Manager as provided in this Agreement.

**20.12   Commercial Obligations Ordinance**.  Arbitration shall be governed by the Commercial Obligations Ordinance as adopted by the Tribe in Resolution No. T-R-25-06, on September 8, 2006, as thereafter amended from time to time.

## ARTICLE 21
## AGREEMENT

**21.1    Performance During Disputes**.  It is mutually agreed that except as specifically provided in this Agreement, during any kind of controversy, claim, disagreement or dispute, including a dispute as to the validity of this Agreement or to terminate the Agreement for cause, Manager shall remain in possession of the Facility as Manager; and the Tribe and Manager shall continue their performance of the provisions of this Agreement.  Manager shall be entitled to seek injunctive relief from a civil court of competent jurisdiction or other competent authority to maintain possession in the event of a threatened eviction during any dispute, controversy, claim or disagreement arising out of this Agreement.   The Tribe expressly waives it sovereign immunity for disputes covered by this Section 21.1.  Notwithstanding anything to the contrary contained in this Section 21.1 or in this Agreement, the Tribe may terminate this Agreement where the Manager has had its license revoked by the Tribal Gaming Commission because the Manager, or a director or officer of the Manager, has been convicted of or pleads nolo contendere to a criminal felony or misdemeanor offense such as fraud, embezzlement or a crime

of moral turpitude; provided, however, the Tribe may not terminate this Agreement based on a director or officer's conviction or plea of nolo contendere where the Manager immediately prohibits such individual from continued management responsibility or presence at the Facility and terminates such individual no later than ten (10) days after receiving notice of the conviction. In the event that any of Manager's managers, officers or members owning five percent (5.0%) or more of the membership interests or equity interests of Manager is convicted of or pleads nolo contendere to a criminal felony or misdemeanor offense such as fraud, embezzlement or a crime of moral turpitude, an offense involving gaming, or that individual's gaming license is revoked in any jurisdiction by final administrative action (and after completion of judicial review or expiration of the time for seeking such review and any appeals therefrom), said individual shall not be allowed to continue management responsibility or presence at the Facility and shall immediately be prohibited by Manager from said activities or presence.

## ARTICLE 22
## MANAGER'S MARKS

### 22.1  [Intentionally Omitted].

22.2  **Ownership of Manager's Marks**. The Tribe agrees to recognize the exclusive right of ownership by Manager to all Manager's Marks, licenses or registrations now or hereafter held or applied for by the Manager in connection with this Agreement. The Tribe hereby disclaims any right or interest therein, regardless of any legal protection afforded thereto. The Tribe acknowledges that all of Manager's Marks may not be used in connection with the Enterprise, and Manager shall have sole discretion to determine which Manager's Marks shall be so used. The Tribe covenants that in the event of termination, cancellation or expiration of this Agreement, whether as a result of a default by Manager or otherwise, the Tribe shall not hold itself out as, or continue operation of the Enterprise as a casino managed or affiliated with Manager nor will it utilize any of Manager's Marks or any variant thereof in the operation of its Facility. The Tribe agrees that Manager or its respective representative may, at any time thereafter, enter the Facility and, at its expense, may remove all signs, furnishings, printed material, emblems, slogans or other distinguishing characteristics which are now or hereafter may be connected or identified with Manager or which carry any of Manager's Marks.

22.3  **Restriction on Use of Manager's Name**. The Tribe shall not use the name of Manager, or any variation thereof, directly or indirectly, in connection with (a) a private placement or public sale of securities or other comparable means of financing or (b) press releases and other public communications, without the prior written approval of Manager.

22.4  **Litigation Regarding Manager's Marks**. The Tribe and Manager hereby agree that in the event the Tribe and/or Manager is (are) the subject of any litigation or action brought by a party seeking to restrain the use, for or with respect to the Enterprise, by the Tribe and/or Manager of any of Manager's Marks used by Manager for or in connection with the Enterprise, any such litigation or action shall be defended entirely at the expense of Manager, notwithstanding that Manager may not be named as a party thereto. In the event the Tribe desires to bring suit against any user of any of Manager's Marks, seeking to restrain such user from using any of Manager's Marks, then such suit shall be brought only with the consent of Manager and at the expense of the Tribe notwithstanding that such user maybe a prior or

449325.5                    42

subsequent user. In all cases the conduct of any suit whether brought by the Tribe and/or Manager or instituted against the Tribe and/or Manager shall be under the absolute control of the Manager notwithstanding that Manager may not be a party to such suit. The Tribe, at its sole cost, shall have the right to engage its own legal counsel and the Tribe's own counsel shall have the right to participate in any such litigation. The Tribe shall have the right at any time during the course of such litigation to withdraw from participation therein. Manager hereby agrees to hold the Tribe harmless from and to indemnify the Tribe against any judgments or awards of any court or administrative agency of competent jurisdiction, whether such awards be in the form of damages, costs or otherwise, which the Tribe is required to pay and/or pays arising from the use of any of Manager's Marks or names or similar rights or registrations for or in connection with the Enterprise.

## ARTICLE 23
## CONFIDENTIAL AND PROPRIETARY INFORMATION

**23.1 Confidential Information.** Both parties agree that any information received concerning the other party during the performance of this Agreement, regarding the parties' organization, financial matters, marketing plans, or other information of a proprietary nature, will be treated by both parties in full confidence and except as required to allow Manager and the Tribe to perform their respective covenants and obligations hereunder, or in response to legal process or appropriate and necessary governmental inquiry, will not be revealed to any other persons, firms or organizations. This provision shall survive the termination of this Agreement for a period of two (2) years.

**23.2 Proprietary Information of Manager.** The Tribe agrees that Manager has the sole and exclusive right, title and ownership to: (a) certain proprietary information, techniques and methods of operating gaming businesses; (b) certain proprietary information, techniques and methods of designing games used in gaming businesses; (c) certain proprietary information, techniques and methods of training employees in the gaming business; and (d) certain proprietary business plans, projections and marketing, advertising and promotion plans, strategies, and systems, all of which have been developed and/or acquired over many years through the expenditure of time, money and effort and which Manager maintains as confidential and as a trade secret(s) (collectively, the "Confidential and Proprietary Information").

The Tribe further agrees to maintain the confidentiality of such Confidential and Proprietary Information, and upon the termination of this Agreement, return same to Manager.

## ARTICLE 24
## OTHER DOCUMENTS

The parties agree to execute such other documents as maybe reasonably required to document the parties obligations to each other pursuant to this Agreement and the Development and Construction Agreement.

## ARTICLE 25
## EXECUTION

This Agreement is being executed in five counterparts, three to be retained by the Tribe for its own use and for submission to the NIGC and two to be retained by the Manager. Each of the five originals is equally valid. This Agreement shall be deemed "executed" and shall be binding upon both parties when properly executed and approved by the Chairman of the NIGC.

## ARTICLE 26
## ENTERPRISE NAME

The Enterprise shall be operated under the business name of "Tonkawa Indian Casino" and the "Tonkawa Smoke Shop" (as applicable) or such other name(s) as the parties may agree.

## ARTICLE 27
## INTENT TO NEGOTIATE NEW AGREEMENT

27.1 **Intent to Enter into Successive Agreement**. On or before one-hundred and eighty (180) days before the end of this Agreement, the Tribe shall give Manager notice of its intent regarding its willingness to enter into negotiations for a new Management Agreement to be effective upon the conclusion of this Agreement. Such new management agreement shall be submitted to the NIGC for its review and approval.

27.2 **Transition Plan**. If the Tribe and Manager are unable to agree to the terms of a new agreement or if the Tribe decides not to enter into negotiations for a new agreement, then the Tribe and Manager shall agree upon a transition plan within thirty (30) days notice from the Tribe of its intention not to negotiate a new Management Agreement, including an information technology transition plan, which plan shall be sufficient to allow the Tribe to operate the Enterprise and provide for the orderly transition of the management of the Enterprise.

## ARTICLE 28
## ENTIRE AGREEMENT

This Agreement, including the Exhibits attached hereto constitutes the entire understanding and agreement of the parties hereto and supersedes all other prior agreements and understandings, written or oral, between the parties. All prior and contemporaneous conversations, discussions, negotiations, possible and alleged agreements and representations, covenants and warranties with respect to the subject matter hereof are waived, merged herein and superseded hereby.

## ARTICLE 29
## MODIFICATION OF AGREEMENT

Manager and Tribe each warrant and represent that they shall not act in any way whatsoever, directly or indirectly to cause this Agreement to be amended, supplemented or modified, except by a written instrument executed by both parties. Further the Tribe specifically pledges not to contract with any third party relative to the subject matter of this Agreement

449325.5                      44

pending a final non-appealable decision of the NIGC as to the validity of this Management Agreement.

## ARTICLE 30
## CHOICE AND ADOPTION OF LAW

The parties agree that the interpretation and enforcement of this Agreement shall be governed by and construed first in accordance with relevant laws of the Tribe; second, federal law; and third, the laws of the State of Oklahoma (without giving effect to conflict of laws principles) or such other court of competent jurisdiction. Although the parties acknowledge and agree that the laws of the State of Oklahoma are not applicable to this Agreement, the parties agree that the Arbitrator or a court of competent jurisdiction shall resolve any d isputes in accordance with the law of the State of Oklahoma concerning construction of contracts for the limited purpose of interpretation of this Agreement in order to define the rights and obligations of the parties. The parties further agree that the Arbitrator or a court of competent jurisdiction shall apply the Oklahoma statutes of limitation that would otherwise be applicable to any dispute for purposes of enforcement of this Agreement.

## ARTICLE 31
## NEITHER PARTY DEEMED DRAFTER

The parties to this Agreement have had sufficient time to consult legal counsel and negotiate changes regarding the terms hereof. Therefore, neither party shall be deemed the drafter of this. Agreement and, as such, this Agreement shall not be construed against either party due to the drafting hereof.

AGREED AND ACCEPTED by the parties as indicated by the signatures of their authorized representatives and executed on Tonkawa Tribal Indian Country:

TONKAWA TRIBE OF INDIANS OF OKLAHOMA,
a federally recognized Indian tribe

By: _____               _____, 2007
      Name: Anthony E. Street                                          Date
      Title: President

GAUGHAN GAMING-TONKAWA, LLC, a
Nevada limited liability company

By:   Gaughan Gaming, LLC, a Nevada limited
        liability company, Managing Member

      By: _____                    August 27, 2007
      Name: John Gaughan                                      Date
      Title:  Managing Member

46

Approved pursuant to 25 U.S.C. § 2711 and
Approved pursuant to 25 U.S.C. § 81

NATIONAL INDIAN GAMING COMMISSION

By: _____

     Name: Philip N. Hogen
     Title: Chairman

SEP 1 1 2007

     Date

47

### EXHIBIT "A"
### Legal Description of Property

Property owned by the United States of America in trust  for The Tonkawa Tribe of Indians of Oklahoma and legally described as follows:

The SW Quarter of Section 1, Township 25 North, Range 1 West, Kay County, Oklahoma, and containing 100 acres.

## EXHIBIT "B"
### Board of Review

Once you have been employed at the Casino for 90 calendar days, you may request a Board of Review if you feel job-related problems have not been resolved. You may request a Board of Review to protest decisions, work history entries, performance evaluations, any disciplinary action including termination, etc. The three impartial members of the Board decide to either uphold, modify, or overturn the original decision made in relation to the issue you are protesting. The Board of Review is made up of three impartial members as follows:

1. An employee representative;

2. A management representative having no jurisdiction over your department;

3. A tribal representative who has not been involved in your issue.

A Board of Review request form must be filed with Human Resources within seven days of the incident or of your learning of the incident. A decision is made on the basis of facts and evidence presented to the Board of Review. The Board's decision is final and cannot be appealed or reversed by anyone in the Enterprise.

On an annual basis, employees are asked to volunteer for one year terms as employee representatives on the Board of Review.