

APR   2 2010

Larriann Musick, Chairperson
La Jolla Band of Luiseno Indians
22000 Highway 76
Pauma Valley, CA  92061

      Re:    Agreements between the La Jolla Band of Luiseno Indians and Panther
              Partners LLC

Dear Chairperson Musick:

      This is in response to the La Jolla Band of Luiseno Indians' ("Tribe's") request
that the National Indian Gaming Commission ("NIGC") review certain agreements
between the Tribe and Panther Partners LLC ("Panther") to determine whether the
agreements constitute management contracts pursuant to the Indian Gaming Regulatory
Act (IGRA), 25 U.S.C. § 2711. Specifically, these agreements are entitled: Development
Agreement, Developer Credit Agreement, Note, and Developer Security Agreement
(collectively "the Agreements"). The parties have also submitted a management
agreement ("MA") for the Chairman's review and approval and would like an opinion
that the Agreements, considered independently, are not themselves management contracts
and that they do not grant a proprietary interest to Panther. After careful review, it is my
opinion that the Agreements, by themselves, are not management agreements requiring
the approval of the Chairman. However, as they are collateral agreements to a
management contract submitted to the Chairman for review and approval, these
agreements must also be submitted as part of that review. Finally, the Agreements do not
grant a proprietary interest to Panther.

<u>Authority</u>

      The authority of the NIGC to review and approve gaming-related contracts is
limited by IGRA to management contracts and collateral agreements to management
contracts to the extent that they implicate management. *Catskill Development LLC v.
Park Place Entertainment Corp.*, No. 06-5860, 2008 U.S. App. Lexis 21839 at *38 (2nd
Cir. October 21, 2008) ("a collateral agreement is subject to agency approval under 25
C.F.R. § 533.7 only if it 'provides for management of all or part of a gaming

**NATIONAL HEADQUARTERS**  1441 L St. NW, Suite 9100, Washington, DC 20005   Tel: 202.632.7003   Fax 202.632.7066  **WWW.NIGC.GOV**

**REGIONAL OFFICES**  Portland, OR; Sacramento, CA; Phoenix, AZ; St. Paul, MN; Tulsa, OK

**EXHIBIT**

**4**

operation.'"); *Machal Inc. v. Jena Band of Choctaw Indians*, 387 F. Supp. 2d 659, 666 (W.D. La. 2005) ("collateral agreements are subject to approval by the NIGC, but only if that agreement 'relate[s] to the gaming activity'"). *Accord*, *Jena Band of Choctaw Indians v. Tri-Millenium Corp.*, 387 F. Supp. 2d 671, 678 (W.D. La. 2005); *United States ex rel. St. Regis Mohawk Tribe v. President R.C.-St. Regis Management Co.*, No. 7:02-CV-845, 2005 U.S. Dist. LEXIS 12456, at *3-*4, *9-*10 (N.D.N.Y. June 13, 2005), *aff'd on other grounds*, 451 F.3d 44 (2nd Cir. 2006).

The NIGC has defined the term *management contract* as "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a subcontractor if such contract or agreement provides for the management of all or part of a gaming operation." 25 C.F.R. § 502.15. *Collateral agreement* is defined as "any contract, whether or not in writing, that is related either directly or indirectly, to a management contract, or to any rights, duties or obligations created between a tribe (or any of its members, entities, organizations) and a management contractor or subcontractor (or any person or entity related to a management contractor or subcontractor)." 25 C.F.R. § 502.5.

Though NIGC regulations do not define *management*, the term has its ordinary meaning. Management encompasses activities such as planning, organizing, directing, coordinating, and controlling. *NIGC Bulletin No.* 94-5: "Approved Management Contracts v. Consulting Agreements (Unapproved Management Contracts are Void)." Accordingly, the definition of *primary management official* is "any person who has the authority to set up working policy for the gaming operation." 25 C.F.R. § 502.19(b)(2). Further, management employees are "those who formulate and effectuate management policies by expressing and making operative the decision of their employer." *N.L.R.B. v. Bell Aerospace Co.,* 416 U.S. 267, 288 (1974). Whether particular employees are "managerial" is not controlled by an employee's job title. *Waldo v. M.S.P.B.*, 19 F. 3d 1395 (Fed. Cir. 1994). Rather, the question must be answered in terms of the employee's actual job responsibilities, authority and relationship to management. *Id.* at 1399. In essence, an employee can qualify as management if the employee actually has authority to take discretionary actions – a *de jure* manager – or recommends discretionary actions that are implemented by others possessing actual authority to control employer policy – a *de facto* manager. *Id.* at 1399 *citing N.L.R.B. v. Yeshiva*, 444 U.S. 672, 683 (1980).

If a contract requires the performance of any management activity with respect to all or part of a gaming operation, the contract is a management contract within the meaning of 25 U.S.C. § 2711 and requires the NIGC Chairman's approval. Management contracts not approved by the Chairman are void. 25 C.F.R. § 533.7; *Wells Fargo Bank, N.A. v. Lake pf the Torches Economic Dev. Corp.*, No. 09-CV-768, 2010 U.S.Dist. LEXIS 1714 at *8-*9 (W.D. Wisc. January 11, 2010).

As to proprietary interests, among IGRA's requirements for approval of tribal gaming ordinances is that "the Indian tribe will have the sole proprietary interest and responsibility for the conduct of any gaming activity." 25 U.S.C. § 2710(b)(2)(A).

2

Under this section, if any entity other than a tribe possesses a proprietary interest in the gaming activity, gaming may not take place. The NIGC, in its regulations, also requires that all tribal gaming ordinances include such a provision. 25 CFR § 522.4(b)(1).

Although there are no cases directly on point, courts have defined proprietary interest in a number of contexts. In a criminal tax case, an appellate court discussed what the phrase proprietary interest meant, after the trial court had been criticized for not defining it for jurors, saying:

> It is assumed that the jury gave the phrase its common, ordinary meaning, such as 'one who has an interest in, control of, or present use of certain property.' Certainly, the phrase is not so technical, nor ambiguous, as to require a specific definition.

*Evans v. United States*, 349 F.2d 653 (5th Cir. 1965). In another tax case, *Dondlinger v. United States*, 1970 U.S. Dist. LEXIS 12693 (D. Neb. 1970), the issue was whether the plaintiff had a sufficient proprietary interest in a wagering establishment to be liable for taxes assessed against persons engaged in the business of accepting wagers. The court observed:

> It is not necessary that a partnership exist. It is only necessary that a plaintiff have some proprietary interest. . . *One would have a proprietary interest if he were sharing in or deriving profit from the club* as opposed to being a salaried employee merely performing clerical and ministerial duties. [emphasis added]

*Id.* An additional aid to statutory interpretation includes the legislative history of the statute. The legislative history of the IGRA with respect to "proprietary interest" is scant, stating only that, "the tribe must be the sole owner of the gaming enterprise." S. Rep. 100-446, 1988 U.S.C.C.A.N. 3071-3106, 3078. Despite the brevity of this information, the drafters' concept of "proprietary interest" appears to be consistent with the ordinary definition of proprietary interest, while emphasizing the notion that entities other than tribes are not to share in the ownership of gaming enterprises.

Finally, in regulatory preamble language, the NIGC provided a non-exhaustive list of arrangements that would violate the sole proprietary interest clause. According to this published guidance, sole proprietary interest violations would exist under:

- an agreement whereby a vendor pays the tribe for the right to place gambling devices that are controlled by the vendor on the gaming floor;
- a security agreement whereby a tribe grants a security interest in the gaming operation, if such interest would give a party other than the tribe the right to control gaming in the event of default by the tribe; and
- stock ownership in a tribal gaming operation, even by tribal members.

58 Fed. Reg. 5802, 5804 (Jan. 22, 1993). Again, this list was not meant to be exhaustive, but it does provide three types of scenarios that are not allowed under IGRA's sole proprietary interest clause.

Management Contract Analysis

Pursuant to *NIGC Bulletin No. 94-5*, the presence of certain management activities in a contract between a tribe and an outside party indicates that the contract is a management contract. The agreements contain no indicia of management and the parties have specifically agreed to exclude the possibility of management. (Developer Credit Agreement § 11.19, Development Agreement § 12.18).

I am aware of the recent decision in *Wells Fargo v. Lake of the Torches* and the court's holding that any agreement in which receivership is a possible remedy upon default is a management contract. *See Wells Fargo v. Lake of the Torches*, at \*11-\*12. The court there found a bond trust indenture to be a management contract in part because it contained a specific provision allowing for the appointment of a receiver upon default. *Id.* Moreover, the court specifically rejected Wells Fargo's argument that a receiver would not exercise managerial control because its sole function would be to ensure that the gaming operation deposited its revenues and paid its liabilities. *Id.* Specifically, the court stated: "[b]y forcing the Corporation [Lake of the Torches] to deposit its revenues and pay its liabilities, the receiver would in fact be exerting a form of managerial control since those monies could not be used for other purposes related to the operation of the Casino facility." *Id.* at \*12. While I generally agree with the court's analysis, I do not think the circumstances here are the same.

The Developer Security Agreement pledges all gaming revenues as security. Previous opinions have posited that an agreement containing a security interest in all gaming revenues, without further limitation, authorizes management of the facility. But, here, the Agreements specifically restrict management activities:

> [N]otwithstanding any provisions in any Project Document, unless the Management Agreement has been approved on behalf of the Chairman of NIGC and is in effect under IGRA, the Developer shall not engage in any of the following after the occurrence of the Opening Date: planning, organizing, directing, coordinating, or controlling all or any portion of the Tribe's gaming operations (collectively, "Management Activities"), including, but not limited to:
>
> > 1. the training, supervision, direction, hiring, firing, retention, compensation (including benefits) of any employee (whether or not a management employee) or contractor;
> > 2. any employment policies or practices;
> > 3. the hours or days of operation;
> > 4. any accounting systems or procedures;

4

5. any advertising, promotions or other marketing activities;
6. the purchase, lease, or substitution of any gaming device or related equipment or software, including player tracking equipment;
7. the vendor, type, theme, percentage of pay-out, display or placement of any gaming device or equipment; or
8. budgeting, allocating, or conditioning payments of the Borrower's operating expenses; provided however, that upon the occurrence of an Event of Default, the Developer will not be in violation of the foregoing restriction solely because the Developer:
    A. enforces compliance with any term in any Project Document that does not require the gaming operation to be subject to any third-party decision-making as to any Management Activities; or
    B. requires that all or any portion of the revenues securing the Tribe's obligations be applied to satisfy valid terms of the Project Documents; or
    C. otherwise forecloses on all or any portion of the property securing the Tribe's obligations under the Project Documents.

Developer Credit Agreement § 11.19. The Development Agreement contains a substantively identical provision, § 12.18. The presence of these provisions in the Agreements ensures that the Tribe maintains management control over the decisions affecting the casino facility.

None of the Agreements specifically set out the appointment of a receiver as a specific remedy upon default. However, the Developer Security Agreement provides that upon default the Developer may "exercise any of the remedies available to the Developer as a secured party under the UCC." (§ 4(d)). Those remedies include the appointment of a receiver. Fortunately, the Developer Security Agreement contains the same limitations set forth in § 11.19 of the Developer Credit Agreement. Accordingly, the Developer Security Agreement is fairly read to preclude the appointment of a receiver that would exert management control over the gaming facilities. Therefore, unlike the agreement in *Lake of the Torches*, the Agreements here lack the receivership provision that was one of the bases of the court's finding management there.

Proprietary Interest Analysis

Under the Development Agreement, Panther will receive a development fee of [ ] of the aggregate project costs. Additionally, under the Developer Loan, Panther will receive interest at a rate of [ ] of the first [ ] and [ ] on the balance. Although payment is not measured as a payment of gaming revenue, [ ] of development costs with interest rates of [ ] and [ ] respectively on the loan balance

b4

5

do raise concerns. Specifically, the development fee would be approximately[      ]
and interest on the loan would amount to[            ] This seems to be an incredible
return on Panther's investment, and this amount does not include any revenue received
from managing the facility. In other instances, we have opined that such a large
compensation structure would constitute a proprietary interest. Therefore, we must
examine why this situation is unique. Additionally, we must analyze whether the tribe is
getting value for the payment and whether Panther's risk is proportionate.

The parties have provided a detailed analysis of the risks involved as well an
analysis of the value to the Tribe. The most significant of the risks seems to be the
availability of credit and the competitiveness of the regional market.

At this time, no party other than Panther has committed any financing to the
proposed project. The Tribe selected Panther through a competitive bidding process in
which the Tribe received a total of[    ]other bids. After reviewing all the proposals, the
Tribe concluded that Panther's constituted "the very best terms the Tribe can obtain."
Moreover, in your letter you state that "but for Panther Partners this project would not be
going forward." Therefore, Panther seemed to be the only option for the Tribe. Panther
will be advancing the Tribe[        ]prior to the opening of the gaming facility and to
date has advanced[          ]This loan may be subordinate to the additional financing
required to complete the project. The repayment of this loan is tied to the Tribe obtaining
permanent financing and the success of the gaming operation. If the Tribe is unable to
obtain permanent financing or if the facility is not successful Panther could lose its
advance. Additionally, if the parties terminate their relationship, under certain
circumstances, prior to the opening of the casino then the Tribe[                    ]
the Developer Loan. (Development Agreement § 11). In addition to providing the initial
funds for the project, Panther offers a long resume of gaming management experience
which will be necessary considering the competition the Tribe faces.

There are approximately 20 other gaming facilities within the target market for
the Tribe's proposed casino. This represents a significant amount of direct competition
with the Tribe's proposed casino; competition that already has a well established
customer base. This risk is compounded by the fact that the proposed location is situated
farther from the areas highest population center than the majority of its competitors. This
facility will also be[                    ]than most of its competitors.
Specifically, this market includes the Pechanga Casino that hosts 4,000 slot machines,
214 table games, and 522 hotel rooms. Finally, it is important to note that the Tribe has
previously attempted to develop a casino project but those attempts failed. Contractual
obligations related to the most recent of these attempts have not yet been resolved and
may require further financial assistance from Panther.

As part of the management contract approval process, the parties submitted a
business plan that included projections of the facility's profits. These projections indicate
that the Tribe will be receiving over[    ]of the net gaming revenue from this facility.
Despite the development compensation structure and the management fee the Tribe will
be retaining the lion's share of the profits.

In light of these risks, the fee and interest rates while high are not out of proportion to the risk involved. More importantly, neither the fee nor the high interest rate reflects an ownership interest in the gaming operation. Finally, as previously noted, the agreements specifically exclude the possibility of management thereby strictly limiting Panther's ability to control the gaming activity.

Conclusion

The Agreements are collateral agreements that should be submitted as part of the management contract review. The Agreements are not, individually or collectively, management agreements that would require the approval of the Chairman. Finally, the Agreements do not grant Panther a proprietary interest in the gaming activity.

I anticipate that this letter will be the subject of Freedom of Information Act (FOIA) requests. Since we believe that some of the information contained herein may fall within FOIA Exemption 4(c), which applies to confidential proprietary information, the release of which could cause substantial harm, I ask that you provide me with your views regarding release within ten days.

I am also sending a copy of the submitted agreements to the Department of Interior Office of Indian Gaming for review under 25 U.S.C. § 81. If you have any questions please contact John Hay at (202) 632-7003.

Sincerely,

Penny J. Coleman
Acting General Counsel

cc:   Paula Hart, Office of Indian Gaming (w/ incoming)
      James Kawahara, Esq.
      Kent Richey, Esq.