UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

City of Duluth,

                Plaintiff,

vs.

Fond du Lac Band of Lake Superior
Chippewa,

                Defendant.

Case No. 0:09-cv-02668-ADM-RLE
Honorable Ann D. Montgomery

### Second Affidavit of Kevin K. Washburn

Kevin K. Washburn, being duly sworn, testify as follows:

1. I have been asked to opine as to whether the 1994 agreements between the City of Duluth and the Fond du Lac Band of Lake Superior Chippewa interfere with the Band's "sole proprietary interest" in its gaming operation in violation of federal legal and regulatory requirements. My qualifications are reflected in paragraphs 2 through 4 and my opinion begins at paragraph 5.

2. I am the Dean of the University of New Mexico School of Law. I have served in this capacity since July 1, 2009. Prior to the deanship, I was the Rosenstiel Distinguished Professor of Law at the University of Arizona (2008-09) and the Oneida Nation Visiting Professor of Law at Harvard Law School (2007-08). I began my academic career at the University of Minnesota Law School, where I served on the faculty from 2002-08. One of my principal areas of expertise is Indian gaming. I have taught courses in gaming law and Indian law. Prior to becoming an academic, I was the General Counsel of the National Indian Gaming Commission in Washington, D.C., where I served from January of 2000 to July of 2002 under Chairman Montie R. Deer. Before that, I served stints as a federal prosecutor and a civil trial attorney at the U.S. Department of Justice. After graduating from Yale Law School, I served as a law clerk to Judge Wm. C. Canby, Jr., of the Ninth Circuit, who authored the Nutshell on American Indian law. I first was exposed to legal issues involving Indian gaming during that clerkship. Since becoming an academic, I have testified often before Congress on matters involving Indian gaming. I serve as an executive editor of Cohen's Handbook of Indian Law and have principle responsibility for the chapter on Indian gaming, among others. I have also testified on several occasions in federal, state, and arbitral forums on such matters. A copy of my current curriculum vitae is attached to this affidavit as Exhibit A.


EXHIBIT 5

3. The Fond du Lac Band of Lake Superior Chippewa has retained me to explain the processes of the National Indian Gaming Commission ("Commission"), how the Commission's definition of "sole proprietary interest" has evolved since the Indian Gaming Regulatory Act ("IGRA") was enacted and the Commission was formed, how the Commission evaluates whether an entity other than an Indian tribe has taken a proprietary interest in a tribe's gaming activity, and – based on that information – how the Commission would evaluate the 1994 Agreements between the City of Duluth and the Band.

4. I have engaged in research on the sole-proprietary-interest standard for several years. When I was serving as general counsel to the NIGC, the provision began to attract a significant amount of attention because Indian gaming was beginning to be seen in some high-profile cases to benefit outsiders much more than Indian tribes. Since I left the Commission, I have also been consulted by various parties in matters in litigation in judicial or arbitral forums regarding the definition of "sole proprietary interest."

Opinion

5. Introduction: In the agreements in this case, the parties seem to have worked very hard to evade federal regulatory requirements. They did so, in part, by creating an unusual business structure in which the Band leased its own trust land to a third party which then sub-leased the land back to the Band. As a result, *the Band is paying millions of dollars of "rent" each year to lease land that it already owns.* Moreover, *the so-called "rent" that the Band is paying for the lease of its land is unrelated to the value of the land, and is likely to be many times higher than the market value of the land being "rented," suggesting that the agreements in this case create is a sham transaction designed to pay something other than "rent."* This agreement is highly unusual, and ought to have been highly suspicious. The NIGC today would be very likely to conclude that the agreement violates the Band's sole proprietary interest in its gaming operation by granting, in effect, an ownership interest to the City.

6. In 1994, in their effort to evade federal regulatory requirements, the parties successfully obtained the blessing of the key regulatory agency, which was then in its infancy, and the Court. There is no question that the parties sought to evade federal regulatory requirements. Indeed, the parties seem to have admitted that the original arrangement ran afoul of federal law. The unusual arrangement created by the 1994 Agreements was apparently intended to create technical compliance without substantially changing the substantive terms of prior agreements. The question is whether the parties can successfully evade federal law in this manner. If not, then the issue for the Court in this case is whether it should allow parties to collude to evade substantive federal legal requirements and undermine the intent of Congress and the rule of law.

2

7. It is not surprising that this question arises in a case involving Indian law; there is a long history of federal statutory protections for Indian tribes being eroded or ignored when it is expedient to do so. I suspect that the Commission and the court ignored troubling aspects of the arrangement in this case for two reasons. First, it involved two public entities seeking to work together around a controversial matter, which is ordinarily beneficial. And, second, the victim cooperated. The victim, of course, was the Band, which entered a contract that seems, in some respects, unconscionable and was induced to give away significant gaming revenues for no clear benefit. As a result, Congressional intent and the rule of law may well have been undermined.

8. Discussion: In IGRA, Congress authorized Indian gaming to be an *Indian tribal* resource. Congress sought to protect Indian gaming as a tribal resource by specifying that only Indian tribes can own and operate Indian gaming operations. The intent here was clear. President Ronald Reagan had made it a goal of his Indian policy to seek to wean tribes from the public fisc.[1] Congress enacted, and President Reagan signed, IGRA explicitly in order to "promote tribal economic development" and "tribal self-sufficiency."[2] It authorized gaming only for public revenues for tribes and it forbade tribes from alienating the right to conduct gaming on the reservation. In effectuating this intent, Congress specifically provided that the tribe retain the "sole proprietary interest" in the gaming operation.[3] As a result, it is clear that, although a tribe may contract with an outside party for specific services relative to a casino, including management of the gaming operation, it cannot sell the asset, the gaming operation itself. That asset, the casino, must be owned by the tribe. The single overarching purpose here was to insure that "the Indian tribe is the primary beneficiary of the gaming operation[.]"[4] Allowing non-tribal actors to become primary beneficiaries of Indian gaming would undermine President Reagan's goal of developing a significant resource for tribes with a view toward ultimate self-sufficiency.

9. IGRA is a single statute in a long line of federal laws, beginning with the Trade and Intercourse Acts, designed to protect Indians from outsiders seeking to profit from tribes. While few federal laws have absolutely forbidden outsiders from conducting business with tribes, numerous statutes have called for careful scrutiny of such business dealings. IGRA is within this category of federal laws requiring careful oversight of contracts between Indian tribes and outsiders. Prior to the enactment of IGRA, such contracts were regulated, if at all, primarily under a statute that required the Secretary of the Interior to review certain contracts related to the encumbrance or alienation of lands.

---

[1] 1 PUBLIC PAPERS OF THE PRESIDENT OF THE UNITED STATES: RONALD REAGAN, 1983, at 96, 97 (1984).
[2] 25 U.S.C. § 2702(1).
[3] 25 U.S.C. § 2710(b)(2)(A).
[4] 25 U.S.C. § 2702(2).

3

That statute, commonly known as Section 81, was originally enacted in 1871.[5] Congress enacted the law out of concern about the ability of individual Indians and Indian tribes to protect themselves in financial transactions, and primarily transactions involving land. Section 81 gave federal authorities the ability to review and approve (or disapprove) such contracts to protect Indian tribes from fraud and sharp dealing by non-Indians who might seek to take advantage of Indians. As Congress noted when it enacted IGRA, Section 81 primarily dealt with contracts that were relative to, or encumbered, Indian lands, and was not designed generally to deal with substantial contracts that may have no direct nexus to property. Thus, to close a perceived gap in the law,[6] when it enacted IGRA, Congress established the NIGC and shifted to the NIGC the authority to review certain contracts in the gaming realm, whether or not they might have been covered by Section 81.

10. The purposes for shifting this review to the NIGC reflected the distinct concerns of Congress in regulating this area. First, in the earliest debates leading up to the passage of IGRA, Congress was concerned about "over-reaching" by outside investors. Thus, in IGRA, Congress explicitly sought to insure that the Indian tribe, not the outsider, would be "the primary beneficiary" of Indian gaming. For example, at the heart of IGRA is a section that provides for the regulation of Indian tribal gaming contracts with outside management contractors.[7] To achieve this end, the management contract provisions explicitly limit the magnitude of revenues that outside managers can earn from Indian gaming operations and the time in which such a contract can run.[8] These provisions reflected the intention by Congress to protect Indian gaming and Indian tribes from outside profiteers and to insure that Indian gaming furthers tribal economic development and self-sufficiency.

11. Although IGRA created the NIGC in theory on October 17, 1988, the Commission did not issue its first regulations until 1993. At the time of the review of the 1994 Agreements, the Commission was in its infancy and had only a very small staff. Much of the focus in the early years at the NIGC was on management contractors and other private parties seeking to invest in Indian gaming and to obtain significant revenues. In the mid-1990s, however, the focus began to shift toward public entities that sought to take substantial revenues from Indian gaming operations. Unlike Minnesota, which did not seek a share of Indian gaming revenues in its tribal-state gaming compacts, many other state governments began to seek substantial shares of Indian gaming revenues.

---

[5] 25 U.S.C. § 81. In its current form, Section 81 reads as follows: "No agreement or contract with an Indian tribe that encumbers Indian lands for a period of 7 or more years shall be valid unless that agreement or contract bears the approval of the Secretary of the Interior or a designee of the Secretary."
[6] 25 U.S.C. §§ 2701(2) & 2711(h).
[7] 25 U.S.C. § 2711.
[8] *See generally* Kevin K. Washburn, *The Mechanics of the Indian Gaming Management Contract Approval Process*, 9 GAMING L. REV. 333 (2004).

4

These efforts produced significant litigation and ultimately resulted in legally imposed limits on revenue sharing for states in tribal-state gaming compacts. Ultimately, the legal principle that developed was that states cannot demand shares of tribal gaming revenues unless the state provides something in return, a *quid pro quo*. Otherwise, revenue sharing is unlawful. In most cases, the benefit offered by the state as the *quid pro quo* has been some level of "exclusivity" in gaming.[9] In other words, the states promised to protect the tribal gaming monopoly or oligopoly to limit the competition that Indian tribes face, insuring a substantial economic benefit to tribes.

12. In the late 1990s, the NIGC began to scrutinize more carefully other private investors. Some of this scrutiny was prompted by Congress, following media reports about a South African developer who allegedly earned hundreds of millions of dollars from the Mohegan Sun casino in Connecticut. Through the Mohegan Sun controversy, it became apparent that circumstances in Indian gaming were beginning to depart from the Congressional ideal articulated in IGRA that Indian tribes should be the "primary beneficiary" of Indian gaming. The NIGC soon turned to the "sole proprietary interest" standard to address numerous troubling gaming deals between outsiders and Indian tribes.

13. IGRA provides that each "Indian tribe will have the sole proprietary interest and responsibility for the conduct of any gaming activity" and each tribe must adopt an ordinance, enforceable by the NIGC, so providing before it conducts gaming.[10] Since the year 2000, the NIGC has issued dozens of letters admonishing tribes and their contracting counterparts not to enter contracts, or to revise existing contracts, that violated the "sole proprietary interest" standard.[11] While the Commission has not issued a regulation defining the statutory term, "sole proprietary interest,"[12] it has taken numerous enforcement actions based on violations of IGRA's requirement that an Indian tribe retain the "sole proprietary interest" in a tribal gaming activity.[13] One of those enforcement actions recently produced a fine of $5 million.[14] On most occasions, the NIGC has had to

---

[9] *See generally* NELL JESSUP NEWTON, ET AL., EDS., FELIX S. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW §12.05[2] (2005).

[10] 25 U.S.C. § 2710(b)(2)(A).

[11] Some of the NIGC opinion letters describing the "sole proprietary interest" principle can be viewed at: http://nigc.gov/ReadingRoom/SoleProprietaryInterestLetters/tabid/879/Default.aspx.

[12] *See* 25 U.S.C. § 2710(b)(2)(A).

[13] For an example of such an enforcement action, see NOV 99-33 against Seneca Junction (November 18, 1999), *available at* http://nigc.gov/ReadingRoom/EnforcementActions/tabid/124/Default.aspx.

[14] *See, e.g., In re the Matter of Ivy Ong and Carlo World Wide*, NIGC NOV 07-02 and CFA 07-02 - Final Decision and Order, January 18, 2008, ¶¶ 1 and 3 (levying a final civil fine of $5 million for violation of the sole proprietary interest principle) (attached as Exhibit B).

5

take no formal action because the mere threat has caused parties to revise their agreements, rendering enforcement unnecessary. The Department of the Interior has concurred in the Commission's understanding of the meaning of the "sole proprietary interest" standard.[15]

14. As a policy matter, I have expressed significant doubts about the efficacy of the NIGC's review of tribal economic arrangements in the context of the "sole proprietary interest" standard.[16] However, the NIGC has viewed its enforcement of the "sole proprietary interest" standard as a substantial and successful enforcement effort and has informed members of the United States Senate that the Commission has saved tribes millions of dollars through this initiative, serving the purposes of IGRA to support tribal self-sufficiency.[17]

15. Under the NIGC's interpretation of the "sole proprietary interest" standard, the question is whether the tribe has alienated any part of the gaming operation, such that another party has effectively obtained part ownership. In general, as can be seen from reviewing dozens of letters the NIGC has written on the "sole proprietary interest" standard, the NIGC has tended to consider certain factors in determining whether an agreement violates the "sole proprietary interest" standard. As interpreted for the facts in this case in light of the 1994 Agreements, the factors to be considered here would include, but are not limited to, the following:

- The percentage of any payment by the Band to the City expressed as a percentage of the casino's net revenue;

- The length of the payment term;

---

[15] Memorandum from the Associate Solicitor, Division of Indian Affairs, to the Director of the Office of Indian Gaming Management, regarding the review of a lease between Lake Sakakawea Associates (LSA) and the Three Affiliated Tribes of the Fort Berthold Reservation (October 10, 2002).

[16] *See, e.g.*, Kevin K. Washburn, et al., *Paternalism or Protection?: Federal Review of Tribal Economic Decisions in Indian Gaming*, 12 GAMING L. REV. & ECON. 435 (2008) (transcript of a discussion at Harvard Law School organized by Professor Washburn and others). *See also* Kevin K. Washburn, *Prepared Statement and Oral Testimony*, Oversight Hearing on the Regulation of Indian Gaming, United States Senate, Committee on Indian Affairs (John McCain, Chairman), 109th Cong., 1st Sess. (April 27, 2005).

[17] Letter from Philip N. Hogen, Chairman, NIGC, to Senator John McCain, Chairman, Senate Committee on Indian Affairs, et al., p. 6 (February 1, 2005) (describing contracts in which an outside investor receives compensation that bears no relationship to the value of the services provided as "illegal and unconscionable" because it is akin to "a fractional ownership" interest that violates IGRA's requirement that tribes retain the "sole proprietary interest" in the gaming operation) (attached as Exhibit C).

6

- Whether (and how) the Band's payment is tied to casino profits;

- Whether the Band's payment is structured as "rent";

- Whether the 1994 Agreements grant any security interests to the City;

- What services or other consideration the Band has received from the City in return for the payment;

- The extent of the risk the City has taken on;

- The "market rate" for services comparable to those the City provides to the Band; and

- Whether the 1994 Agreements include any features of a management contract.

16. As I stated in my prior Affidavit, I cannot fully analyze these factors to my own satisfaction in the time I have been allowed and with the information currently available. More information would be needed to conduct this analysis most effectively. For example, one would need appraisal data of the market value of the land that the Band is ostensibly "leasing" from the Commission and market rates for equivalent rental land to determine whether the "lease" can fairly be characterized as such. It is likely that, in this case, the arrangement here is not what an ordinary person would characterize as a lease at all but is designed to obfuscate a very different type of financial arrangement. It would also be helpful to obtain information on the amount of revenues that the city has received from the lease arrangement to insure that the "rent" payments are fair for a "lease" transaction. I suspect that such data would be damning to the characterization of the arrangement here as a "lease"; it would be the kind of data that the NIGC might seek to discover in its analysis.

17. Despite the lack of full information available to me, the NIGC has applied the factors set forth above in dozens of letters in the past ten years and I have reviewed most of these letters in some form and am familiar with the Commission's analysis. As a result, I can provide some observations as to the significant concerns that the NIGC would likely have with the 1994 Agreements in this case.

18. The terms of this transaction are highly unusual. To "lease" land that the Band already owns, and on which the casino is located, the Band must pay "rent" to the City equal to 19 percent of the gross revenues that the Band earns from video games of

7

chance.[18] The term of the agreement is roughly 18 years, with a term for renewal for another 25 years. Under standard NIGC analysis under the "sole proprietary interest" standard, the NIGC would likely find myriad problems with this arrangement, as set forth below.

19. First, Indian gaming can generally only occur on land owned by a tribe. The Band is the beneficial owner of the land, and the lease to the commission interferes, to some degree, with this ownership and undermines the federal legal requirement that Indian gaming can occur only on Indian lands.[19] The need for the Band to lease out and then lease back its own land creates an artificial transaction that is highly suspect. To any neutral observer, the lease-leaseback arrangement looks like a sham transaction designed to allow a third party into a deal in which the third party is unnecessary.

20. Second, the NIGC is usually skeptical when a non-tribal entity takes a share of gaming revenues and seeks to characterize this payment as "rent." Here, the Band is paying "rent" to the City that is entirely unrelated to the value of the leased land. The rent payment is calculated not on the value of the land leased but on the income from video games of chance, i.e., slot machines. To the NIGC, such an arrangement would look more like a joint venture in a gaming operation than a payment for a lease of land.[20]

21. Third, there is no cap on the amount of rent that the Band must pay. This fact undermines the notion that the City (or the Commission) is a landlord and the Band merely is a renter with a lease. Under typical NIGC analysis, which looks beyond the form to the facts of the transaction, the Band and the City are sharing income in the business, more in accord with a joint venture. In sum, the parties simply do not have a relationship that looks like the traditional relationship between a landlord and tenant; under the standard NIGC analysis, it looks like these two parties are sharing revenues in a manner more akin to partners in a gaming operation.[21] While such an arrangement might

---

[18] Sublease and Assignment of Gaming Rights Agreement Between Duluth Fond du Lac Economic Development Corporation and Fond du Lac Band of Lake Superior Chippewa at § 4.1, pp. 10-11 (June 20, 1994).

[19] *See* 25 U.S.C. §2703(4)(a)&(b) (definition of Indian lands).

[20] *See, e.g.*, Letter from Penny J. Coleman, Acting General Counsel, NIGC, to Chairman Mitchell Cypress, Seminole Tribe of Florida (June 5, 2003) at 9 ("The most obvious indicator of CCG's proprietary interest in the gaming operation at Coconut creek is found in the high percentage payments of net gaming revenue, which, when considered along with the lease provisions discussed above, suggest a profit-sharing arrangement between the Tribe and CCG under the auspices of 'rent.'") (attached as Exhibit D). Note: the NIGC letters cited herein and attached hereto have been obtained and collected from various public sources, such as the Commission's website.

[21] In an opinion arising related to a gaming operation in California with facts somewhat analogous to the present case, the NIGC explained its concerns with a 16% "rent"

not be unlawful outside of Indian gaming, the NIGC would likely conclude that this arrangement undermines the Band's "sole proprietary interest" in its gaming operation.

22. Fourth, the rate of "rent" might well be found to be far higher than the purchase value of the land being rented. In the course of the 18 years (or up to 43 years) term of the sublease, the Band may well pay rent that is many times more than the fair market value of the land itself. This would suggest that the Band is actually paying the City something other than "rent." Discovery would be necessary to determine the value of the land that the Band is ostensibly "leasing" under this arrangement. Moreover, the length of this agreement is very long in comparison to other agreements found troubling by the NIGC and the value of the payments appears extremely high.

23. Fifth, the rental rate may also undermine the Band's Congressionally-mandated role as the "primary beneficiary" of the Indian gaming activity. The City's "rent" payment of 19 percent of gross revenues from video games of chance is a substantial payment that may well exceed even the share that Congress has explicitly authorized for approved management contractors. Indeed, typical gaming venues at the present time, slot machine revenues represent the substantial majority of all gaming revenues. Because the City's "rent" is based on gross revenues, the City's rental payment comes off the top. The Band must make payroll and all of its other expenses out of the remaining 81% of revenues. As a result, when final figures are calculated, the City may, in some years, earn net revenues that rival those earned by the Band.[22] If so, the sublease agreement may well undermine the IGRA requirement that the Indian tribe be the *primary* beneficiary of an Indian gaming operation.

24. In its "sole proprietary interest" analysis, the NIGC sometimes recognizes value if the non-tribal party, here the City, is taking on significant financial risk, such as making a multi-million dollar loan which would justify the large payments. To my knowledge, the City has undertaken no significant financial risks in this case that would justify outsized returns. Nor has the City apparently offered services commensurate with the revenue that the City has received. For these reasons, if the NIGC reviewed this transaction today, the NIGC would be likely to find that the sublease is inconsistent with the NIGC's understanding of the "sole proprietary interest" standard.

---

payment this way: "Although the 16% payment is called an "Incentive Rent" payment, this label mischaracterizes what is really a profit-sharing arrangement." Letter from NIGC Acting General Counsel Penny J. Coleman to Chairperson Merlene Sanchez, Guidiville Rancheria, p. 4 (July 21, 2004) (attached as Exhibit E).

[22] In the California opinion letter cited above, the NIGC found that a payment equivalent to 16% of gross revenues would equal more than 50% of net revenues based on figures the NIGC collected from California gaming operations in 2001-02. See Letter from NIGC Acting General Counsel Penny J. Coleman to Chairperson Merlene Sanchez, Guidiville Rancheria, p. 4 (July 21, 2004) (Exhibit E).

25. The primary regulatory remedy for a violation of the "sole proprietary interest" principle is an action by a tribal gaming commission or the NIGC to close a facility or levy a fine against a tribal operator or perhaps an outside contractor. As expressed in IGRA, the right to engage in Indian gaming is a tribal public right, not a private right or a state or municipal right. The tribe must retain ownership of the gaming enterprise and is forbidden from alienating its right to conduct gaming to an outsider. In sum, if this principle has been violated, the NIGC could bring an enforcement action.

26. Ultimately, the question here is whether the 1994 Agreements violate the rule of law. I believe that the NIGC would answer that question in the affirmative. That said, the Court's insight is apt that there has been a lot of opinion and very little "controlling" law addressing the substantive issue of what constitutes a violation of Congress's "sole proprietary interest" standard. Order, p. 16. The Court would perform a valuable service to the public, the NIGC, the Indian gaming industry as a whole, non-tribal contractors, Indian tribes, and Indian people if it would reach the substantive issue of whether the 1994 Agreements violated IGRA's "sole proprietary interest" principle. Millions of dollars of revenues invested throughout the United States ride on the question of what Congress meant by "sole proprietary interest." This Court can provide more authoritative guidance on that question than any academic, or apparently the NIGC, can.

Further affiant sayeth not.

_____
Kevin K. Washburn

Subscribed and sworn to before me this

13 th day of January, 2010.

_____
Notary Public

10

Exhibits to this Affidavit

A – Curriculum Vita of Kevin Washburn.

B – NIGC Final Decision and Order, *In re the Matter of Ivy Ong and Carlo World Wide*, NIGC NOV 07-02 and CFA 07-02, January 18, 2008.

C – Letter from Philip N. Hogen, Chairman, NIGC, to Senator John McCain, Chairman, Senate Committee on Indian Affairs, et al. (February 1, 2005).

D – Letter from Penny J. Coleman, Acting General Counsel, NIGC, to Chairman Mitchell Cypress, Seminole Tribe of Florida (June 5, 2003).

E – Letter from NIGC Acting General Counsel Penny J. Coleman to Chairperson Merlene Sanchez, Guidiville Rancheria (July 21, 2004).

11